# EXHIBIT
# 1



**Patricia GRIMAUD-PALMERO**
**Huissier**
**Tél. 97 77 48 48**
**20 Bd de Suisse**
**98000 MONACO**

Ordonnance n°14.290 portant application de
la Loi n°1221 du 9 novembre 1999

ENREGISTRÉ à MONACO, le       0 1 AOÛT 2019
F°/Bd    *13.1*   Case   *6*
Reçu dix Euros

# SIGNIFICATION DE PIECES

SECOND ORIGINAL

**L'AN DEUX MILLE DIX NEUF ET LE TRENTE ET UN DU MOIS DE JUILLET**

## À LA REQUETE DE :

La Société dénommée **INTERNATIONAL PETROLEUM PRODUCTS AND ADDITIVES COMPANY INC., en abrégé IPAC,** société Californienne, ayant son siège social sis 7600 Dublin Blvd, Suite 240 CA 94568 DUBLIN, USA, agissant poursuites et diligences de son Président en exercice, domicilié ès qualités audit siège.

Élisant domicile en l'Etude de **Maître Arnaud ZABALDANO**, Avocat-Défenseur près la Cour d'Appel de Monaco, y demeurant en cette qualité 31, Avenue Princesse Grace, L'Estoril, Bloc A.



*Je soussignée Patricia GRIMAUD-PALMERO,*
*Huissier près la Cour d'Appel de Monaco, y demeurant 20 Bd de Suisse.*

**Conformément aux dispositions de la Convention de la Haye du 15 novembre 1965 relative à la signification et la notification à l'étranger des actes judiciaires et extrajudiciaires en matière civile ou commerciale.**

## AI SIGNIFIE ET EN TETE DES PRESENTES DONNÉ COPIE À :

La société dénommée **BLACK GOLD**, Société à Responsabilité Limitée, immatriculée au Répertoire du Commerce et de l'Industrie de Monaco sous le N° 11 S 05485, ayant son siège social sis 6, Lacets Saint Léon, « Périgord I », Bloc K, 3ème étage, N°209, 98000 Monaco, prise en la personne de son Gérant en exercice, **Monsieur Lorenzo NAPOLEONI**, y domicilié ès qualité.

### Où étant et parlant à :

*N'ayant trouvé personne, je me suis rendue à la Mairie de Monaco où j'ai déposé la copie, parlant à Monsieur le Maire qui a visé l'original et j'ai avisé le requis par lettre recommandée conformément à la Loi.*



**Vu et reçu copie**
**Monaco, le** *31 07 19*
**pour le Maire**

ACT1907250

1

**- DE SIX DOCUMENTS INTITULÉS :**

1) Petition to confirm arbitral award and enter judgment thereon, du 31 mai 2019 **en langue anglaise et sa traduction en français.**

2) Joshi declaration in support of petition and motion to confirm arbitral award and enter judgment thereon, **en langue anglaise et sa traduction en français.**

   **2.1.** Exhibit 1 : copy of a Sales Representative Agreement, effective January 1, 2016, between IPAC and Black Gold S.A.R.L., **en langue anglaise et sa traduction en français.**

   **2.2.** Exhibit 2 : copy of an Exclusive Distributor Agreement, effective january 1, 2016, between IPAC and Black Gold, **en langue anglaise et sa traduction en français.**

   **2.3.** Exhibit 3 : copy of an arbitration award, dated May 30,2019, *in International Petroleum Products and Additives Co.* Inc. V. Black Gold S.A.R.L., AAA Case N°.01-18-0001-9728, before the International Centre for Dispute Resolution of the American Arbitration Association, **en langue anglaise et sa traduction en français.**

3) – Summons in civil action to Black Gold, du 4 juin 2019 **en langue anglaise et sa traduction en français.**

Et aux fins qu'elle n'en ignore, je lui ai remis et laissé copie du présent, étant et parlant comme devant.

**SOUS TOUTES RESERVES**

**COUT : CINQ CENT CINQUANTE ET UN EUROS**

(A 23 euros, Marie)

1   Vinay V. Joshi (Calif. Bar No. 213487)
    vjoshi@thepatentattorneys.com
2   Anthony S. Kim (Calif. Bar No. 225703)
    akim@thepatentattorneys.com
3   Amin Turocy & Watson LLP
    160 West Santa Clara Street
4   Suite 975
    San Jose CA 95113
5   Telephone: (650) 618-6481
    Facsimile:  (216) 696-8731
6

7   Counsel for Petitioner
    International Petroleum Products and Additives Company, Inc.
8

9                       **UNITED STATES DISTRICT COURT**
                        **NORTHERN DISTRICT OF CALIFORNIA**
10

11  INTERNATIONAL PETROLEUM PRODUCTS          Case No. TBD
12  AND ADDITIVES COMPANY, INC.,
                                              **PETITION TO CONFIRM ARBITRAL**
13                  Petitioner,               **AWARD AND ENTER JUDGMENT**
                                              **THEREON**
14          v.
                                              [Filed concurrently with (1) Notice of Motion
15  BLACK GOLD S.A.R.L.,                      and Motion to Confirm Arbitral Award and
                                              Enter Judgment Thereon; (2) Declaration of
16                  Respondent.               Vinay Joshi in Support of Petition and Motion
                                              to Confirm; (3) [Proposed] Order Granting
17                                            Motion to Confirm; (4) Fed. R. Civ. P. 7.1
                                              Notice of Interested Parties; and (5) Civil L.R.
18                                            3-15 Certification of Interested Parties]
19

20          International Petroleum Products and Additives Company, Inc. ("IPAC") hereby petitions
21
    this court pursuant to 9 U.S.C. section 9 for an order confirming an arbitral award ("Arbitral
22
    Award") from the International Centre for Dispute Resolution ("ICDR") of the American
23
    Arbitration Association ("AAA") in favor of IPAC and against Respondent Black Gold S.A.R.L.
24
    ("Black Gold"), AAA Case No. 01-18-0001-9728, and requests that the Court enter judgment
25
    thereon.
26
            The Petition is made on the following grounds:
27

28

## THE PARTIES

1.      IPAC is a California corporation with its principal place of business at 7600 Dublin Boulevard # 240, Dublin, CA 94568.  IPAC has been a leader in the petrochemical additive marketplace for over ten years.  Broadly, an additive is a mixture of chemical compounds that is intended to be combined with a petroleum product.  The resulting finished product, *e.g.*, engine motor oil, is a mixture of additive and petroleum product that has one or more characteristics conferred on it by the additive, such as thermal/oxidative stability, rust protection, protection from deposit building, viscosity, wear, pitting, spalling, scoring, rust, corrosion, foaming, and demulsibility.  IPAC's products include additives for industrial, driveline (transmission), crankcase (engine), grease, and fuel applications.  Since its founding, IPAC has been rooted in delivering quality additives to customers and providing them with sound and cost-effective options to solve problems.  To do this, IPAC employs a team of research and development chemists who continue to build the IPAC family of products, develop new products to meet the ever-changing needs of IPAC's customers, and strengthen IPAC's manufacturing capabilities.  All IPAC products are subjected to stringent laboratory testing for the latest requirements and specifications.

2.      Black Gold is a Monegasque limited liability company with its principal place of business at 6, Lacets Saint-Léon, in the Principality of Monaco.  On information and belief, Black Gold is a seller and distributor of petroleum products and additives.  Black Gold's sole shareholders are a married couple, Lorenzo and Sofia Napoleoni ("Lorenzo" and "Sofia", respectively), both of whom are citizens of Italy and residents of Monaco.  Other than Lorenzo and Sofia, Black Gold has no employees, officers, directors, or other persons with an ownership or beneficial interest in Black Gold.

## JURISIDICTION AND VENUE

3.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. section 1331 because this action arises at least in part under the Federal Arbitration Act, 9 U.S.C. section 9.

1    4.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. section 1332 because

2 there is complete diversity of citizenship among the parties and the amount in controversy,

3 exclusive of interest and costs, exceeds $75,000.

4    5.    The Court has personal jurisdiction over Black Gold because Black Gold is a party to

5 agreements containing an arbitration clause providing for arbitration of disputes in San Francisco,

6 California.  In addition, personal jurisdiction over Black Gold is appropriate pursuant to the

7 California Long Arm Statute, California Code of Civil Procedure section 410.10, because Black

8 Gold has directed activities toward IPAC in California, resulting in injury to IPAC within

9 California.

10    6.    Venue is proper in the Northern District of California pursuant to 28 U.S.C. section

11 1391 and 9 U.S.C. section 9 because the arbitration was held in San Francisco and the Arbitral

12 Award was made in San Francisco.  Moreover, venue is proper because a substantial part of the

13 events or omissions giving rise to the claims occurred in this District.

14    **THE AGREEMENTS TO ARBITRATE**

15    7.    IPAC entered into two separate agreements with Black Gold concerning IPAC's

16 additives business.  Under those agreements, Black Gold had two roles: sales representative and

17 distributor.

18    8.    Pursuant to a Sales Representative Agreement effective January 1, 2016 ("Sales

19 Representative Agreement"), Black Gold acted as a sales representative on behalf of Black Gold.

20 Under the Sales Representative Agreement, Black Gold received a percentage commission on sales.

21 The Sales Representative Agreement provided that certain customers would be exclusive to Black

22 Gold, provided that Black Gold met certain agreed-upon sales targets (also known as "budget" or

23 "sales budget"), as set forth in Schedule B.  The Sales Representative Agreement had an initial term

24 of three years, with automatic renewal for additional three year periods, pursuant to Section 5.

25 However, failure to meet sales budget or to agree upon a sales budget for the next year would

26 constitute cause for termination, pursuant to Section 6.  Pursuant to Section 15, during the term of

27 the Sales Representative Agreement, Black Gold agreed not to sell any products that compete with

28

3

1    IPAC's, with the exception of polymer products.  Black Gold also agreed to keep IPAC information

2    confidential, pursuant to Section 12.  Upon termination, Black Gold was obliged to return IPAC

3    information to IPAC, and to maintain the confidentiality of IPAC confidential information, pursuant

4    to Sections 8 and 12.  A true and correct copy of the Sales Agreement is attached as Exhibit 1 to the

5    Declaration of Vinay Joshi ("Joshi Declaration").

6        9.       Section 19 of the Sales Representative Agreement contains the following arbitration

7    provision:

8        <u>Arbitration</u>. Any dispute or controversy between the parties arising out of or relating to this
         Agreement, including without limitation, a dispute or controversy relating to the
9        construction of any provision or the validity or enforceability of any term or condition
         (including this Section 18 [sic]) or of the entire Agreement, or any claim that all or any part
10       of this Agreement (including this provision) is void or voidable, shall be submitted to
         arbitration before a single arbitrator in accordance with the Commercial Rules of Arbitration
11       of the American Arbitration Association then in effect, at an office of or designated by the
         American Arbitration Association in the City of San Francisco, California. Each party shall
12       bear its costs in any such proceeding. The decision of the arbitrator shall be final and
         binding upon the parties and may be enforced in any court of competent jurisdiction. To the
13       fullest extent permitted by law, the parties irrevocably submit to the jurisdiction of such
         forum and waive any objection it may have to either the jurisdiction or venue of such forum.
14

15       10.      Pursuant to an Exclusive Distributor Agreement effective January 1, 2016

16   ("Exclusive Distributor Agreement"), Black Gold also acted as a distributor of IPAC products.

17   The Exclusive Distributor Agreement allowed Black Gold to purchase IPAC's products for resale

18   (with markup) to downstream customers.  Those distribution customers placed their orders with

19   Black Gold, and IPAC did not have any visibility into Black Gold's distribution activities.  The

20   Exclusive Distributor Agreement had an initial term of one year, with provision for renewal,

21   pursuant to Section XV.  Pursuant to Section VIII, Black Gold agreed not to render service to any

22   other business directly competitive with the business of IPAC, and to maintain the confidentiality of

23   IPAC confidential information.  As with the Sales Representative Agreement, the Exclusive

24   Distributor Agreement provided for certain customer accounts to remain exclusive, provided that

25   Black Gold meet annual sales budget, as set forth in Schedule B.  Upon termination the Exclusive

26   Distributor Agreement, at Section XV.C, provides that Black Gold shall surrender and return all

27   materials to IPAC, and to take reasonable steps to transfer a viable business to IPAC with respect to

28                                                4

1  Black Gold's distribution customers.  A true and correct copy of the Exclusive Distributor

2  Agreement is attached as Exhibit 2 to the Joshi Declaration.

3       11.    Section XVI.E of the Exclusive Distributor Agreement contains the following

4  arbitration provision:

> Disputes. Any controversy or claim arising out of or in relation to this Agreement, or the
> breach or alleged breach thereof, which cannot be settled amicably, shall be settled by
> arbitration in accordance with the Commercial Arbitration Rules of the International
> Arbitration Association and the provisions of this Section. Any party may initiate arbitration
> by giving written notice to the other party of an intention to arbitrate and by filing with the
> Centre for International Commercial Arbitration located in San Francisco, California (or
> such other Centre location as the parties may agree) three (3) copies of such notice and three
> (3) copies of this Agreement together with the appropriate filing fee. The arbitration shall be
> conducted before three (3) arbitrators who shall be appointed in accordance with the said
> rules. The arbitration proceedings shall be held at the Centre location agreed to by the
> parties and shall be subject to the above arbitration rules. The arbitrators may grant any legal
> and/or equitable relief to which a party may be entitled under the law or legal theory under
> which the party seeks relief, provided, however, that no claim may be made for any special,
> indirect, consequential, or punitive damages arising out of or related to this Agreement, or
> any act, omission, or event occurring in connection therewith, except that punitive damages
> may be awarded for willful or wanton misconduct. The arbitration award shall be given
> within three (3) months from appointment of the third arbitrator. The award given by the
> three arbitrators or the majority thereof, shall be final and binding on the parties and shall be
> subject to no appeal. The award shall not serve as precedent or authority in any subsequent
> proceeding, provided, however, that if the losing party should fail to comply with the award,
> the prevailing party may apply to any court having jurisdiction for an order confirming the
> award in accordance with applicable law. The award can be enforced in any court having
> jurisdiction. Unless otherwise required by law or court orders, the substance of any
> arbitration proceedings shall be kept confidential by all parties and by the arbitrators;
> however, the fact that such a proceeding exists, or that an award has been rendered, need not
> be kept confidential. The costs of the proceeding, including the fees and costs of attorneys,
> accountants, and witnesses, and the compensation of the arbitrators, shall be assessed by the
> arbitrators against the parties according to the arbitrators' determination of fault.

     12.    Pursuant to Section XVI.F of the Exclusive Distributor Agreement, the parties

agreed that their rights and obligations would be governed by California law.

### THE ARBITRATION

     13.    Pursuant to the foregoing Sales Representative and Exclusive Distributor

Agreements, IPAC filed an arbitration demand before AAA on or about May 7, 2018.  In the course

of the arbitration, IPAC claimed that Black Gold had breached both agreements, breached the duty

of good faith and fair dealing, and breached the duty of loyalty.  IPAC also pursued claims for

tortious interference with contractual relations and trade secret misappropriation.

14.     The arbitration was conducted before an arbitrator of the ICDR based in San Francisco, California.  The merits hearing occurred February 4-6, 2019 before the arbitrator in San Francisco.

15.     On May 30, 2019, the arbitrator issued the Arbitral Award in IPAC's favor and against Black Gold, in the amount of $1,094,193.58 as follows: $687,702.56 in compensatory damages; $305,138.65 in attorneys' fees and costs; and $101,352.37 as reimbursement for IPAC's payment of administrative fees and expenses and arbitrator compensation.  The arbitrator further awarded injunctive relief in favor of IPAC and against Black Gold.  A true and correct copy of the Arbitral Award is attached as Exhibit 3 of the Joshi Declaration.  All parties were served with the award on May 30, 2019.

## CONFIRMATION OF THE AWARD

16.     The Federal Arbitration Act, 9 U.S.C. section 1 *et seq.*, provides for the judicial recognition and enforcement of arbitration mechanisms.  Section 9 provides that, if the parties in their agreement have specified a particular court, at any time within one year after an arbitration award is made, any party to the arbitration may apply to the court specified for an order confirming the award.  If no court is specified in the parties' agreement, then such application may be made to the United States court in and for the district within such award was made.  Section 9 further provides that the court must grant such application unless the award is vacated, modified, or corrected as prescribed in Sections 9.

17.     Furthermore, the Sales Representative and Exclusive Distributor Agreements provide that any arbitration award, such as the Arbitral Award, may be enforced in any court having jurisdiction.

18.     This Petition to Confirm is made within one year of the date the Arbitral Award was issued.

## PRAYER FOR RELIEF

WHEREFORE, IPAC respectfully requests that the Court issue an order confirming the Arbitral Award and entering judgment in favor of IPAC and against Black Gold for the following:

6

1       A.    Compensatory damages in the amount of $687,702.56, as specifically set forth in the

2   Arbitral Award;

3       B.    Attorneys' fees and costs in the amount of $305,138.65, as specifically set forth in

4   the Arbitral Award;

5       C.    Reimbursement for IPAC's payment of administrative fees and expenses and

6   arbitrator compensation in the amount of $101,352.37, as specifically set forth in the Arbitral

7   Award;

8       D.    Attorneys' fees and costs incurred by IPAC in its continuing efforts to collect on the

9   Arbitral Award and/or the judgment entered by this Court, according to proof, from the date of the

10  award until the total judgment amount is fully paid;

11      E.    Injunctive relief against Black Gold and any and all persons or entities acting in

12  concert with it or in participation with it or in support of it or in combination with it or in collusion

13  with it or in conspiracy with it, as specifically set forth in the Arbitral Award; and

14      F.    Any such other and further relief as the Court deems just and proper under the

15  circumstances.

16

17  Dated:  May 31, 2019

18                           */s/ Vinay V. Joshi*

Vinay V. Joshi

19                           vjoshi@thepatentattorneys.com

Anthony S. Kim

20                           akim@thepatentattorneys.com

Amin Turocy & Watson LLP

21                           160 West Santa Clara Street

Suite 975

22                           San Jose CA 95113

23                           Telephone: (650) 618-6481

Facsimile:  (216) 696-8731

24

25                           ***Attorneys for Petitioner***

***International Petroleum Products and***

26                           ***Additives Company, Inc.***

27

28                     7

# TRADUCTION

Vinay V. Joshi (Barreau californien n° 213487)
vjoshi@thepatentattorneys.com
Anthony S. Kim (Barreau californien ° 225703)
akim@thepatentattorneys.com
Amin Turocy & Watson LLP
160 West Santa Clara Street
Suite 975
San Jose CA 95113
Téléphone : (650) 618-6481
Télécopie : (216) 696-8731

Avocat du Demandeur
International Petroleum Products and Additives Company, Inc.

## TRIBUNAL DE DISTRICT DES ÉTATS-UNIS
## DISTRICT NORD DE LA CALIFORNIE

| | |
|---|---|
| INTERNATIONAL PETROLEUM PRODUCTS AND ADDITIVES COMPANY, INC., | Affaire n° : à déterminer |
| Demandeur, | |
| c. | **PÉTITION EN CONFIRMATION DE LA SENTENCE ARBITRALE ET EN INSCRIPTION DU JUGEMENT** |
| BLACK GOLD S.A.R.L., | [Déposée en même temps que (1) Avis de motion et requête en confirmation de la sentence arbitrale et en inscription du jugement ; (2) Déclaration de Vinay Joshi à l'appui de la pétition et de la requête en confirmation; (3) [proposée] Ordonnance visant à confirmer la requête en confirmation; (4) Règles de procédure civile fédérales P. 7.1 Avis des parties intéressées; et (5) Règles du droit civil 3-15 Certification des parties intéressées] |
| Défendeur, | |

Par la présente, la société International Petroleum Products and Additives Company, Inc. (« IPAC ») requiert que le tribunal, conformément à la section 9 de l'U.S.C. 9, en application d'une ordonnance confirmant une sentence arbitrale (« Sentence arbitrale ») du Centre international pour la résolution des conflits (« ICDR ») de l'Association d'arbitrage américaine (« AAA ») en faveur de IPAC et contre l'intimé Black Gold S.A.R.L. (« Black Gold »), affaire AAA n ° 01-18-0001-9728, et demande au tribunal d'inscrire son jugement dans cette affaire.

La pétition est fondée sur les motifs suivants :

# TRADUCTION

## LES PARTIES

1. IPAC est une société californienne dont le siège principal est situé à 7600 Dublin Boulevard n° 240, Dublin, CA 94568. IPAC a été un chef de file sur le marché des additifs pétrochimiques depuis plus de dix ans.  Généralement, un additif est un mélange de composés chimiques destiné à être combiné avec un produit pétrolier.  Le produit fini obtenu, par exemple une huile pour moteur, est un mélange d'additifs et de produit pétrolier présentant une ou plusieurs caractéristiques qui lui sont conférées par les additifs, tels que la stabilité thermique et oxydative, la protection contre la rouille, la protection contre accumulation des dépôts, viscosité, usure, corrosion par piqûres, écaillage, entaillage, rouille, corrosion, moussage et désémulsibilité. Les produits de IPAC comprennent des additifs pour les applications industrielles, telles que transmission, carter de moteur, graisses, et applications liées aux combustibles.  Depuis sa création, IPAC vend des additifs de qualité à ses clients et leur fournit des options saines et rentables pour résoudre les problèmes.  Pour ce faire, lPAC emploie une équipe de chimistes en recherche et développement qui continuent à agrandir la famille de produits IPAC, à développer de nouveaux produits pour répondre aux besoins en constante évolution des clients IPAC, et à renforcer les capacités de fabrication de IPAC.  Tous les produits IPAC sont soumis à des tests de laboratoire rigoureux pour les dernières exigences et spécifications.

2.	Black Gold est une société monégasque à responsabilité limitée dont le siège principal est situé au 6, Lacets Saint-Léon, dans la Principauté de Monaco. Sur la base de l'information et de la croyance, Black Gold est un vendeur et un distributeur de produits pétroliers et d'additifs. Les actionnaires uniques de Black Gold sont un couple marié, Lorenzo et Sofia Napoleoni (« Lorenzo » et « Sofia », respectivement), tous deux citoyens de l'Italie et résidents de Monaco. Outre Lorenzo et Sofia, Black Gold n'a aucun employé, dirigeant, administrateur ou autre personne ayant un droit de propriété ou un intérêt bénéficiaire dans Black Gold.

## JURIDICTION ET LIEU

3.	Le Tribunal est compétent en vertu de la section 1331 du 28 U.S.C. parce que cette action découle au moins en partie du Federal Arbitration Act, 9 U.S.C., section 9.

2

# TRADUCTION

4.    Le Tribunal est compétent en vertu de la section 1332 du 28 U.S.C. parce qu'il existe une diversité complète de citoyenneté entre les parties et que le montant en cause, hors intérêts et frais, dépasse 75 000 $.

5.    Le Tribunal a compétence personnelle sur Black Gold, car Black Gold est partie aux contrats contenant une clause compromissoire prévoyant l'arbitrage des différends à San Francisco, Californie. En outre, la compétence personnelle à l'égard de Black Gold est appropriée en vertu du California Long Arm Statute, article 410.10 du Code de procédure civile de Californie, car Black Gold a orienté ses activités vers IPAC en Californie, causant des dommages à IPAC dans l'état de Californie.

6.    Le lieu est approprié dans le district nord de la Californie conformément à 28 U.S.C. section 1391 et 9 U.S.C. section 9 parce que l'arbitrage a eu lieu à San Francisco et que la sentence arbitrale a été rendue à San Francisco. De plus, le lieu est approprié, car une partie substantielle des événements ou omissions donnant lieu aux réclamations sont survenues dans ce district.

## LES CONTRATS SOUMIS À ARBITRAGE

7.    IPAC a conclu deux contrats distincts avec Black Gold concernant la commercialisation des additifs IPAC. Aux termes de ces contrats, Black Gold avait deux rôles : représentant commercial et distributeur.

8.    Aux termes d'un contrat de représentation commerciale en vigueur à compter du 1er janvier 2016 (le « Contrat de représentation commerciale »), Black Gold a agi en tant que représentant commercial pour le compte de Black Gold. En vertu du contrat de représentation commerciale, Black Gold percevait un pourcentage de commission sur les ventes. Le contrat de représentation commerciale prévoyait que certains clients seraient les clients exclusifs de Black Gold, à condition que Black Gold atteigne certains objectifs de vente convenus (également appelés « budget » ou « budget de vente »), comme indiqué à l'annexe B. Le contrat de représentation commerciale avait une durée initiale de trois ans, avec renouvellement automatique pour des périodes supplémentaires de trois ans, conformément à l'article 5. Cependant, le non-respect du budget de vente ou de l'adoption d'un budget de vente pour l'année suivante constituerait un motif de résiliation, conformément à la Section 6. Conformément à l'article 15, pendant la durée du contrat de représentation commerciale, Black Gold acceptait de ne vendre aucun produit concurrençant les produits IPAC, à l'exception des produits à base de polymères. Black Gold acceptait également de préserver la confidentialité des informations de IPAC,

3

# TRADUCTION

conformément à l'article 12. Au moment de la résiliation, Black Gold était obligé de retourner à IPAC les informations IPAC et à préserver la confidentialité des informations confidentielles de l'IPAC, conformément aux articles 8 et 12. Une copie conforme et exacte du contrat de représentation commerciale est jointe en tant qu'Annexe 1 à la déclaration de Vinay Joshi (« Déclaration de Joshi »).

      9. La section 19 du contrat de représentation commerciale contient la disposition d'arbitrage suivante :

> Arbitrage. En cas de différend ou de litige entre les Parties résultant du présent Contrat ou s'y rapportant, y compris, mais sans s'y limiter, les différends ou litiges concernant l'interprétation d'une disposition ou la validité ou le caractère exécutoire d'une modalité ou d'une condition (y compris le présent Article 18) ou de la totalité du Contrat, ou si tout ou partie du présent Contrat (y compris la présente clause) est déclaré nul ou annulable, le différend sera soumis à arbitrage par un arbitre unique, conformément aux règles commerciales d'arbitrage de l'American Arbitration Association en vigueur à cette date, à un bureau de l'American Arbitration Association ou au bureau que cette dernière désignera dans la Ville de San Francisco (Californie). Chaque partie assume ses dépens encourus dans le cadre d'une telle procédure. La décision de l'arbitre sera définitive et exécutoire pour les parties et peut être appliquée par n'importe quel tribunal ayant compétence. Dans toute la mesure permise par la loi, les parties se soumettent irrévocablement à la compétence de ce forum et renoncent à toute objection concernant la compétence ou le lieu dudit forum.

10. En vertu d'un contrat de distributeur exclusif en vigueur à compter du 1er janvier 2016 (« Contrat de distributeur exclusif »), Black Gold a également agi en tant que distributeur des produits IPAC. Le contrat de distributeur exclusif autorisait Black Gold à acheter les produits IPAC pour les revendre (avec majoration) aux clients en aval. Ces clients de la distribution ont passé leurs commandes auprès de Black Gold et IPAC n'avaient aucune visibilité sur les activités de distribution de Black Gold. The Le contrat de distributeur exclusif avait une durée initiale d'un an et pouvait être renouvelé, conformément à la section XV. En vertu de la section VIII, Black Gold a accepté de ne procurer aucun service à d'autres entreprises directement en concurrence avec les entreprises IPAC, et de préserver la confidentialité des informations confidentielles de IPAC. Comme pour le contrat de représentation commerciale, le contrat de distributeur exclusif prévoyait que certains comptes clients resteraient exclusifs, à condition que Black Gold respecte le budget annuel des ventes, comme indiqué à l'annexe B. À la résiliation, le contrat de distributeur exclusif, à la section XV.C, prévoit que Black Gold restituera tous les documents à IPAC et fera tout ce qui est raisonnablement requis afin de transmettre à IPAC des activités viables avec les

# T R A D U C T I O N

clients de distribution de Black Gold.  Une copie conforme et exacte du contrat de distributeur exclusif est joint en tant qu'Annexe 2 de la Déclaration de Joshi.

11.     La section XVI.E du contrat de distributeur exclusif contient les dispositions d'arbitrage suivantes :

Litiges. Toute contestation ou réclamation découlant de ou en relation avec le présent Contrat ou la violation ou son manquement présumé, qui ne peut être réglé à l'amiable, seront réglés par voie d'arbitrage conformément aux règles d'arbitrage commercial de l'Association d'arbitrage international et les dispositions de la présente section. Toute partie peut entamer un arbitrage en notifiant par écrit à l'autre partie son intention d'arbitrer et en déposant auprès du Centre pour l'arbitrage commercial international situé à San Francisco, Californie (ou dans tout autre lieu du Centre agréé par les parties) trois (3) copies de cet avis et trois (3) exemplaires du présent Contrat ainsi que les frais de dépôt appropriés. L'arbitrage doit être effectué devant trois (3) arbitres nommés conformément à ces règles. La procédure d'arbitrage aura lieu du Centre convenu par les parties et sera soumise aux règles d'arbitrage susmentionnées. Les arbitres peuvent accorder toute réparation légale et/ou équitable à laquelle une partie peut prétendre en vertu du droit ou de la théorie légale en vertu de laquelle la partie demande réparation, à condition, toutefois, qu'aucune réclamation ne peut être faite pour tout dommage spécial, indirect ou consécutif, ou dommages-intérêts punitifs découlant de ou liés au présent Contrat, ou tout acte, omission ou événement survenant à cet égard, sauf que les dommages-intérêts punitifs peuvent être accordés pour une faute intentionnelle ou sans motif. La sentence arbitrale doit être rendue  dans les trois (3) mois suivant la nomination du troisième arbitre. La sentence donnée par les trois arbitres ou la majorité de ceux-ci, est définitive et contraignante pour les parties et ne peut donner lieu à aucun recours. La sentence ne doit pas servir de précédent ou d'autorité dans toute procédure ultérieure, à condition toutefois, que si la partie perdante ne se conforme pas à la sentence, la partie gagnante peut demander à un tribunal compétent d'obtenir une ordonnance confirmant la sentence conformément aux lois applicables. La sentence peut être exécutée devant tout tribunal compétent. Sauf disposition contraire de la loi ou requis par ordonnances des tribunaux, le contenu de toute procédure d'arbitrage doit rester confidentiel pour toutes les parties et les arbitres ; cependant, le fait qu'une telle procédure existe ou qu'une sentence ait été rendue ne doit pas nécessairement rester confidentiel. Les coûts de la procédure, y compris les honoraires et les frais des avocats, des comptables et des témoins, ainsi que la rémunération des arbitres, sont évalués par les arbitres à l'égard les parties conformément à la détermination de la faute par l'arbitre.

12.     Conformément à la section XVI.F du contrat de distributeur exclusif, les parties 20 ont convenu que leurs droits et obligations seraient régis par la loi californienne.

## L'ARBITRAGE

13.     En vertu des contrats de représentation commerciale et de distributeur exclusif susmentionnés IPAC a déposé une demande d'arbitrage devant AAA le ou autour du 7 mai 2018. Au cours de l'arbitrage, IPAC a affirmé que Black Gold a violé les deux contrats, violé l'obligation de bonne foi et de loyauté, et a enfreint l'obligation de loyauté.  IPAC a également entamé des procédures pour ingérence délictuelle dans les relations contractuelles et appropriation illicite de secrets commerciaux.

5

# T R A D U C T I O N

14.L'arbitrage s'est déroulé devant un arbitre de l'ICDR (Centre international pour la résolution des conflits) basé à San Francisco, Californie.

2   L'audience au fond a eu lieu du 4 au 6 février 2019 devant l'arbitre à San Francisco. Le 30 mai 2019, l'arbitre a rendu la sentence arbitrale en faveur de IPAC et contre Black Gold, au montant de 1 094 193,58 $, comme suit : 687 702,56 $ en dommages compensatoires ; 305 138,65 $ en frais d'avocat ; et 101 352,37 $ à titre de remboursement des paiements de IPAC pour les frais et dépens administratifs et pour l'indemnisation de l'arbitre. L'arbitre a également accordé une injonction en faveur de IPAC et contre Black Gold. Une copie conforme et exacte de la sentence arbitrale est jointe à l'Annexe 3 de la déclaration de Joshi.  La sentence a été signifiée à toutes les parties le 30 mai 2019.

## CONFIRMATION DE LA SENTENCE

16      La loi fédérale sur l'arbitrage, 9 U.S.C., sections 1 *et suivantes*, prévoit la reconnaissance judiciaire et l'exécution des mécanismes d'arbitrage. L'article 9 prévoit que, si les parties dans leur contrat ont spécifié un tribunal particulier, à tout moment dans l'année suivant le prononcé de la sentence arbitrale, toute partie à l'arbitrage peut demander au tribunal désigné une ordonnance confirmant la sentence. Si aucun tribunal n'est spécifié dans l'accord entre les parties, une telle demande peut être introduite auprès du tribunal des États-Unis dans et pour le district dans lequel une telle sentence a été rendue. En outre, la Section 9 prévoit que le tribunal doit accepter cette demande à moins que la sentence ne soit annulée, modifiée ou corrigée comme prescrit à l'article 9.

17      En outre, les contrats de représentation commerciale et de distributeur exclusif prévoient que toute sentence arbitrale, telle que la sentence arbitrale aux présentes, peut être exécutée devant tout tribunal compétent.

18.      La pétition en confirmation est présentée dans un délai d'un an à compter de la date à laquelle la sentence arbitrale a été rendue.

## PRIÈRE EN RÉPARATION

3   EN CONSÉQUENCE, IPAC demande respectueusement à la Cour de rendre une ordonnance confirmant la sentence arbitrale et prononce un jugement en faveur de IPAC et contre Black Gold pour les motifs suivants

# TRADUCTION

Patricia GRIMAUD-PALMERO
Huissier
Tel. SOC
20 Bd de Suisse
98000 MONACO

Affaire 3:19-cv-03004 Document 1 Déposé le 31/05/2019 Page 7 de 7

A.     Dommages-intérêts compensatoires d'un montant de 687 702,56 dollars US, tels qu'énoncés expressément dans la sentence arbitrale ;

B.     Honoraires et frais d'avocat d'un montant de 305 138,65 dollars US, tels qu'énoncés spécifiquement dans la sentence arbitrale ;

C.     Remboursement du paiement par IPAC des frais et dépenses administratives et l'indemnité d'un arbitre pour un montant de 101 352,37 dollars US, tels qu'énoncés spécifiquement dans la sentence arbitrale ;

D.     Honoraires et frais d'avocat engagés par IPAC dans ses efforts continus pour recouvrer les dommages déterminés par la sentence arbitrale et / ou le jugement rendu par ce tribunal, selon la preuve, à compter de la date de la sentence jusqu'au paiement intégral du montant total du jugement ;

E.     Action en injonction à l'encontre de Black Gold et de toutes les personnes ou entités agissant de concert avec elle ou en participation avec elle ou à l'appui de celle-ci ou en combinaison avec elle ou en collusion avec elle ou en association avec elle, comme indiqué expressément dans la sentence arbitrale ; et

F.     Toute autre réparation supplémentaire que le tribunal jugera juste et appropriée en vertu des circonstances.

.Date : le 31 mai 2019

*/s/ Vinay V. Joshi*
Vinay V. Joshi
vjoshi@thepatentattorneys.com
Anthony S. Kim
akim@thepatentattorneys.com
Amin Turocy & Watson LLP
160 West Santa Clara Street
Suite 975
San Jose, CA 95113
Téléphone : (650) 618-6481
Télécopie :  (216) 696-8731

***Avocats pour le Demandeur
International Petroleum Products and
Additives Company, Inc.***

7

## *ATTESTATION DE TRADUCTION EXACTE*

Je soussignée, Catherine Lewi, certifie en toute bonne foi que la traduction ci-dessus en langue française a été faite par moi-même en ma qualité de Traductrice professionnelle certifiée d'anglais en français par l'ATA (American Translators Association) et représente la version complète et conforme du document original en langue anglaise.

*Catherine Lewi – New York, NY 10028 – USA*
*Tél. : +1-858-401-0127 - e-mail : catherine.lewi@yahoo.com*

Catherine Lewi
English into French
Certification #437484

Verify at www.atanet.org/verify

_____
Signature

28 JUILET 2019
_____
Date

STATE OF NEW YORK, COUNTY OF NEW YORK

The foregoing instrument was acknowledged before me
this ___ day of _____ 2019 by CATHERINE LEWI
Charmaine Raphael, Notary Public 01RA6217652
COMMISSION EXPIRES FEBRUARY 16, 2022

1  Vinay V. Joshi (Calif. Bar No. 213487)
   vjoshi@thepatentattorneys.com
2  Anthony S. Kim (Calif. Bar No. 225703)
   akim@thepatentattorneys.com
3  Amin Turocy & Watson LLP
   160 West Santa Clara Street
4  Suite 975
   San Jose CA 95113
5  Telephone: (650) 618-6481
   Facsimile:  (216) 696-8731
6

7  Counsel for Petitioner
   International Petroleum Products and Additives Company, Inc.
8

9              **UNITED STATES DISTRICT COURT**
              **NORTHERN DISTRICT OF CALIFORNIA**
10

11 INTERNATIONAL PETROLEUM PRODUCTS         Case No. TBD
   AND ADDITIVES COMPANY, INC.,
12                                          **JOSHI DECLARATION IN SUPPORT OF**
                    Petitioner,             **PETITION AND MOTION TO CONFIRM**
13                                          **ARBITRAL AWARD AND ENTER**
            v.                              **JUDGMENT THEREON**
14
   BLACK GOLD S.A.R.L.,                     Date:  TBD
15                                          Time: TBD
                    Respondent.             Courtroom: TBD
16                                          Judge: TBD

17                                          [Filed concurrently with (1) Petition to Confirm
18                                          Arbitral Award and Enter Judgment Thereon;
                                            (2) Notice of Motion and Motion to Confirm
19                                          Arbitral Award and Enter Judgment Thereon;
                                            (3) [Proposed] Order Granting Motion to
20                                          Confirm; (4) Fed. R. Civ. P. 7.1 Notice of
                                            Interested Parties; and (5) Civil L.R. 3-15
21                                          Certification of Interested Parties]
22

23

24

25

26

27

28

                                            JOSHI DECL. ISO PETITION/MOTION TO CONFIRM
                                                                        Case No. TBD

1   I, Vinay V. Joshi, declare:

2       1.     I am outside counsel of record for Petitioner International Petroleum Products and

3 Additives Company, Inc. ("IPAC").  Unless stated otherwise, the statements of this declaration are

4 based upon my personal knowledge.

5       2.     Attached hereto as Exhibit 1 is a true and correct copy of a Sales Representative

6 Agreement, effective January 1, 2016, between IPAC and Black Gold S.A.R.L. ("Black Gold").

7       3.     Attached as Exhibit 2 is a true and correct copy of an Exclusive Distributor

8 Agreement, effective January 1, 2016, between IPAC and Black Gold.

9       4.     Attached hereto as Exhibit 3 is a true and correct copy of an arbitration award, dated

10 May 30, 2019, in *International Petroleum Products and Additives Co., Inc. v. Black Gold S.A.R.L.,*

11 AAA Case No. 01-18-0001-9728, before the International Centre for Dispute Resolution of the

12 American Arbitration Association.

13

14     I declare under penalty of perjury under the laws of the United States of America that the

15 foregoing is true and correct.

16

17

18                          /s/ Vinay V. Joshi

19                          Vinay V. Joshi

20

21

22

23

24

25

26

27

28

- 2 -

# T R A D U C T I O N

Vinay V. Joshi (Barreau californien n° 213487)
vjoshi@thepatentattorneys.com
Anthony S. Kim (Barreau californien n° 225703)
akim@thepatentattorneys.com
Amin Turocy & Watson LLP
160 West Santa Clara Street
Suite 975
San Jose CA 95113
Téléphone : (650) 618-6481
Télécopie : (216) 696-8731

Avocat du Demandeur
International Petroleum Products and Additives Company, Inc.

## TRIBUNAL DE DISTRICT DES ÉTATS-UNIS
## DISTRICT NORD DE LA CALIFORNIE

INTERNATIONAL PETROLEUM PRODUCTS
AND ADDITIVES COMPANY, INC.,

      Demandeur,

  c.

BLACK GOLD S.A.R.L.,

      Défendeur,

Affaire n° : à déterminer

**DÉCLARATION DE JOSHI À L'APPUI DE LA PÉTITION ET REQUÊTE EN CONFIRMATION DE LA SENTENCE ARBITRALE ET EN INSCRIPTION DU JUGEMENT**

Date : à déterminer
Heure : à déterminer
Salle d'audience : à déterminer
Juge : à déterminer

[Déposée en même temps que (1) la requête en confirmation de la sentence arbitrale et nscription du jugement ; Avis de motion et requête en confirmation de la sentence arbitrale et en inscription du jugement ; [Proposition] Ordonnance accordant la requête en confirmation ; (4) Règles de procédure civile fédérales P. 7.1 Avis des parties intéressées; et (5) Règles du droit civil 3-15 Certification des parties intéressées]

# TRADUCTION

Affaire 3:19-cv-03004-JCS Document 4 déposé le 31/05/2019 Page 2 de 2

Je soussigné Vinay V. Joshi déclare ce qui suit :

      1.     Je suis l'avocat externe au dossier du Demandeur International Petroleum Products and Additives Company, Inc. (« IPAC »). Sauf indication contraire, les affirmations dans cette déclaration sont basées sur ma connaissance personnelle.

2.     L'Annexe 1 ci-jointe est une copie conforme et exacte du Contrat de représentation commerciale en vigueur à compter du 1er janvier 2016 entre IPAC et Black Gold S.A.R.L. (« Black Gold »).

3.     L'Annexe 2 ci-jointe est une copie conforme et exacte du Contrat de distributeur exclusif en vigueur à compter du 1er janvier 2016 entre IPAC et Black Gold.

4.     L'Annexe 3 ci-jointe est une copie conforme et exacte de la sentence arbitrale datée du 30 mai 2019, dans *International Petroleum Products and Additives Co., Inc. c. Black Gold S.A.R.L.*, Affaire AAA n° 01-18-0001-9728, devant le Centre international de résolution des différends de l'Association américaine d'arbitrage.

      Je déclare sous peine de parjure en vertu de la législation des États-Unis d'Amérique que ce qui précède est exact et correct.

           /s/ Vinay V. Joshi _____

           Vinay V. Joshi

## *ATTESTATION DE TRADUCTION EXACTE*

Je soussignée, Catherine Lewi, certifie en toute bonne foi que la traduction ci-dessus en langue française a été faite par moi-même en ma qualité de Traductrice professionnelle certifiée d'anglais en français par l'ATA (American Translators Association) et représente la version complète et conforme du document original en langue anglaise.

*Catherine Lewi – New York, NY 10028 – USA*
*Tél. : +1-858-401-0127 - e-mail : catherine.lewi@yahoo.com*

Verify at www.atanet.org/verify

_____
Signature

28 JUILLET 2019
_____
Date

STATE OF NEW YORK, COUNTY OF NEW YORK

The foregoing instrument was acknowledged before me this ____ day of _____ 2017 by CATHERINE LEWI

Charmaine Raphael, Notary Public 01RA6217652
COMMISSION EXPIRES FEBRUARY 16, 2022

Patricia GRIMAUD-PALMERO
Huissier
Tél. 97 77 45 48
20 Bd de Suisse
98000 MONACO

Patricia GRIMAUD-PALMERO
Huissier

Tél 97 72 48 48
20 Bd de Suisse
98000 MONACO

# EXHIBIT

# 1

## INTERNATIONAL PETROLEUM PRODUCTS AND ADDITIVES COMPANY, INC.

### SALES REPRESENTATIVE AGREEMENT

This Agreement is made and is effective as of the 1st day of January 2016, and replaces and supersedes the prior Agreement of 19th Day of September, 2012 and all Amendments thereto by and between International Petroleum Products and Additives Company, Inc., a California corporation, together with any subsidiaries and affiliates (including IPAC EU Cooperatie U.A.) with an office located, at 7600 Dublin Blvd. Suite 240, Dublin, CA 94568 (hereinafter referred to as "Company") and BLACK GOLD S.A.R.L with offices at 4 Rue R.P. Louis Frolla, 98000 MONACO, PRINCIPALITY OF MONACO (the "Sales Representative"). IPAC and Sales Representative collectively may be referred to as "Parties".

SECTION 1. <u>Appointment</u>. The Company hereby appoints the SALES REPRESENTATIVE as its Representative for the following customer accounts. SALES REPRESENTATIVE is to solicit orders for Products listed in Schedule A (the "Products") from the assigned customers and as specified in Schedule B (the "current and prospective customers"); which Schedule is attached hereto and made a part hereof. Additionally Sales Representative shall provide sufficient and reasonable sales support to customers of the Company's Products for those customers and prospective customers. During 2016 a review of the sales activities will be made by the Company and if it is determined that certain prospective customers, identified on Exhibit B 2, are not active, (not active being defined as not having placed IPAC product orders totaling $50,000 or more during 2016) then the Company will have an option to assign these prospective customers to another salesperson or Sales Representative.

SECTION 2. <u>Independent Contractor</u>.

(a) By acceptance of this appointment the SALES REPRESENTATIVE agrees it is and shall be an independent contractor, conducting all of its business only in its own name. The entire management and direction of the SALES REPRESENTATIVE's operation, including the SALES REPRESENTATIVE's sales organization, shall at all times be under the exclusive control and management of the SALES REPRESENTATIVE.

(b) The SALES REPRESENTATIVE agrees to maintain at least one active sales office and to provide adequate coverage of the customers. The SALES REPRESENTATIVE agrees that all of its personnel are and shall be bound by the terms of this Agreement. The SALES REPRESENTATIVE shall use its best efforts to promote the business and welfare of IPAC.

SECTION 3. <u>Commissions</u>.

(a) IPAC agrees to pay commissions in accordance with Schedule C (attached hereto and made a part hereof) to the SALES REPRESENTATIVE for IPAC "Net Sales Billed" (as defined herein below) for direct sales of the Products to the Customers. For the purpose of this Agreement, "Net Sales Billed" is defined as the invoiced amount less any freight and packaging costs and less discounts or allowances which are actually realized by Company for Products sold to a customer by Company.

Patricia GRILLAUD-PALMERO
Huissier

Tél. 97 77 48 48

(b)     If because of returned Product, IPAC grants credit or makes a refund to a customer, any commission already paid on such returned Product shall be deducted from the next commission payment or immediately refunded by the SALES REPRESENTATIVE if no further commission is due or to become due.

SECTION 4.   Time of Payment.  Within thirty (30) days following the end of the month in which an applicable direct invoice payment is made and received by IPAC, IPAC shall prepare and furnish to the SALES REPRESENTATIVE a complete and accurate statement of the commissions due, accompanied by the remittance of the amount shown due.

SECTION 5.   Term of Agreement.

(a)     This Agreement shall continue in force for a period of three (3) years from the effective date above or until terminated earlier as provided in this Agreement.  Following the first 3 years term, this Agreement shall be automatically renewed for additional 3 year periods unless terminated earlier as per Section 5 Clause (b) or Clause (c) of this agreement.

(b)     Termination may be made by either party without cause by notice given to the other, and will become effective the following a sixty (60) day period of time after giving such notice ("Non-cause Termination Period").

(c)     Either party may terminate this Agreement for cause if the other party breaches this Agreement and such breach is not cured within fifteen (15) days following notice thereof, in which event termination automatically shall be effective at the end of such fifteen (15) day opportunity to cure period.  Provided, however, that an opportunity to cure need not be given more often than once in any twelve (12) month period, and if accordingly no opportunity to cure is given, termination shall be effective fifteen (15) days after such termination for cause notice is given. Furthermore, IPAC may terminate this Agreement effective immediately upon notice to SALES REPRESENTATIVE if in IPAC's sole opinion SALES REPRESENTATIVE has, or is imminently likely to take some action seriously injurious to the reputation or business of IPAC including violation of IPAC export control procedures and conditions.

(d)     The sales representative will not sell IPAC products nor represent IPAC in any countries or with any customers that are on the sanctioned by the US government. In addition the sales representative will not conduct any business on his own within those banned countries as IPAC cannot be associated with any sales representatives/agents that sell into those banned countries. The current list of banned countries is: CRIMEA - REGION OF UKRAINE, CUBA, IRAN, NORTH KOREA, SUDAN, and SYRIA.

SECTION 6.   Commissions upon Termination.

(a)     In the event of termination of this Agreement by either party, the SALES REPRESENTATIVE shall be paid commissions on existing customer orders with firm shipping dates that were placed by SALES REPRESENTATIVE and accepted by IPAC prior to the effective date of termination.

(b)     Additionally, the IPAC will pay SALES REPRESENTATIVE commissions,

in accordance with Section 4, and pursuant to the commission schedule (Schedule C) in effect at the time notice of termination is given, on repeat orders from Customers introduced to IPAC prior to the termination date by SALES REPRESENTATIVE for a period of two years following the termination date of this Agreement should the Sales Representative be terminated by IPAC without Cause.

(c)  Cause shall be defined to include failing to perform or meet an annual sales budget. Other Causes will include failing to abide by IPAC's export policies and related strict adherence to the US Export control laws and regulations; any material breach of the provisions of this agreement and actions by the Sales Representative that is seriously injurious to the reputation or business of IPAC.

(d)  If the termination is based on Cause or if the Sales Representative voluntarily terminates this Agreement then the Sales Representative will be entitled to receive commissions, in accordance with Section 4, and pursuant to the commission schedule (Schedule C) in effect at the time notice of termination is given, on repeat orders from Customers introduced to IPAC prior to the termination date by SALES REPRESENTATIVE for a period of twelve (12) months following the termination date of this Agreement .

(e)  If the sales Representative and IPAC cannot agree on Sales budgets for any subsequent year following the first year of this Agreement then this Agreement will terminate and Sales Representative will be entitled to receive commissions, in accordance with Section 4, and pursuant to the commission schedule (Schedule C) in effect at the time notice of termination is given, on repeat orders from Customers introduced to IPAC prior to the termination date by SALES REPRESENTATIVE for a period of twelve (12) months following the termination date of this Agreement .

SECTION 7.  <u>Agreement Modification</u>.  Upon sixty (60) days prior notice to SALES REPRESENTATIVE, IPAC shall have the unilateral and exclusive right to amend or change the list of Products contained in Schedule A hereof and the global price list set for Products.

SECTION 8.  Property.  Upon termination of this Agreement for any reason by either party, all items belonging to IPAC in the possession or control of the SALES REPRESENTATIVE, including but not limited to literature, sales aids, purchase order copies and files, customer drawings and other documentation relating to IPAC, shall be promptly and safely returned to IPAC at its address first listed above, or elsewhere in the USA as designated by notice from IPAC, at the sole expense of SALES REPRESENTATIVE.

SECTION 9.  <u>Invoices and Collections</u>.  All invoices in connection with Products sold by the SALES REPRESENTATIVE shall be rendered by IPAC directly to the customer and copy to be forwarded to the SALES REPRESENTATIVE.

SECTION 10.  <u>SALES REPRESENTATIVE May Not Assign</u>.  The SALES REPRESENTATIVE agrees that its appointment pursuant to this Agreement is personal, and all rights and obligations of the SALES REPRESENTATIVE hereunder (including the right to receive any commission) are not subject to assignment or delegation either voluntarily or by

Patricia ERMANNO PALMERO
Notario
...
98000 MONACO

operation of law.

        SECTION 11. Order Solicitation and Acceptance. All orders solicited or obtained by the SALES REPRESENTATIVE shall be subject to acceptance or rejection by IPAC at IPAC's sole discretion. The SALES REPRESENTATIVE agrees it shall not have any right or authority to accept any order or to assume or create any obligation, express or implied, on behalf of IPAC. The SALES REPRESENTATIVE shall solicit sales orders for IPAC's Products and services only at such current prices as periodically may be established or quoted by IPAC. The SALES REPRESENTATIVE shall have no authority to, and shall not, vary from the terms and conditions of sale established by IPAC, nor shall the SALES REPRESENTATIVE make any allowance or adjustment of any account or authorize the return of any Product without first obtaining IPAC's written approval.

        SECTION 12. Proprietary Obligation. The SALES REPRESENTATIVE agrees that during the term of this Agreement and for a period of five (5) years thereafter, it and its officers, employees and agents shall not disclose to anyone, any confidential information of IPAC, including, but not limited to, sales information, identity of customers and prospective customers, quantity and kind of Products shipped or sold, prices and methods of pricing, Product returns, unannounced products, confidential product and process information, and such other information which, if disclosed to others, would be detrimental to the best interests of IPAC.

        SECTION 13. Limitation of Liability and indemnification. IN NO EVENT WILL SALES REPRESENTATIVE BE LIABLE TO IPAC FOR ANY INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES OF ANY NATURE OR KIND WHATSOEVER, INCLUDING BUT NOT LIMITED TO, LOSS OF PROFITS OR OTHER ECONOMIC LOSS ARISING OUT OF, OR IN CONNECTION WITH THIS AGREEMENT UNLESS SALES REPRESENTATIVE COMMITTS UNAUTHORIZED ACTS BEYOND THE SCOPE OF THIS SALES REPRESENTATIVE AGREEMENT INCLUDING ILLEGAL ACTS. IPAC AND SALES REPRESETNATIVE AGREES THE RELATIONSHIP UNDER THIS AGREEMENT IS LIMITED TO CONSULTATION AND REPRESENTATION AS SET FORTH ABOVE. THE IPAC AGREES TO DEFEND, INDEMNIFY, AND HOLD HARMLESS CONSULTANT FOR ALL CLAIMS, CAUSE OF ACTION, LIABILITIES, COSTS, REASONABLE ATTORNEY'S FEES AND DAMAGES WHICH SALES REPRESENTATIVE MAY INCUR WITHIN THE SALES REPRESENTATIVE'S AUTHORIZED AND LEGAL SCOPE OF ACTIVITIES WHILE ENGAGED IN THE PERFORMANCE OF THIS AGREEMENT.

        SECTION 14. Product Obligation. IPAC shall be under no obligation to the SALES REPRESENTATIVE to continue its business or to continue to develop, sell or supply any of the Products, nor shall any warranty as to any of the Products run from IPAC to the SALES REPRESENTATIVE.

        SECTION 15. Conflict of Interest. The SALES REPRESENTATIVE agrees not to sell or promote any products that compete with Products as covered by this Agreement which from time-to-time may change during the term of this Agreement. As of Effective date, SALES REPRESENTATIVE does not sell any products which compete with Products covered by this agreement, and IPAC agrees not to commence sale of products such as base oil which would compete

with products currently sold or promoted by SALES REPRESENTATIVE. As the Parties both sell solid polymer products, the parties agree not to sell solid polymer products to the same customers. Existing solid polymer customers of each Party are considered to be exclusive customers for sales of solid polymer products for that Party to this agreement.

SECTION 16. Notices.  All notices, claims, certificates, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if either personally delivered or five days after the date of deposit in the mail (registered or certified mail, postage prepaid, return receipt requested) or my facsimile as follows:

(a)     If to IPAC:

International Petroleum Products and Additives IPAC, Inc.
7600 Dublin Blvd., Suite 240
Dublin, CA 94568
Attn:  Brian Cereghino, CEO

(b)     If to SALES REPRESENTATIVE:

BLACK GOLD SARL
4 Rue R.P. Louis Frolla
98000 Monaco
Principality of Monaco
T. +37793302942
M. +33647353844
Attn:  Lorenzo Napoleoni, CEO

or to such other address as the party to whom notice is to be given may have previously furnished to the other in the manner set forth above.

SECTION 17. Law Governing.  This Agreement shall be governed by, and construed and enforced in accordance with, the internal laws of the State of California, without regard to the conflict of laws provisions thereof.

SECTION 18. Severability.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced because of any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to either party.

SECTION 19. Arbitration.  Any dispute or controversy between the parties arising out of or relating to this Agreement, including without limitation, a dispute or controversy relating to the

construction of any provision or the validity or enforceability of any term or condition (including this Section 18) or of the entire Agreement, or any claim that all or any part of this Agreement (including this provision) is void or voidable, shall be submitted to arbitration before a single arbitrator in accordance with the Commercial Rules of Arbitration of the American Arbitration Association then in effect, at an office of or designated by the American Arbitration Association in the City of San Francisco, California. Each party shall bear its costs in any such proceeding. The decision of the arbitrator shall be final and binding upon the parties and may be enforced in any court of competent jurisdiction. To the fullest extent permitted by law, the parties irrevocably submit to the jurisdiction of such forum and waive any objection it may have to either the jurisdiction or venue of such forum.

SECTION 20. <u>Miscellaneous</u>. As used in this Agreement, the masculine, feminine or neuter gender when used in reference to SALES REPRESENTATIVE shall be deemed to include the masculine and feminine wherever necessary or appropriate. This Agreement will be null and void if it is not fully executed by all of the Parties by August 15, 2016.

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by IPAC and SALES REPRESENTATIVE as of the date first above written.

International Petroleum Products and
Additives Company, Inc.

BY: _____
**Brian J Cereghino**
**CEO**

Dated: 08/09/2016

Black Gold S.A.R.L.

BY: _____
**Lorenzo Napoleoni**
**CEO**

<u>ATTACHMENTS</u>:

Schedule A, Products

Schedule B, B 1, B 2, Customer Accounts

Schedule C, Commissions

## SCHEDULE A

## PRODUCTS

*"Products"* shall mean and refer to, individually and/or collectively, all of the Company's manufactured and distributed Additives or components sold to both manufacturers and wholesalers as set forth in this Schedule A, including any modifications, corrections, updates, improvements, derivatives or enhancements thereto, together with Documentation prepared for use in connection therewith. During the term of this Agreement, Company may amend Schedule A to include additional Products or delete existing Products. Company shall give Sales Representative sixty (60) calendar days prior written notice thereof.

Products Represented

A. The following Company products comprise the Products:

All of the Company's manufactured and distributed Additives and components sold to both manufacturers, and wholesalers, which may change from time to time as exclusively determined by the Company.



**SCHEDULE B**

## Exclusive Customer Accounts and Prospective Accounts

Required minimum 2016 total sales volume for Sales Representative's exclusive customer accounts will be in US dollars listed below on Schedule B 1.

A)  For all years subsequent to 2016, the Company & Sales Representative will review end of year sales and forecast the sales goals for the following year. The Company will then fix a reasonable target considering the existing 2016 target and communicate, within 90 days of each year-end (12.31), to Sales Representative the new minimum sales level to maintain exclusivity of named customer accounts (Schedule B1) for following year. The sales representative will be entitled to Customers on an exclusive basis as determined on a year to year basis by the Company.

B)  For the purposes of determining exclusive Customers, the Sales Representative will be allowed to prospect at the customers listed in Schedule B2. The Company will make a determination to assign the customer account to the Sales Representative it deems appropriate and fair.

C)  On a case by case basis, considering competitive and market conditions, the Customers will remain exclusive to the Sales Representative as long as the Customers are active, meaning purchases material amounts of Products from the Company within the prior twelve months (as above).

Notes:

**1.  Exclusive** means that Sales Representative will be due a commission if any sales are generated within the assigned accounts per Exhibit B1 or as added or subtracted, in good faith, from time to time by the Company are deemed "Exclusive". However the Customers generated by Sales Representative will continue to remain the clients/customers of the Sales Representative and Sales Representative will hold the right to solicit reorders from those clients and earn commissions accordingly for as long as this Agreement is in force and the sales goals (as mutually agreed to by the Parties) for each particular customer are met for the preceding twelve months.

## Schedule B1

## Customer Accounts

| ACCOUNT | Country | 2015 BUDGET | 2016 BUDGET |
|---|---|---|---|
| Lubtech | Romania | | $ 350,000 |
| The Palestinian Mineral Lube Co | Israel | $150,000 | |
| TransNational Blenders | Netherlands | $180,000 | $1,700,000 |
| SLIDER | Greece | $200,000 | $ 150,000 |
| Societa Internazionale Lubricanti—SIL | Italy | $200,000 | $ 100,000 |
| Deutsche Olewerke Lubmin | Germany | $500,000 | $ 450,000 |
| AXXON Oil | Italy | $250,000 | $ 100,000 |
| Belgin Madeni | Turkey | $120,000 | $ 350,000 |
| Black Gold | Monaco | $500,000 | $ 600,000 |
| PAZ Lubricants | Israel | $40,000 | $ 50,000 |
| Acietes Industriales Limitada | Chile | | $ 120,000 |
| Petrochemicals Europa | Serbia | | $ 120,000 |
| De Oliebron | Netherlands | | $ 200,000 |
| Petropal | Isreal | | $  60,000 |
| | | | |
| | | TOTAL BUDGET | $4,350,000 |
| **Schedule B2** | **Prospective** | **Customer Accounts** | |
| CIL | Italy | | $ TBD |
| Conqordoil | Italy | | $ TBD |
| Siral | Italy | | $ TBD |
| Rilub | Italy | | $ TBD |

Patricia GRIMAUD-PALMERO
Huissier

Tél. 97 77 48 48
20 Bd de Suisse
98000 MONACO

| Ramoil | Italy | | $ TBD |
|---|---|---|---|
| Total | France | | $ TBD |
| Unil-OPAL | France | | $ TBD |
| Motul | France | | $ TBD |
| Accor | France | | $ TBD |
| HAFA | France | | $ TBD |
| SOCAZ | France | | $ TBD |
| IGOL | France | | $ TBD |
| YACCO | FRANCE | | $ TBD |
| DURAND | FRANCE | | $ TBD |
| ACIA | FRANCE | | $ TBD |
| CLIP | FRANCE | | $ TBD |
| DELEK | ISRAEL | | $ TBD |
| | | | $ TBD |
| CYCLON | GREECE | | $ TBD |
| RS 200 | GREECE | | $ TBD |
| SILVER INDUSTRIAL— BLACK GOLD DISTRIBUTOR ACCOUNT | SPAIN | | $ TBD |
| COSAN/COMMA | UNITED KINGDOM | | $ TBD |
| MORRIS | UNITED KINGDOM | | $ TBD |
| SHELL | UNITED KINGDOM | | $ TBD |
| TEDEX | POLAND | | $ TBD |
| ORLEN | POLAND | | $ TBD |
| PRISTA | BALKANS | | $ TBD |
| HEXOL | BALKANS | | $ TBD |

Sales Representative Agreement                                    Page 10

| | | | |
|---|---|---|---|
| INA | BALKANS | | $ TBD |
| MOL | BALKANS | | $ TBD |
| GALP | PORTUGAL | | $ TBD |
| ROWE | GERMANY | | $ TBD |
| SWD | GERMANY | | $ TBD |
| OEST | GERMANY | | $ TBD |
| PENTOSIN | GERMANY | | $ TBD |
| BANTLEON | GERMANY | | $ TBD |
| ZELLER/GMELIN | GERMANY | | $ TBD |
| | | | $ TBD |
| EUROL | NETHERLANDS | | $ TBD |
| KROON | NETHERLANDS | | $ TBD |
| ALPET | TURKEY | | $ TBD |
| SEAHORSE | TURKEY | | $ TBD |
| AKTAS | TURKEY | | $ TBD |
| GEMA | TURKEY | | $ TBD |
| ATLANTIK PETROKIMYA | TURKEY | | $ TBD |
| Q8 | BELGIUM | | $ TBD |
| WOLF | BELGIUM | | $ TBD |
| ARDECA | BELGIUM | | $ TBD |
| UNIL | BELGIUM | | $ TBD |
| VIVO | MOROCCO | | $ TBD |
| DELFIN | RUSSIA | | $ TBD |
| GAZPROMNEFT | RUSSIA | | $ TBD |
| OILYB | EGYPT | | $ TBD |
| ORBICHEM | SOUTH AFRICA | | $ TBD |
| JOPETROL | JORDAN | | $ TBD |
| ADNOC | UAE | | $ TBD |
| SHARLU | UAE | | $ TBD |
| | | | $ TBD |
| | | | $ TBD |

Sales Representative Agreement

Page 11

| | | | $ TBD |
|---|---|---|---|
| | | | $ TBD |
| UAE ACCOUNTS AVAILABLE ON NOVEMBER 1-2016 IF NO ACTIVITY | | | |

Patricia GRIMAUD-PALMERO
Huissier

Tél. 97 77 48 48
20 Bd de Suisse
98000 MONACO

SCHEDULE C

**Commission Compensation**

1.  Sales Representative will earn a commission of three and one-half percent (3.5%) of the Revenues received in Cash by the Company based on the Sales Invoices to customers introduced by Sales Representative during the term of this Agreement. The commission payable to Sales Representative shall be calculated on a Net Sales basis which is the customer invoice amount less any separate freight and packaging costs billed to the customer and less discounts or allowances which are actually received by the customer for Products sold to the customer by Company. Additionally, for specific individual customers or sales opportunities at a customer, Sales Representative and Company may agree in advance to a different commission percentage than provided above.

2.  Commissions shall be payable in US dollars or Euros, depending upon the currency invoiced to the customer and will be paid on a monthly basis within 10 days of the end of each calendar month by wire transfer to the account of Sales Representative.

Patricia GRIMAUD-PALMERO
Huissier

Tél. 97 77 49 49
20, Bd de Suisse
98000 MONACO

# ANNEXE

# 1

# TRADUCTION

## INTERNATIONAL PETROLEUM PRODUCTS AND ADDITIVES COMPANY, INC.

### CONTRAT DE REPRÉSENTATION COMMERCIALE

Le présent Contrat est établi et entre en vigueur le 1er janvier 2016 entre International Petroleum Products And Additives Company, Inc, une société californienne, et toutes ses filiales et sociétés affiliées (y compris IPAC EU Cooperatie U.A.) possédant un bureau au 7600 Dublin Blvd., Suite 240, Dublin, CA 94568, (ci-après la « Société ») d'une part, et BLACK GOLD S.A.R.L. possédant des bureaux au 4 rue R.P. Louis Frolla, 98000 MONACO, PRINCIPAUTÉ DE MONACO (ci-après le « Représentant commercial ») d'autre part. Le présent Contrat annule et remplace le Contrat antérieur du 19 septembre 2012 et tous ses amendements. IPAC et le Représentant commercial peuvent être désignés dans leur ensemble par le terme de « Parties ».

ARTICLE 1.   Nomination du Représentant commercial.   Par les présentes, la Société nomme le REPRÉSENTANT COMMERCIAL pour le représenter auprès des comptes clients suivants. Le REPRÉSENTANT COMMERCIAL doit obtenir des commandes pour les Produits énumérés à l'Annexe A (les « Produits ») auprès des clients qui lui ont été attribués comme cela est précisé à l'Annexe B (les « clients actuels et potentiels ») ; ladite Annexe est annexée et incorporée aux présentes. Le Représentant commercial doit en outre assurer le suivi commercial des Produits de la Société de manière suffisante et raisonnable auprès des clients et des clients potentiels. Au cours de 2016, la Société procédera à l'évaluation des activités de vente et s'il s'avère que certains clients potentiels, identifiés à l'Annexe B 2, ne sont pas actifs (est défini comme non actif le client dont les commandes totales de produits IPAC en 2016 sont inférieures à 50 000 $), la Société pourra décider d'attribuer ces clients potentiels à un autre vendeur ou Représentant commercial.

ARTICLE 2 :   Statut d'Entrepreneur indépendant.

(a)   Le REPRÉSENTANT COMMERCIAL qui accepte cette nomination convient qu'il est et sera un entrepreneur indépendant exerçant l'intégralité de ses activités en son seul nom. Le REPRÉSENTANT COMMERCIAL doit à tout moment et exclusivement exercer le contrôle et la gestion de l'ensemble de la gestion et de la direction de ses activités, y compris de l'organisation de son activité de REPRÉSENTATION COMMERCIALE.

(b)   Le REPRÉSENTANT COMMERCIAL s'engage à maintenir au moins un bureau commercial actif et à assurer le suivi approprié des clients. Le REPRÉSENTANT COMMERCIAL convient que tous les membres de son personnel doivent et devront respecter les modalités du présent Contrat. Le REPRÉSENTANT COMMERCIAL doit tout mettre en œuvre pour promouvoir les intérêts commerciaux et le bon fonctionnement d'IPAC.

ARTICLE 3 :   Commissions.
(a)   IPAC s'engage à rémunérer le REPRÉSENTANT COMMERCIAL pour les ventes directes de Produits aux Clients conformément à l'Annexe C (jointe et incorporée aux présentes) par des commissions correspondant au « Ventes nettes facturées » d'IPAC (telles que définies ci-dessous). Aux fins du présent Contrat, le terme « Ventes nettes facturées » désigne le montant effectivement facturé par la Société pour les Produits vendus par la Société à un client, après déduction des frais de transport et d'emballage et des escomptes ou remises.

Patricia GRIMALDI-PALMERO
Huissier
Tél. 97 77 49 48
20 Bd de Suisse
98000 MONACO

# TRADUCTION

(b)      Dans le cas où IPAC accorde un avoir ou effectue un remboursement à un client suite à un retour de Produit, toute commission déjà versée au titre de ce Produit sera déduite du montant de la commission suivante ou remboursée immédiatement par le REPRÉSENTANT COMMERCIAL si aucune autre commission n'est due ou ne sera due.

ARTICLE 4. Délai de règlement. Dans les trente (30) jours suivant la fin du mois au cours duquel IPAC reçoit le paiement direct d'une facture applicable, IPAC doit établir et communiquer au REPRÉSENTANT COMMERCIAL un relevé complet et exact des commissions dues, accompagné du versement du montant indiqué comme dû sur le relevé.

ARTICLE 5.   Durée du Contrat.
(a)      La durée du présent Contrat est de trois (3) ans à compter de la date d'entrée en vigueur indiquée ci-dessus, sauf cas de résiliation anticipée prévue par les modalités du présent Contrat. Au terme de la première période de 3 ans, le présent Contrat est automatiquement reconduit pour des durées supplémentaires de trois ans, sauf résiliation anticipée conformément à l'alinéa b) ou l'alinéa c) de l'Article 5 du présent Contrat.

(b)      L'une ou l'autre des parties peut résilier le présent Contrat sans motif par l'envoi d'un préavis à l'autre partie, et la résiliation prendra effet soixante (60) jours à compter de l'envoi du préavis (« Délai de résiliation sans motif »).

(c)      En cas d'infraction au présent Contrat par l'une des parties, l'autre partie peut résilier le présent Contrat pour motif valable si cette infraction n'est pas remédiée dans les quinze (15) jours suivant l'envoi du préavis, et la résiliation prend effet automatiquement à la fin dudit délai de quinze (15) jours prévu pour remédier à ladite infraction. Toutefois, dans la mesure où il n'est pas nécessaire d'accorder une opportunité de remédiation à une infraction plus d'une fois par période de douze (12) mois alors, par conséquent, en l'absence de délai de remédiation, la résiliation prend effet quinze (15) jours après envoi du préavis de résiliation pour motif valable. En outre, IPAC peut résilier le présent Contrat avec effet immédiat par préavis au REPRÉSENTANT COMMERCIAL si, selon IPAC, le REPRÉSENTANT COMMERCIAL a pris, ou est susceptible de prendre toute mesure portant gravement atteinte à la réputation ou à l'activité d'IPAC, y compris en violant les procédures et conditions de contrôle des exportations d'IPAC.

(d)      Le Représentant commercial ne vendra aucun produit d'IPAC et ne représentera pas IPAC dans l'un quelconque des pays, ou auprès d'un des clients faisant l'objet de sanctions de la part des États-Unis. Par ailleurs, le Représentant commercial n'exercera aucune activité commerciale pour son propre compte dans ces pays interdits, étant donné qu'IPAC ne peut être associée à aucun représentant ou agent commercial réalisant des ventes dans lesdits pays interdits. La liste actuelle des pays interdits est la suivante : CRIMÉE (RÉGION D'UKRAINE), CUBA, IRAN, CORÉE DU NORD, SOUDAN et SYRIE.

ARTICLE 6. Commissions en cas de résiliation.

(a)      En cas de résiliation du présent Contrat par l'une ou l'autre des parties, le REPRÉSENTANT COMMERCIAL percevra les commissions dues au titre des commandes clients en cours portant des dates d'expédition fermes, qui ont été passées par le

# T R A D U C T I O N

REPRÉSENTANT COMMERCIAL et acceptées par IPAC avant la date d'effet de la résiliation.

(b)    En outre, IPAC versera des commissions au REPRÉSENTANT COMMERCIAL, conformément à l'Article 4, et selon le barème de commissions (Annexe C) en vigueur à la date du préavis de résiliation, au titre des renouvellements de commandes de Clients présentées à IPAC par le REPRÉSENTANT COMMERCIAL avant la date de résiliation, et ce pendant une période de deux ans à compter de la date de résiliation du présent Contrat dans le cas où IPAC effectue une résiliation sans motif valable.

(c)    La définition du terme « motif » inclut le défaut d'exécution ou le non-respect d'un budget annuel de ventes. Les autres motifs comprennent le non-respect des politiques d'exportation d'IPAC et tout manquement au strict respect des lois et réglementations des É.-U. en matière de contrôle des exportations ; toute infraction grave aux dispositions du présent Contrat et toute action du Représentant commercial portant gravement atteinte à la réputation ou à l'activité d'IPAC.

(d)    En cas de résiliation pour motif valable, ou si le Représentant commercial résilie volontairement le présent Contrat, le Représentant commercial sera en droit de recevoir les commissions, conformément à l'Article 4, et selon le barème de commissions (Annexe C) en vigueur à la date du préavis de résiliation, au titre des renouvellements de commandes de Clients présentés à IPAC par le REPRÉSENTANT COMMERCIAL avant la date de résiliation, et ce pendant une période de douze (12) mois à compter de la date de résiliation du présent Contrat.

(e)    Si le Représentant commercial et IPAC ne peuvent convenir des budgets de ventes pour toute année ultérieure à la première année du présent Contrat, le présent Contrat sera résilié et le Représentant commercial sera en droit de percevoir des commissions, conformément à l'Article 4, et selon le barème de commissions (Annexe C) en vigueur à la date du préavis de résiliation, au titre des renouvellements de commandes de Clients présentés à IPAC par le REPRÉSENTANT COMMERCIAL avant la date de résiliation, et ce pendant une période de douze (12) mois à compter de la date de résiliation du présent Contrat.

ARTICLE 7.   Modification du Contrat.    Sur préavis de soixante (60) jours au REPRÉSENTANT COMMERCIAL, IPAC a le droit unilatéral et exclusif de modifier ou de changer la liste des Produits figurant à l'Annexe A des présentes, ainsi que la liste de prix globale établie pour les Produits.

ARTICLE 8. Propriété. En cas de résiliation du présent Contrat pour quelque raison que ce soit par l'une ou l'autre des parties, le REPRÉSENTANT COMMERCIAL doit immédiatement renvoyer à IPAC à l'adresse indiquée ci-dessus, ou à l'adresse désignée aux États-Unis par IPAC par préavis, de manière sécurisée et à ses frais exclusivement, toutes les pièces en sa possession ou sous son contrôle et appartenant à IPAC, y compris, mais sans s'y limiter, la documentation, les matériels de promotion, les exemplaires de bons de commande et fichiers associés, les dessins des clients et autres documents concernant IPAC.

ARTICLE 9. Factures et Recouvrements. IPAC présentera directement au client toutes les factures relatives aux Produits vendus par le REPRÉSENTANT COMMERCIAL et en enverra la copie au REPRÉSENTANT COMMERCIAL.

ARTICLE 10.  Le REPRÉSENTANT COMMERCIAL ne peut pas sous-traiter.

Patricia GRIMAUD-PALMERO
Huissier

**T R A D U C T I O N**

Le REPRÉSENTANT COMMERCIAL convient qu'il est nommé personnellement aux termes du présent Contrat et qu'aucun des droits et obligations de REPRÉSENTATION COMMERCIALE définis aux présentes (dont le droit aux commissions) ne peut être cédé ou délégué, que ce soit volontairement ou en application de la loi.

ARTICLE 11. <u>Sollicitation et Acceptation des commandes</u>. Toutes les commandes sollicitées ou obtenues par le REPRÉSENTANT COMMERCIAL sont sujettes à l'acceptation ou au rejet par IPAC, à sa seule discrétion. Le REPRÉSENTANT COMMERCIAL convient n'avoir ni le droit ni l'autorité d'accepter une commande ou d'assumer ou de créer une obligation, expresse ou implicite, pour le compte d'IPAC. Le REPRÉSENTANT COMMERCIAL sollicitera des commandes pour les Produits et services d'IPAC uniquement aux prix en vigueur selon le barème établi ou communiqué périodiquement par IPAC. Le REPRÉSENTANT COMMERCIAL n'a pas le pouvoir de déroger et ne dérogera pas aux conditions de vente établies par IPAC, et le REPRÉSENTANT COMMERCIAL ne peut modifier ni ajuster un quelconque compte ni autoriser le retour d'un quelconque Produit sans l'approbation écrite préalable d'IPAC.

ARTICLE 12. <u>Obligation de respecter la confidentialité des informations</u>. Le REPRÉSENTANT COMMERCIAL convient que pendant la durée du présent Contrat et pendant la période qui suit de cinq (5) ans, ni lui ni ses dirigeants, personnels et agents ne pourront divulguer à qui que ce soit aucune information confidentielle d'IPAC, y compris, mais sans s'y limiter, des informations concernant les ventes, l'identité des clients et clients potentiels, la quantité et le type de Produits expédiés ou vendus, les prix et méthodes de tarification, les retours de Produits, les produits non annoncés et les informations confidentielles concernant les produits et les procédés, et toute autre information dont la communication à autrui nuirait aux intérêts d'IPAC.

ARTICLE 13. <u>Limitation de responsabilité et indemnisation.</u> LE REPRÉSENTANT COMMERCIAL EST EXONÉRÉ DE TOUTE RESPONSABILITÉ CONCERNANT TOUS LES DOMMAGES INDIRECTS, SPÉCIAUX OU CONSÉCUTIFS, DE QUELQUE NATURE QUE CE SOIT SUBIS PAR IPAC, Y COMPRIS, MAIS SANS S'Y LIMITER, EN CAS DE PERTE DE PROFITS OU DE TOUTE AUTRE PERTE ÉCONOMIQUE RÉSULTANT DU PRÉSENT CONTRAT OU QUI Y SERAIENT ASSOCIÉS, SAUF SI LE REPRÉSENTANT COMMERCIAL AGIT DE FAÇON NON AUTORISÉE AU-DELÀ DU CADRE DU PRÉSENT CONTRAT, Y COMPRIS EN CAS D'ACTES ILLICITES. IPAC ET LE REPRÉSENTANT COMMERCIAL CONVIENNENT QUE LA RELATION ÉTABLIE AUX TERMES DU PRÉSENT CONTRAT SE LIMITE À LA CONSULTATION ET À LA REPRÉSENTATION SELON LA DÉFINITION CI-DESSUS AUX PRÉSENTES. IPAC ACCEPTE DE DÉFENDRE, D'INDEMNISER ET DE DÉGAGER DE TOUTE RESPONSABILITÉ LE CONSULTANT À L'ÉGARD DE TOUTE RÉCLAMATION, MOTIF D'ACTION EN JUSTICE, RESPONSABILITÉ, COÛTS, HONORAIRES RAISONNABLES D'AVOCAT ET DOMMAGES-INTÉRÊTS QUE POURRAIT ENCOURIR LE REPRÉSENTANT COMMERCIAL DANS LE CADRE DE L'EXÉCUTION DES ACTIVITÉS AUTORISÉES ET LÉGALES AU PRÉSENT CONTRAT.

ARTICLE 14. <u>Obligation relative au Produit</u>. IPAC n'a aucune obligation envers le REPRÉSENTANT COMMERCIAL concernant la poursuite de son activité ou de la poursuite du développement, de la commercialisation ou de l'approvisionnement des Produits, et IPAC n'offre aucune garantie au REPRÉSENTANT COMMERCIAL concernant aucun des Produits.

**T R A D U C T I O N**

ARTICLE 15. <u>Conflit d'intérêts</u>. Le REPRÉSENTANT COMMERCIAL convient de ne pas vendre ni promouvoir de produits concurrents des Produits couverts par le présent Contrat, ces Produits étant susceptibles de modifications pendant la durée du présent Contrat. À compter de la date d'entrée en vigueur, le REPRÉSENTANT COMMERCIAL ne vend aucun produit concurrent des Produits objets du présent Contrat, et IPAC s'engage à ne pas entreprendre la vente de produits, tel que l'huile de base, qui concurrenceraient des produits dont le REPRÉSENTANT COMMERCIAL assure la vente ou la promotion à l'heure actuelle. Étant donné que les Parties vendent toutes deux des produits à polymères solides, les Parties conviennent de ne pas vendre de produits à polymères solides aux mêmes clients. Les clients existants de chacune des Parties sont considérés comme les clients exclusifs de cette Partie au Contrat pour les ventes de produits à polymères solides.

ARTICLE 16. <u>Avis</u>. Tous les avis, réclamations, certificats, requêtes, demandes et autres communications effectués aux termes des présentes doivent l'être par écrit et sont réputés avoir été dûment remis s'ils ont été remis en mains propres ou cinq jours à compter de la date du dépôt à la poste (courrier recommandé ou certifié, port payé, avec demande d'accusé de réception) ou par télécopieur comme suit :

    (a)    Envoi à IPAC :

        International Petroleum Products and Additives IPAC, Inc.
        7600 Dublin Blvd, Suite 240
        Dublin, CA 94568
        Attn: Brian Cereghino, CEO

    (b)    Envoi au REPRÉSENTANT COMMERCIAL :

        BLACK GOLD SARL
        4 Rue R.P. Louis Frolla
        98000 Monaco
        Principauté de Monaco
        T. +37793302942
        Portable +33647353844
        À l'attention de : Lorenzo Napoleoni, CEO

ou à toute autre adresse que la partie destinataire de l'avis peut avoir préalablement fournie à l'autre partie de la manière indiquée précédemment.

ARTICLE 17. <u>Loi applicable</u>. Le présent Contrat est régi par les lois internes de l'État de Californie, et doit être interprété et appliqué conformément à ces lois, sans égard aux dispositions en matière de conflits de lois.

# TRADUCTION

ARTICLE 18. <u>Clause de divisibilité.</u> En cas d'invalidité, d'illégalité ou d'impossibilité d'appliquer une modalité ou une autre disposition du présent Contrat en raison d'une règle de droit ou d'une politique publique, toutes les autres conditions et dispositions du présent Contrat restent néanmoins pleinement applicables, aussi longtemps que la signification économique ou juridique des opérations envisagées aux présentes n'est pas affectée de quelque façon que ce soit au détriment de l'une des Parties.

ARTICLE 19. <u>Arbitrage.</u> En cas de différend ou de litige entre les Parties résultant du présent Contrat ou s'y rapportant, y compris, mais sans s'y limiter, les différends ou litiges concernant l'interprétation d'une disposition ou la validité ou le caractère exécutoire d'une modalité ou d'une condition (y compris le présent Article 18) ou de la totalité du Contrat, ou si tout ou partie du présent Contrat (y compris la présente clause) est déclaré nul ou annulable, le différend sera soumis à arbitrage par un arbitre unique, conformément aux règles commerciales d'arbitrage de l'American Arbitration Association en vigueur à cette date, à un bureau de l'American Arbitration Association ou au bureau que cette dernière désignera dans la Ville de San Francisco (Californie). Chaque partie assume les dépens encourus dans le cadre d'une telle procédure. La décision de l'arbitre sera définitive et exécutoire pour les parties et peut être appliquée par n'importe quel tribunal ayant compétence. Dans toute la mesure permise par la loi, les parties se soumettent irrévocablement à la compétence de ce forum et renoncent à toute objection concernant la compétence ou le lieu dudit forum.

ARTICLE 20. <u>Divers.</u> L'utilisation des genres masculin ou féminin dans le présent Contrat en référence au REPRÉSENTANT COMMERCIAL est considérée comme incluant le masculin et le féminin chaque fois que cela est nécessaire ou approprié. Le présent Contrat sera nul et non avenu s'il n'est pas signé complètement par toutes les Parties d'ici le 15 août 2016.

EN FOI DE QUOI, le présent Contrat a été dûment signé et délivré par IPAC et par le REPRÉSENTANT COMMERCIAL à la date indiquée ci-dessus en premier.

| | |
|---|---|
| International Petroleum Products and Additives Company, Inc. | Black Gold S.A.R.L. (*Stamp BLACK GOLD S.A.R.L.*) |
| Signature (*Signature*) | Signature (*Signature*) |
| **Brian J Cereghino** | **Lorenzo Napoleoni** |
| CEO | CEO |

Date 9 septembre 2016

<u>ANNEXES</u> :

Annexe A, Produits

Annexe B, B 1, B 2, Comptes clients

Annexe C, Commissions

---

Contrat de représentation commerciale                                   Page 6

# TRADUCTION

## ANNEXE A

## PRODUITS

Le terme *« Produits »* désigne et fait référence, individuellement et/ou collectivement, à tous les Additifs ou composants fabriqués et distribués par la Société et vendus aussi bien aux fabricants qu'aux grossistes selon la liste figurant à la présente Annexe A, et comprend toutes les modifications, corrections, mises à jour, améliorations, dérivés ou perfectionnements qui y sont apportés, ainsi que la Documentation préparée pour leur utilisation. Pendant la durée du présent Contrat, la Société peut modifier l'Annexe A afin d'y inclure d'autres Produits ou de supprimer des Produits existants. La Société doit en notifier le Représentant commercial par écrit soixante (60) jours civils à l'avance.

Produits représentés

A.      Les produits suivants de la Société constituent les Produits :

Tous les Additifs et composants fabriqués et distribués par la Société et vendus aussi bien aux fabricants qu'aux grossistes, qui sont susceptibles de modifications périodiques tel que déterminé exclusivement par la Société.

# T R A D U C T I O N

Patricia ERMANNO PALMERO
Huissier
Tél. 97 77 48 48
20 Bd de Suisse
98000 MONACO

## ANNEXE B

### Comptes clients exclusifs et Comptes clients potentiels

Le volume total minimum de ventes que doit effectuer le Représentant commercial en 2016 auprès des comptes clients exclusifs est indiqué en dollars US ci-dessous à l'Annexe B 1.

A) Pour toutes les années postérieures à 2016, la Société et le Représentant commercial examineront les ventes de fin d'année et prévoiront les objectifs de vente pour l'année suivante. La Société fixera ensuite un objectif raisonnable compte tenu de l'objectif actuel de 2016 et communiquera au Représentant commercial, dans les 90 jours suivant la fin de chaque exercice (31 décembre), le nouvel objectif minimum de vente à atteindre par le Représentant commercial pour conserver l'exclusivité des comptes clients désignés (Annexe B1) pour l'exercice suivant. Le Représentant commercial aura un droit exclusif aux Clients, cette exclusivité étant déterminée d'année en année par la Société.

B) Aux fins de déterminer les clients exclusifs, le Représentant commercial est autorisé à prospecter la liste des clients à l'Annexe B2. La Société prendra la décision d'attribuer le compte client au Représentant commercial selon ce qu'elle juge approprié et équitable.

C) Au cas par cas, compte tenu de la concurrence et de la conjoncture commerciale, le Représentant commercial conserve l'exclusivité des Clients aussi longtemps que ses Clients restent actifs, c.-à-d. aussi longtemps que ces Clients achètent des quantités importantes de Produits de la Société durant les douze mois qui précèdent (comme ci-dessus).

**Remarques** :

1. Le terme « *Exclusif* » signifie que le Représentant commercial perçoit une commission sur les ventes générées pour les comptes désignés aux termes de l'Annexe B1 ou selon les ajouts ou suppressions, de bonne foi, de temps à autre, qui sont considérés par la Société comme des Clients « Exclusifs ». Toutefois, les comptes Clients générés par le Représentant commercial demeureront les clients/acheteurs du Représentant commercial, et le Représentant commercial conservera le droit de solliciter des renouvellements de commande auprès de ses clients et de gagner les commissions afférentes, aussi longtemps que le présent Contrat restera en vigueur et que les objectifs de vente (dont les Parties auront mutuellement convenu) pour chaque client considéré seront atteints au cours des douze mois précédents.

# T R A D U C T I O N

## Annexe B1

### Comptes clients

| COMPTE | Pays | BUDGET 2015 | BUDGET 2016 |
|---|---|---|---|
| Lubtech | Roumanie | | $350.000 |
| The Palestinian Mineral Lube Co | Israël | $150.000 | |
| TransNational Blenders | Pays-Bas | $180.000 | $1.700.000 |
| SLIDER | Grèce | $200,000 | $150.000 |
| Societa Internazionale Lubricanti—SIL | Italie | $200,000 | $100.000 |
| Deutsche Olewerke Lubmin | Allemagne | $500,000 | $450.000 |
| AXXON Oil | Italie | $250.000 | $ 100,000 |
| Belgin Madeni | Turquie | $120,000 | $350.000 |
| Black Gold | Monaco | $500.000 | $600.000 |
| PAZ Lubricants | Israël | $40.000 | $50.000 |
| Acietes Industriales Limitada | Chili | | $120.000 |
| Petrochemicals Europa | Serbie | | $120.000 |
| De Oliebron | Pays-Bas | | $ 200.000 |
| Petropal | Israël | | $60.000 |
| | | | |
| | | BUDGET TOTAL | $4.350.000 |
| **Annexe B2** | | **Comptes Clients Potentiels** | |
| CIL | Italie | | $ à déterminer |
| Conqordoil | Italy | | $ à déterminer |
| Siral | Italie | | $ à déterminer |
| Rilub | Italie | | $ à déterminer |

# T R A D U C T I O N

| | | | |
|---|---|---|---|
| Ramoil | Italie | | $ à déterminer |
| Total | France | | $ à déterminer |
| Unil-OPAL | France | | $ à déterminer |
| Motul | France | | $ à déterminer |
| Accor | France | | $ à déterminer |
| HAFA | France | | $ à déterminer |
| SOCAZ | France | | $ à déterminer |
| IGOL | France | | $ à déterminer |
| YACCO | FRANCE | | $ à déterminer |
| DURAND | FRANCE | | $ à déterminer |
| ACIA | FRANCE | | $ à déterminer |
| CLIP | FRANCE | | $ à déterminer |
| DELEK | ISRAEL | | $ à déterminer |
| | | | $ à déterminer |
| CYCLON | GRÈCE | | $ à déterminer |
| RS 200 | GRÈCE | | $ à déterminer |
| SILVER INDUSTRIAL -- BLACK GOLD DISTRIBUTOR | ESPAGNE | | $ à déterminer |
| COSAN/COMMA | ROYAUME-UNI | | $ à déterminer |
| MORRIS | ROYAUME-UNI | | $ à déterminer |
| SHELL | ROYAUME-UNI | | $ à déterminer |
| TEDEX | POLOGNE | | $ à déterminer |
| ORLEN | POLOGNE | | $ à déterminer |
| PRISTA | BALKANS | | $ à déterminer |
| HEXOL | BALKANS | | $ à déterminer |

Contrat de représentation commerciale

# TRADUCTION

| | | | |
|---|---|---|---|
| INA | BALKANS | | $ à déterminer |
| MOL | BALKANS | | $ à déterminer |
| GALP | PORTUGAL | | $ à déterminer |
| ROWE | ALLEMAGNE | | $ à déterminer |
| SWD | ALLEMAGNE | | $ à déterminer |
| OEST | ALLEMAGNE | | $ à déterminer |
| PENTOSIN | ALLEMAGNE | | $ à déterminer |
| BANTLEON | ALLEMAGNE | | $ à déterminer |
| ZELLER/GMELIN | ALLEMAGNE | | $ à déterminer |
| | | | $ à déterminer |
| EUROL | PAYS-BAS | | $ à déterminer |
| KROON | PAYS-BAS | | $ à déterminer |
| ALPET | TURQUIE | | $ à déterminer |
| SEAHORSE | TURQUIE | | $ à déterminer |
| AKTAS | TURQUIE | | $ à déterminer |
| GEMA | TURQUIE | | $ à déterminer |
| ATLANTIK PETROKIMYA | TURQUIE | | $ à déterminer |
| Q8 | BELGIQUE | | $ à déterminer |
| WOLF | BELGIQUE | | $ à déterminer |
| ARDECA | BELGIQUE | | $ à déterminer |
| UNIL | BELGIQUE | | $ à déterminer |
| VIVO | MAROC | | $ à déterminer |
| DELFIN | RUSSIE | | $ à déterminer |
| GAZPROMNEFT | RUSSIE | | $ à déterminer |
| OILYB | ÉGYPTE | | $ à déterminer |
| ORBICHEM | AFRIQUE DU SUD | | $ à déterminer |
| JOPETROL | JORDANIE | | $ à déterminer |
| ADNOC | ÉAU | | $ à déterminer |
| SHARLU | ÉAU | | $ à déterminer |
| | | | $ à déterminer |
| | | | $ à déterminer |

Contrat de représentation commerciale

# TRADUCTION

| | | | |
|---|---|---|---|
| | | | $ à déterminer |
| | | | $ à déterminer |
| COMPTES DES ÉMIRATS ARABES UNIS DISPONIBLE LE 1ER NOVEMBRE 2016 SI AUCUNE ACTIVITÉ | | | |

Patricia GRIMALDI-PALMERO
Huissier
Tel 97 77 48 48
70 Bd de Suisse
93000 MONACO

---

Contrat de représentation commerciale                                    Page 12

# TRADUCTION

ANNEXE C

**Rémunération par Commission**

1. Le Représentant commercial percevra une commission en espèces égale à trois et demi pour cent (3,5 %) du Chiffre d'affaires de la Société réalisé sur les factures de vente aux clients présentés par le Représentant commercial pendant la durée du présent Contrat. La commission payable au Représentant commercial sera calculée sur la base des Ventes nettes, soit le montant de la facture au client après déduction des frais de transport et d'emballage distincts facturés au client et des escomptes ou remises effectivement accordés aux clients pour les Produits vendus au client par la Société. Le Représentant Commercial et la Société peuvent en outre convenir à l'avance, pour des clients individuels spécifiques ou des opportunités de vente chez un client, d'un pourcentage de commission différent de celui fourni ci-dessus.

2. Les commissions seront payables en dollars US ou en euros, selon la devise facturée au client, et elles sont payées mensuellement 10 jours fin de mois par virement bancaire sur le compte du Représentant commercial.

## ATTESTATION DE TRADUCTION EXACTE

Je soussignée, Catherine Lewi, certifie en toute bonne foi que la traduction ci-dessus en langue française a été faite par moi-même en ma qualité de Traductrice professionnelle Certifiée d'anglais en français par l'ATA (American Translators Association) et représente la version complète et conforme du document original en langue anglaise.

*Catherine Lewi – New York, NY 10028 – USA*
*Tél. : +1-858-401-0127 - e-mail : catherine.lewi@yahoo.com*

Verify at www.atanet.org/verify

28 JUILLET 2019

Signature                                    Date

STATE OF NEW YORK, COUNTY OF NEW YORK

The foregoing instrument was acknowledged before me
this 29th day of JULY, 2019 by CATHERINE LEWI
Charmaine Raphael, Notary Public 01RA6217652
COMMISSION EXPIRES FEBRUARY 16, 2022

Contrat de représentation commerciale                              Page 13

Patricia GRIMAUD-PALMERO
Huissier
Tél. 97 77 49 49
20 Bd de Suisse
98000 MONACO

# EXHIBIT

# 2

# INTERNATIONAL PETROLEUM PRODUCTS AND ADDITIVES COMPANY, INC.

## EXCLUSIVE DISTRIBUTOR AGREEMENT

This Agreement is made and is effective as of the 1st day of January 2016, and replaces and supersedes the prior Agreement of August 2012 and all Amendments thereto by and between International Petroleum Products and Additives Company, Inc., a California corporation, together with any subsidiaries and affiliates (including IPAC EU Cooperatie U.A.) with an office located, at 7600 Dublin Blvd. Suite 240, Dublin, CA 94568 (hereinafter referred to as "Company") and BLACK GOLD S.A.R.L with offices at 4 Rue R.P. Louis Frolla. 98000 MONACO, PRINCIPALITY OF MONACO (the "Distributor"). IPAC and Distributor collectively may be referred to as "Parties."

WHEREAS, IPAC manufactures the IPAC line of Lubricants and Additives (collectively, "Products") and which are typically sold to independent lubricant and additive manufacturers; The Products as listed on Exhibit A are those currently available to Distributor.

WHEREAS, the Distributor is a Monegasque Limited Liability Company with the power to carry on business as contemplated by this Agreement;

WHEREAS, IPAC and Distributor desires to enter into an Exclusive Distributor Agreement regarding the customers listed in Schedule B for the Products (as listed on Schedule A) and whereby the Distributor will seek to develop additional customer specific opportunities to re-sell the Products within the additive & lubricant market; and

WHEREAS, the parties hereto desire to establish, among other things, the terms and conditions under which orders will be placed by the Distributor and accepted and filled by IPAC.

NOW, THEREFORE, in consideration of the premises stated above and subject to the terms and conditions contained herein, the parties hereby agree as follows:

## I. PRICES

Prices for all Products available for purchase by the Distributor are periodically provided to Distributor by IPAC and shall be paid in U.S. Dollars. IPAC shall be responsible for all reasonable land or airfreight charges to Distributor's facility. The prices shall remain fixed for a period of at least 90 days from the notification date as communicated in writing by IPAC. IPAC shall attempt to fill any orders pending at the time any such notice is given at the prices in effect immediately prior to the notification.

## II. DELIVERY

IPAC shall deliver the Products to the Distributor on an Ex Works (EXW) basis and packed at IPAC's facility in various points in Belgium or the United States. Upon delivery, title to the Products and all risk of loss or damage shall pass to the Distributor. The Products shall be ordered in full container loads with a minimum order quantity of 4 drums of any IPAC product. Containers contain 80 drums of product allowing 4 weeks lead time prior to the shipment date requested by the Distributor. The lead time for Products ordered in less than production run quantities is subject

1

to availability and ordering requirements for IPAC's own stock. IPAC, at its sole discretion, shall determine whether and under what terms such requests shall be fulfilled. IPAC's obligation to meet the delivery dates quoted in response to the Distributor's orders is subject to the prompt receipt by IPAC of all information reasonably required to permit IPAC to proceed with the fulfillment of the Distributor's order or the production of the ordered Products, as the case may be, immediately and without interruption.

## III. DELAYS

IPAC's performance of its obligations under this Agreement shall be excused for the duration of any delay arising directly or indirectly from (A) acts of God, unforeseeable circumstances, acts (including delay or failure to act) of any governmental authority, war (declared or undeclared), riot, revolution, fires, strikes, labor disputes, sabotage, or epidemics, (B) inability, due to causes beyond IPAC's reasonable control, to timely obtain instructions or information from the Distributor, necessary and proper labor, materials, components, facilities, and transportation, or (C) any other cause beyond IPAC's reasonable control.

## IV. PAYMENT

Payment for the value of Products ordered shall be made either through wire or electronic transfer in full 45 days after delivery.

## V. GOVERNMENTAL AUTHORIZATION

**A. All sales hereunder shall be subject to the export control laws and regulations of the United States Government, including but not limited to the Export Administration Act.**

B. The Distributor shall be responsible for the timely obtaining of any required authorizations such as import licenses, exchange permits, or any other specific governmental authorization for the importation and/or sale of the Products. The Distributor shall use its commercially reasonable efforts and, if needed, engage an expert at its own reasonable expense to obtain governmental approval for the sale of IPAC Products. IPAC shall in good faith use commercially practical efforts as may reasonably be required to provide Certificate of Analysis, Certificate of Origin, or other documentation that may be requested by governments as proof that the Products comply with any applicable standards, requirements, tests, or procedures (collectively, the "Standards"). IPAC shall not be liable if any such approval/authorization is delayed, denied, revoked, restricted, or not renewed, and the Distributor shall not be relieved thereby of its obligations to pay IPAC for any Products already shipped to the Distributor at its request. Notwithstanding the preceding, nothing in this Agreement shall be construed to obligate IPAC (i) to pay for the inspection of its facilities or the facilities of any supplier to satisfy governmental agencies or authorities, or (ii) to otherwise incur any costs or expenses to qualify its facilities or the facilities of any supplier pursuant to the governmental regulations. IPAC shall manufacture the Products in accordance with the product specifications, in conformity with all applicable standards known to IPAC at the time of manufacture. Products not in conformity with such standards, or which may be otherwise defective, may, at IPAC's option, be destroyed or returned by the Distributor to IPAC at IPAC's

2

expense upon written authorization from IPAC. The Distributor agrees that it shall not make any disposition, by way of trans-shipment, re-export, diversion or otherwise, of the Products, other to the customers in Exhibit B or as otherwise approved by IPAC. The Distributor will in all cases obtain an executed End-User Certification from their customers, as illustrated in Exhibit C, and maintain such certification in Distributors files to be reasonably available to provide copies for inspection by IPAC should IPAC be required under any governmental order or request.

## VI.  EXCLUSIVITY

A.   The manufacturer hereby appoints the Distributor as its exclusive distributor for the resale of the Products to specific customers listed in Schedule B, and the Distributor agrees to act in that capacity, subject to the following that IPAC shall not;

    1.   appoint any other person, firm or company as a distributor or agent for the customers in Exhibit B; or

    2.   supply to any company listed in Schedule B any of the Products, whether for use or resale.

B.   The Distributor shall be entitled to describe itself as IPAC's 'Authorized Distributor' for the Products, but shall not hold itself out as IPAC's agent for sales of the Products or as being entitled to bind IPAC in any way.

## VII. SALES ACTIVITIES & DISTRIBUTOR RESPONSIBILITIES/OBLIGATIONS

A. Except as otherwise provided herein, the Distributor is not the agent of IPAC for any purpose and is not granted any express or implied right to assume or create any obligation in the name of IPAC or to bind IPAC in any manner. The Distributor shall refer to IPAC all inquiries or requests for Products, as listed in Exhibit A, received from customers not included in schedule B with a copy to IPAC's Sales Representative in the territory. The Distributor shall use its best efforts to operate under professional and ethical guidelines and abide by all local laws as well as the US Export control laws that are in effect and published by the United States government. Additionally, distributor will obtain an end-user certificate as attached as Exhibit C before shipping any IPAC sourced products to third parties.

B. The general responsibilities and obligations of the Distributor include, but are not limited to, the following:

1.   The Distributor will develop at its own expense all training, promotional and business sales aids, including any translation and printing costs. IPAC will make available examples of its US, promotional, and business sales aid materials for the Distributor's use. IPAC reserves the right to review and approve such materials and procedures developed by the Distributor for use in the Territory. Such approvals shall not be unreasonably delayed or withheld.

2.   The Distributor will develop labels for Products and such promotional materials as may be reasonably required for conduct of business by the Distributor. IPAC reserves the right to

3

Patricia GRIMALDI-PALMERO
Huissier
Tél. 97 77 49 48
20 rue de Suisse
98000 MONACO

review and approve such labels and materials prior to their use in. Such approval shall not be unreasonably withheld or delayed. All Products supplied to Distributor shall bear English-language IPAC labels. Distributor shall have the right to develop its own labels at its own cost and expense.

3. The Distributor will coordinate its IPAC Product sales activities with IPAC's Vice President of Sales & Marketing or other designated IPAC representative.

4. The Distributor will not alter, add-to or change the make-up or properties in any way of any IPAC Product that could possibly have an effect on the Product(s) specifications.

## VII.  SUPPORT AND TRAINING

A.  IPAC shall from time to time provide the Distributor with such samples, catalogues, brochures and up to date information concerning the Products as IPAC may consider appropriate or as the Distributor may reasonably require in order to assist the Distributor with the sale of the Products and IPAC shall endeavor to answer as soon as practicable any technical enquiries concerning the Products which are made by the Distributor or its customers.

B.  During the term of this agreement;

i)      IPAC shall make available to the Distributor at such time and period as may be agreed by the Parties the services of a suitably qualified employee of IPAC to assist the Distributor with ideas and strategies to better market the products.

ii)      The Distributor shall be entitled to send to IPAC's premises (at such time and period as may be agreed between the Parties some employees of the Distributor for training by IPAC in matters relating to the Products and their marketing.

C    The services to be provided by IPAC under Clauses B (i) and (ii) shall be free of charge, but the Distributor shall;

i)      if agreed to in writing in advance by IPAC and Distributor on a case by case basis, reimburse to IPAC all travelling, accommodation and other expenses  reasonably incurred by any employee(s) of IPAC in providing such services; and

ii)      remain liable for salaries and other employment costs of and all travelling, accommodation and other expenses incurred by, employees of the Distributor who are sent to IPAC's premises, unless IPAC agrees in advance in writing to reimburse Distributor's travel costs.

4

## VIII. COMPETING PRODUCTS AND CONFIDENTIALITY

A. During the Term of this Agreement, the Distributor will not, directly render service to any other business directly competitive with the business of IPAC.

B. As used in this Section, "Confidential Information" means information disclosed to the Distributor by IPAC or information disclosed to IPAC by Distributor, or known by the Distributor and IPAC as a consequence of, or through, the affiliation with each other, not generally known in the industry in which IPAC and Distributor are active or may become engaged. Distributor shall not disclose any not publicly known information about IPAC's customer lists, products, processes, and services, including information relating to research, development, inventions, manufacture, purchasing, accounting, engineering, marketing, merchandising, selling, pricing, internal policies, and any lawsuits, or legal work without the consent of IPAC. The parties shall not, at any time, either during the term of this Agreement or thereafter, divulge to any person, firm, or corporation any of the Confidential Information received by it during the term of this Agreement, and all such information shall be kept confidential and shall not, in any manner, be revealed to anyone except as may be required by legal process or the order of any court of competent jurisdiction. Distributor may provide summary level financial information to its accounting and legal advisors sufficient to allow Distributor to comply with tax and other regulatory requirements to which it is subject.

## IX. TAXES

A. No sales, use, excise, or similar taxes have been included on the basis that the transaction is presumed to involve resale by the Distributor. The Distributor shall furnish evidence supporting such assumption and appropriate tax exemption evidence to IPAC acceptable in form to any taxing or regulatory authorities which request such information of IPAC.

B. Any taxes (including VAT, income, stamp, and other turnover taxes), duties, fees, charges, or assessments of any nature levied by any governmental authority or any jurisdiction in connection with this Agreement, which is levied against the Distributor shall be for the Distributor's account and shall be paid directly by the Distributor to the applicable governmental authority or jurisdiction. If IPAC is required by law or otherwise to pay any such levy and/or fines, penalties, or assessments as a result of the Distributor's failure to comply with any applicable laws or regulations governing the payment of such levies by the Distributor, the amount of any such payments so made by IPAC shall be reimbursed by the Distributor to IPAC upon submission of IPAC's receipts or other evidence of payment of such levies, less any tax savings by IPAC. The Distributor reserves the right to dispute in good faith any or all such taxes, duties, fees, charges, assessments, or penalties that may be levied against the Distributor or others in connection with this Agreement or its activities hereunder.

## X. WARRANTIES

A.   IPAC hereby warrants to the Distributor that:

   i) All the products supplied under this agreement will be of merchantable quality and will comply with IPAC's specification sheets. The Distributor understands that IPAC will develop and introduce from time to time product changes and/or modifications. The Distributor agrees that these product changes and/or modifications will be introduced into

5

Patricia GRINALD-PALMERO
Notaria

Tel. 97 77 48 48
20 Deric Sainaa
9000...

its line, if approved by governmental authority. The Distributor agrees to introduce into its line the new or modified product as soon as commercially reasonable.

    ii) the trademarks of which registration particulars are given in respect of the Products listed in Schedule A are registered in the name of IPAC and that it has disclosure to the Distributor all trademarks and tradenames used by IPAC in relation to the Products at the date of this agreement

    iii) it is not aware of any rights of any third party in the Territory which would or might render the sale of the Products, or the use of any of the Trademarks on or in relation to the Products unlawful. Except as otherwise provided herein,

B.    IPAC shall not be liable to the Distributor for any liability, claim, loss, damage, or expense of any kind or for any direct, consequential, collateral, or incidental damages relative to or arising from or caused directly or indirectly by the Products or the use thereof, unless expressly set forth in or contemplated by this Agreement. Except as otherwise provided herein, the Distributor's exclusive remedy for any cause of action relating to breach of this warranty shall be limited to the prompt replacement by IPAC of the defective Product, and IPAC's liability to the consumer for any and all losses or damages resulting from any breach of any Product warranty, including negligence, shall in no event exceed the purchase price of the Product in accordance with Section I hereto or, at the election of IPAC, the replacement of the Product.

C.    Product Liability Insurance. The Distributor will undertake to obtain its own product liability insurance to cover potential claims. IPAC hereby agrees to, at its expense, during the term of this Agreement, cause to be maintained product liability insurance covering claims brought within the United States with the named insured thereon being IPAC. The insured amounts shall be no less than $1,000,000 per occurrence and $2,000,000 in the aggregate. This product liability insurance shall cover all Products sold by IPAC to the Distributor.

## XI. PATENTS

    If the Distributor receives a claim that any Products or part thereof manufactured or distributed by IPAC infringes any patent, the Distributor shall notify IPAC promptly in writing and give IPAC information, assistance, and exclusive authority to evaluate, defend, and settle such claim. IPAC shall then at its own expense and option (1) settle such claims, (2) procure for the Distributor the right to use and sell such Products to its customers, (3) replace or modify the Products to avoid infringement, (4) remove the Products and refund the Distributor's purchase price, or (5) defend against such claim. Provided such timely notice has been given by the Distributor, should any court of competent jurisdiction hold such Product to constitute infringement, IPAC shall indemnify Distributor of all costs and damages finally awarded on account of such infringement and, if the use of such Products is enjoined, IPAC shall, at its option and sole expense, take one or more of the actions under (2), (3), (4), or (5) above.

## XII. TRADEMARKS AND TRADE NAMES.

A.   IPAC authorizes the Distributor to use its trademarks or trade names on or in relation to the Products for the purposes only of exercising its rights and performing its obligations under this agreement and IPAC shall not so authorize any other person, firm or company.

B.   The Distributor shall ensure that each reference to and use of any of the Trade marks or trade names by the Distributor is in a manner from time to time approved by IPAC and accompanied by an acknowledgment in a form approved by IPAC that the same is a trademark or trade names of IPAC.

C.   The Distributor shall not

    i)   make any modifications to the Products or their packaging

    ii)   alter, remove or tamper with any trademarks, numbers, or other means of identification used on or in relation to the products

    iii)   use any of the trademarks in any way which might prejudice their distinctiveness or validity or the goodwill of IPAC therein;

    iv)   use in relation to the products any trademarks other than IPAC's trademarks or

    v)   use any trademarks or trade names resembling any trademarks or trade names of IPAC as to be likely to cause confusion or deception.

D.   Except as provided in clause XII (1) above, the Distributor shall have no rights in respect of any trademarks or trade names used by IPAC in relation to the Products or of the goodwill associated therewith, and the Distributor hereby acknowledges that, except as expressly provided in this agreement, it shall not acquire any right of ownership in respect of any IPAC's trademarks and trade names and that such ownership rights and goodwill are, and shall remain, vested in IPAC.

E.   The Distributor shall, at the expense of IPAC take all such steps as IPAC may reasonably require to assist IPAC in maintaining the validity and enforceability of the intellectual property of IPAC over the Products during the term of this agreement.

F.   The Distributor shall at the request of IPAC execute such licenses in respect of the use of the trade marks and trade names as IPAC may reasonably require, provided that the provisions of any licenses shall not be more onerous or restrictive than the provisions of this agreement.

G.   the Distributor shall not do or authorize any third Party to do any act which would or might invalidate or be inconsistent with the intellectual property of IPAC over the Products and shall not omit or authorize any third Party to omit to do any act which, by any omission, would have that effect or character.

7

Patricia CRISTALDO PALMERO
Hundred

H.   The Distributor shall promptly and fully notify IPAC of any actual, threatened or suspected infringement of any intellectual property of IPAC over the products which comes to the Distributor's notice, and of any claim by any third Party so coming to its notice that the importation of the products or their sale infringes any rights of any other person, and the Distributor shall at the request and expense of IPAC do all such things as may be reasonably required to assist IPAC in taking or resisting any proceedings in relation to any such infringement or claim.

## XIII. LIMITATION OF LIABILITY

A. Except as set forth in the preceding and following Sections, the total liability of IPAC to the Distributor on any claim, whether in contract, tort, or otherwise, arising out of, connected with, or resulting from the manufacture, sale, delivery, resale, replacement or use of any Products shall not exceed the price allocable to the Products or part thereof which gives rise to the claim.

B. In no event shall IPAC be liable to the Distributor for any special or consequential damages including, but not limited to, damages for loss of revenue, cost of capital, claims of customers for supply interruptions or failure of supply, and costs and expenses incurred in connection with transportation or substitute facilities or supply sources. The foregoing notwithstanding, each party may be liable for damages caused to the other party by means of fraud, transmission of false information, or violations of law. Such damages will be limited to cost of goods, freight and actual damages.

## XIV. INDEMNIFICATION

A. the Distributor agrees to indemnify and hold harmless IPAC from and against any and all claims for losses, liability, or damage, pecuniary or physical, and reasonable attorneys' fees and expenses, arising out of, or in connection with any acts or omissions of the Distributor in the distribution of the Products pursuant to this Agreement. Such acts or omissions include, but are not limited to, any breach or alleged breach of this Agreement or any of its provisions or warranties, or any violation or failure to comply with all applicable laws, regulations, or codes of the Territory which pertain to the importation, distribution, and sale of the Products.

B. In case any claim, demand, or action shall be brought by any third party including, but not limited to, any governmental authority, against a party entitled to indemnity under Section XIV.A. or XIV.B., above, such party shall promptly notify the other party or parties, as the case may be, from whom indemnity is or may validly be sought, in writing, and the indemnifying party or parties shall assume the defense thereof, including the employment of counsel. In addition, in case a party hereto shall become aware of any facts which might result in any such claim, demand, or action, such party shall promptly notify the other party or parties who would be obligated to provide indemnity hereunder with respect to such claim, demand, or action, and such other party or parties shall have the right to take such action as it or they may deem appropriate to resolve such matter. The indemnified party or parties shall have the right to employ separate counsel in such action and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such indemnified party or parties, unless the employment of such counsel has been specifically authorized by the indemnifying party or parties. Any settlement of any action subject

8

to indemnity hereunder shall require the consent of the indemnified and the indemnifying party, which consent shall not be unreasonably withheld and which shall be given within five (5) days following the giving of notice of such proposed settlement. The indemnifying party or parties shall not be liable for any settlement of any action affected without its or their consent, but if settled with the consent of the indemnifying party or parties, or if there be a final judgment for the plaintiff in any such action, the indemnifying party or parties shall indemnify and hold harmless the indemnified party from and against any loss or liability by reason of such settlement or judgment. If requested by the indemnifying party, the indemnified party shall cooperate with the indemnifying party and its counsel and use its best efforts in contesting any such claim or, if appropriate, in making any counter-claim or cross-complaint against the party asserting the claim, provided that the indemnifying party will reimburse the indemnified party for reasonable expenses incurred in so co-operating upon presentation of receipts or other evidence of such expenses. The indemnifying party and its representatives shall have full and complete access during reasonable hours to all books, records, and files of the indemnified party expressly related to the defense of any claim for indemnification undertaken by the indemnifying party pursuant to this Section, or for any other purpose in connection therewith, provided that the indemnifying party shall safeguard and maintain the confidentiality of all such books, records, and files.

## XV. TERM AND TERMINATION

A. This Agreement will be from the Effective date as first written above and shall continue for one (1) year thereafter, unless terminated earlier by mutual agreement of the parties or otherwise in accordance with the terms hereof. The Parties will endeavor to agree on minimum annual sales volumes for the Distributor to continue (after the first year) as the Exclusive Distributor for the customers listed in Schedule B. Targeted sales volumes for the first year are listed in Schedule B. Should the Parties fail to agree, within sixty (60) days of the 1st year anniversary date, as evidenced in writing by a mutually signed extension, on minimum future annual sales volumes, then this agreement will terminate one (1) year after the effective date.

B. In addition to the provisions of Section XV.A., above, this Agreement may be terminated with immediate effect upon the occurrence of any of the following events:

1. The insolvency of either party; its suffering or committing any act of insolvency, or the inability of either party to pay its debts when due or within 90 days of due date;

2. Either party's bankruptcy or liquidation, whether voluntary or involuntary, or the appointment for it of a receiver or liquidator;

3. An attempted assignment of this Agreement, except as provided in Section XVI.A, below;

4. Any non-payment by the Distributor to IPAC of any indebtedness under this Agreement, provided the Distributor has received written notice of such default and has had thirty (30) days to cure such default but failed to do so;

5. The failure of a breaching party to remedy a breach of this Agreement within thirty (30) days after written notice of breach has been served on the breaching party by the non-breaching party indicating the nature of the breach or purported breach.

6. Any breach of the terms of this Agreement, including but not limited to violations of the US or EU Export laws, by Distributor.

9

Patricia GRIMALDI-PALMERO
Huissier
Tel. 97 77 43 43
20 Bd de Suisse
98000 MONACO

7. In any event either party may, upon written notice to the other, terminate this Agreement with 90 days notice.

C. In the event of termination or expiration of this Agreement:

- Distributor agrees to co-operate with IPAC, to surrender all records to IPAC, and to do whatever is reasonably required by IPAC in order to continue a viable business with IPAC the customers served by Distributor; and

D. Upon termination of this Agreement, the Distributor will immediately cease any and all use of any and all IPAC trademarks and/or trade names and will not sell any goods under such trademarks or trade names or any similar names or marks.


## XVI. MISCELLANEOUS

A. Entire Agreement. This Agreement, together with all Appendices, Exhibits, and attachments hereto, constitutes the entire agreement between the parties and there are no agreements or commitments except as set forth herein. This Agreement supersedes all prior agreements, whether written or oral, that exists or may have existed between the parties prior to the effective date of this Agreement. This Agreement may be amended, modified in whole or in part, or supplemented by an agreement in writing that makes reference to this Agreement and is executed by authorized officers of the parties. No party hereto shall assign its rights or obligations under this Agreement without the prior written consent of the other party. Except as otherwise provided herein, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns.

B. Notices. Any notices required or permitted to be given under this Agreement shall be in writing and shall be given by addressing the same to such other party(ies) at the address set forth below. Such notices shall be given to all parties by (1) overnight or highest priority expedited delivery by an internationally recognized air freight courier service (e.g., UPS, Federal Express, DHL) (herein referred to as "Courier Delivery"), (2) delivery of the same personally to such other party(ies), or (3) transmitting by facsimile and mailing the original. Any such notice shall be deemed to have been given three (3) days after timely delivery to an internationally recognized air freight courier service; if by personal delivery, upon such delivery; or if by facsimile, the day of transmission if made within customary business hours, or if not transmitted within customary business hours, the following business day.

Notices to IPAC shall be addressed and delivered to:

IPAC.
7600 Dublin Blvd.,
Suite 240
Dublin, CA 94568 USA
Telephone:   (925) 556-5530
Facsimile:   (925) 556-5531
Attn.:    Brian Cereghino, CEO

Notices to the Distributor shall be addressed and delivered to:

> BLACK GOLD SARL
> 4 Rue R.P. Louis Frolla
> 98000 Monaco
> Principality of Monaco
> T. +37793302942
> M. +33647353844
> Attn:  Lorenzo Napoleoni, CEO

C. Separability of Provisions. A judicial or administrative declaration by any court of competent jurisdiction of the invalidity of any one or more of the provisions hereof shall not invalidate the remaining provisions of this Agreement in any jurisdiction, nor shall such declaration have any effect on the validity or interpretation of this Agreement outside of that jurisdiction. The parties undertake, however, to negotiate in good faith to find a substitute provision as close as possible to the invalid provision, taking into consideration each party's intentions with respect to this Agreement.

D. Waiver of Compliance. Any failure by any party hereto to enforce at any time any term or condition under this Agreement shall not be construed as a waiver of that party's right to enforce each and every term of this Agreement.

E. Disputes. Any controversy or claim arising out of or in relation to this Agreement, or the breach or alleged breach thereof, which cannot be settled amicably, shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the International Arbitration Association and the provisions of this Section. Any party may initiate arbitration by giving written notice to the other party of an intention to arbitrate and by filing with the Centre for International Commercial Arbitration located in San Francisco, California (or such other Centre location as the parties may agree) three (3) copies of such notice and three (3) copies of this Agreement together with the appropriate filing fee. The arbitration shall be conducted before three (3) arbitrators who shall be appointed in accordance with the said rules. The arbitration proceedings shall be held at the Centre location agreed to by the parties and shall be subject to the above arbitration rules. The arbitrators may grant any legal and/or equitable relief to which a party may be entitled under the law or legal theory under which the party seeks relief, provided, however, that no claim may be made for any special, indirect, consequential, or punitive damages arising out of or related to this Agreement, or any act, omission, or event occurring in connection therewith, except that punitive damages may be awarded for willful or wanton misconduct. The arbitration award shall be given within three (3) months from appointment of the third arbitrator. The award given by the three arbitrators or the majority thereof, shall be final and binding on the parties and shall be subject to no appeal. The award shall not serve as precedent or authority in any subsequent proceeding, provided, however, that if the losing party should fail to comply with the award, the prevailing party may apply to any court having jurisdiction for an order confirming the award in accordance with applicable law. The award can be enforced in any court having jurisdiction. Unless otherwise required by law or court orders, the substance of any arbitration proceedings shall be kept

11

Patricia GRIMAUD-PALMERO
Huissier

Tél. 97 77 48 48

confidential by all parties and by the arbitrators; however, the fact that such a proceeding exists, or that an award has been rendered, need not be kept confidential. The costs of the proceeding, including the fees and costs of attorneys, accountants, and witnesses, and the compensation of the arbitrators, shall be assessed by the arbitrators against the parties according to the arbitrators' determination of fault.

F. Governing Law. The rights and obligations of the parties under this Agreement shall not be governed by the provisions of the 1980 U.N. Convention on Contracts for the International Sale of Goods; rather these rights and obligations shall be governed by the law of the California, USA, including its provisions of the Uniform Commercial Code.

G. Captions; Counterparts. The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

H. Further Instruments. The parties hereto agree to execute and deliver such instruments and take such other action as shall be reasonably necessary, or as shall be reasonably requested by any other party, in order to carry out the transactions and agreements contemplated by this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement in duplicate as of the date first written above, by their duly authorized representatives.


International Petroleum Products            Black Gold S.A.R.L
& Additives Company, Inc                   **BLACK GOLD S.A.R.L.**

By: _____             By: _____
   Brian J Cereghino, CEO                     Lorenzo Napoleoni, (CEO)

Date_____ 9 , 10 , 2016                    Date: 08 08 2016


12

## SCHEDULE A

## PRODUCTS

"Products" shall mean and refer to, individually and/or collectively, all of the Company's manufactured and distributed Additives or components sold to both manufacturers and wholesalers as set forth in this Schedule A, including any modifications, corrections, updates, improvements, derivatives or enhancements thereto, together with Documentation prepared for use in connection therewith. During the term of this Agreement, Company may amend Schedule A to include additional Products or delete existing Products. Company shall give Sales Representative sixty (60) calendar days prior written notice thereof.

Products Distributed

A.     The following Company products comprise the Products:

All of the Company's manufactured and distributed Additives and components sold to both manufacturers, and wholesalers, which may change from time to time as exclusively determined by the Company.



## SCHEDULE B
## Exclusive Customer Accounts

Required minimum 2016 total sales budget for Distributor's exclusive customer accounts will be in US dollars listed below on Schedule B 1.

A) For all years subsequent to 2016, the Company & Distributor will review end of year sales and forecast the sales budget goals for the following year. The Company will then fix a reasonable target and communicate, within 90 days of each year-end (12.31), to Distributor the new minimum sales level to maintain exclusivity of named customer accounts (Schedule B1) for following year. The Distributor will be entitled to Customers on an exclusive basis as determined on a year to year basis by the Company.

B) The Customers will remain exclusive to the Distributor as long as the Customers are active, meaning purchases material amounts of Products from the Company within the prior twelve months (as above).

## Schedule B1
## Customer Accounts

| ACCOUNT | COUNTRY | 2015 BUDGET | 2016 BUDGET |
|---|---|---|---|
| Silver | Spain | | |
| lada | Spain | | |
| Cogelsa | Spain | | |
| Brugarolas | Spain | | |
| Olipes | Spain | | |
| Krafft | Spain | | |
| Trusaco | Spain | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | TOTAL SALES BUDGET | $525,000 |

**Exhibit C**

**END USE/END USER CERTIFICATION**

**From:** International Petroleum Product & Additives Company, Inc

TO : BLACK GOLD SARL

**RE: Compliance with United States Export Regulations**

1. Please confirm by signing below that you and/or the Entity listed below acknowledge that the IPAC products are subject to export controls under the laws and regulations of the United States, including the Export Administration Regulations, and the customer's covenant to comply strictly with those United States export control laws and regulations applicable to the customer's receipt, possession, use and disposition of the IPAC products.

2. Please confirm and verify by signing below that you and/or the Entity listed below will not export, re-export, transfer or divert any of the IPAC products, or any information (technology) relating to the IPAC products to: (i) any country that is subject to a U.S. Government export or trade embargo (CURRENTLY: CRIMEA - REGION OF UKRAINE, CUBA, IRAN, NORTH KOREA, SUDAN, and SYRIA.), or any national or resident of such an embargoed country; or (ii) any person or entity on any U.S. Government list of prohibited and restricted parties (including the Commerce Department's Denied Parties List, the Treasury Department's SDN list, and the Commerce Department's BIS Entity List).

3. You and/or the entity listed below hereby certifies that it will not use the IPAC products, or make the IPAC products available to any other person or entity for use, in any activities directly or indirectly related to the proliferation of weapons of mass destruction (nuclear, chemical or biological weapons or missiles). Ideally, the customer should certify as to: (i) the actual intended end-use of the IPAC products; and (ii) the location in which the IPAC products will be used, although I recognize that some customers may be reluctant to provide that affirmative information for legitimate, competitive and commercial reasons.

| Signature **BLACK GOLD S.A.R.L.** | Date OP OP 2016 |
| --- | --- |
| Print Person's Name (Print or Type) LORENZO NAPOLEONi | Company Name (Print or Type) BLACK GOLD SARL |
| Title (Print or Type) | Address (Print or Type) 4 RUE R. P. LOUIS FROLLA 98000 MONACO, PRINCIPALITY OF MONACO |
| Representative | |

**THIS AUTHORIZATION PREVENTS MOVEMENT OF THE PRODUCTS INTO CRIMEA - REGION OF UKRAINE, CUBA, IRAN, NORTH KOREA, SUDAN, and SYRIA.**

15

**T R A D U C T I O N**



# ANNEXE

# 2

# TRADUCTION

## INTERNATIONAL PETROLEUM PRODUCTS AND ADDITIVES COMPANY, INC.

## CONTRAT DE DISTRIBUTEUR EXCLUSIF

Le présent Contrat est établi et entre en vigueur le 1er janvier 2016, entre International Petroleum Products And Additives Company, Inc., une société californienne, et toutes ses filiales et sociétés affiliées (y compris IPAC EU Cooperatie U.A.) possédant un bureau au 7600 Dublin Blvd., Suite 240, Dublin, CA 94568, (ci-après la « Société ») d'une part, et BLACK GOLD S.A.R.L. possédant des bureaux au 4 rue R.P. Louis Frolla, 98000 MONACO, PRINCIPAUTÉ DE MONACO (ci-après le « Distributeur ») d'autre part. Le présent Contrat annule et remplace le Contrat antérieur du mois d'août 2012 et tous ses amendements. 4 Rue R.P. Louis Frolla 98000 Monaco Principauté de Monaco T. +37793302942 IPAC et le Distributeur peuvent être désignés dans leur ensemble par le terme de « Parties ».

ATTENDU QUE IPAC fabrique la gamme de lubrifiants et additifs IPAC (collectivement, les «Produits »), généralement vendus à des fabricants indépendants de lubrifiants et d'additifs, les produits énumérés à l'Annexe A sont ceux actuellement disponibles pour le Distributeur.

ATTENDU QUE le Distributeur est une Société À Responsabilité Limitée monégasque, ayant le pouvoir d'exercer des activités telles que prévu par le présent Contrat ;

ATTENDU QUE IPAC et le Distributeur souhaitent conclure un Contrat de distributeur exclusif concernant les clients énumérés à l'Annexe B pour les Produits (comme indiqué à l'Annexe A) suivant lequel le Distributeur cherchera à développer des opportunités spécifiques de clients supplémentaires dans le but de revendre les Produits sur le marché des additifs et des lubrifiants ; et

ATTENDU QUE les parties au présent Contrat désirent établir, entre autres, les modalités et les conditions dans lesquelles les ordres seront placés par le Distributeur et acceptés et remplis par IPAC.

EN CONSÉQUENCE, compte tenu des conditions indiquées ci-dessus et sous réserve des modalités et conditions contenues dans les présentes, les parties conviennent de ce qui suit :

## I. PRIX

Les prix de tous les produits disponibles à l'achat par le Distributeur sont périodiquement fournis au Distributeur par IPAC et sont payés en Dollars US. IPAC est responsable de toutes les frais raisonnables de transport par terre ou par air vers les installations du Distributeur. Les prix doivent rester fixes pendant au moins 90 jours à compter de la date de notification communiquée par écrit par IPAC. IPAC essaiera de remplir toutes les commandes en attente aux prix en vigueur immédiatement avant la notification si une telle notification est donnée.

## II. LIVRAISON

IPAC doit livrer les produits au Distributeur sur une base départ usine (EXW) et emballés dans les installations de IPAC à différents endroits en Belgique ou aux États-Unis. Lors de la livraison, la propriété des produits et tous les risques de perte ou de dommage sont transférés au Distributeur. Les produits doivent être commandés en conteneur complet avec une quantité minimum de commande de 4 fûts de tout produit IPAC. Les conteneurs contiennent 80 fûts de produit permettant un délai de 4 semaines avant la date d'expédition demandée par le Distributeur. Le délai de livraison pour les produits commandés en quantités

| 1

# T R A D U C T I O N

inférieures aux quantités en production est sujet à disponibilité et aux exigences de commande pour l'ensemble du stock de IPAC. IPAC, à sa seule discrétion, déterminera si et dans quelles conditions ces demandes seront satisfaites. L'obligation de IPAC de respecter les dates de livraison indiquées en réponse aux ordres passés par le Distributeur est soumise à la réception rapide par IPAC de toutes les informations raisonnablement nécessaires pour permettre à IPAC de procéder à la réalisation de l'ordre du Distributeur ou à la production des produits commandés, suivant le cas, immédiatement et sans interruption.

## III. RETARDS

IPAC est dispensée de respecter les obligations qui lui incombent en vertu du présent Contrat pendant la durée de tout retard résultant directement ou indirectement de (A) cas de force majeure, circonstances imprévisibles, actes (y compris retard ou omission) de la part de toute autorité gouvernementale, guerre (déclarée ou non), émeute, révolution, incendies, grèves, conflits de travail, sabotage ou épidémies, (B) incapacité, due à des causes échappant au contrôle raisonnable de IPAC, d'obtenir en temps opportun des instructions ou des informations auprès du Distributeur, travail nécessaire et approprié, matériaux, composants, installations et transport, ou
(C) toute autre cause hors du contrôle raisonnable de IPAC.

## IV. PAIEMENT

Le paiement de la valeur des produits doit être effectué dans sa totalité par virement télégraphique ou électronique 45 jours après livraison.

## V. AUTORISATION GOUVERNEMENTALE

A. **Toutes les ventes effectuées en vertu des présentes sont soumises aux lois et réglementations en matière de contrôle des exportations du gouvernement des États-Unis, y compris, sans toutefois s'y limiter, la Loi sur l'administration des exportations.**
B. Le Distributeur est responsable d'obtenir en temps requis toutes les autorisations requises, telles que les licences d'importation, les permis d'échange ou toute autre autorisation gouvernementale spécifique pour l'importation et/ou la vente des produits. Le Distributeur doit faire tous les efforts commercialement raisonnables et, si nécessaire, engager un expert à ses propres frais pour obtenir l'approbation du gouvernement pour la vente des produits IPAC. IPAC doit en toute bonne foi faire tous les efforts commercialement pratiques pour fournir le certificat d'analyse, le certificat d'origine, ou tout autre document pouvant être demandé par les gouvernements afin de prouver que les produits sont conformes aux normes applicables, les exigences, les tests, ou les procédures (collectivement, les « normes »). IPAC ne sera pas responsable si une telle approbation/autorisation est retardée, refusée, révoquée, restreinte ou non renouvelée, et le Distributeur n'est pas libéré de ses obligations de payer à IPAC les Produits déjà livrés au Distributeur à sa demande. Nonobstant ce qui précède, rien dans le présent Contrat ne saurait être interprété comme obligeant IPAC (i) à payer pour l'inspection de ses installations ou des installations de tout fournisseur pour satisfaire les agences ou autorités gouvernementales, ou (ii) à engager de quelque autre manière des coûts ou des dépenses pour qualifier ses installations ou les installations de tout fournisseur conformément aux réglementations gouvernementales. IPAC doit fabriquer les produits conformément aux

# T R A D U C T I O N

spécifications du produit, conformément à toutes les normes applicables connues de IPAC au moment de la fabrication. Les produits non conformes à ces normes, ou qui peuvent être autrement défectueux, peuvent au choix de IPAC, être détruits ou retournés par le Distributeur à IPAC aux frais de IPAC sur autorisation écrite de IPAC. Le Distributeur convient de ne nullement céder, par voie de réexpédition, de réexportation, de détournement ou autre, des Produits, autrement que destinés aux clients figurant à l'Annexe B ou autrement approuvés par IPAC. Dans tous les cas, le Distributeur obtiendra une certification d'utilisateur final signée de ses clients, comme illustré dans l'Annexe C, et maintiendra cette certification dans les fichiers du Distributeur afin qu'elle soit raisonnablement disponible pour en fournir des copies aux fins d'inspection par IPAC, si IPAC y était requis en vertu d'une ordonnance ou d'une demande gouvernementale.

## VI.   EXCLUSIVITÉ

A.   Le fabricant désigne par les présentes le Distributeur en tant que Distributeur exclusif pour la revente des produits à des clients spécifiques énumérés à l'Annexe B, et le Distributeur accepte d'agir à ce titre, sous réserve des dispositions suivantes par lesquelles IPAC ne doit pas :

    1.   désigner toute autre personne, entreprise ou société en tant que Distributeur ou agent des clients à l'Annexe B ; ou

    2.   fournir à l'une des sociétés énumérées à l'Annexe B l'un des produits, pour utilisation ou pour revente.

B.   Le Distributeur est en droit de se décrire en tant que « Distributeur agréé » de IPAC pour les produits, mais ne doit pas se considérer comme un agent de IPAC pour la vente des produits ou comme ayant le droit d'engager la responsabilité de IPAC de quelque manière que ce soit.

## VII.  ACTIVITÉS DE VENTE ET RESPONSABILITÉS / OBLIGATIONS DU DISTRIBUTEUR

A. Sauf disposition contraire dans les présentes, le Distributeur n'est pas l'agent de IPAC à quelque fin que ce soit et ne dispose d'aucun droit, explicite ou implicite, d'assumer ou de créer une obligation quelconque au nom de IPAC ou d'engager la responsabilité de IPAC de quelque manière que ce soit. Le Distributeur doit adresser à IPAC toutes les demandes de renseignements ou demandes relatives aux produits, énumérées à l'Annexe A, reçues de clients non inclus à l'Annexe B, avec copie au représentant des ventes de IPAC sur le territoire. Le Distributeur doit s'efforcer au mieux de respecter les normes professionnelles et éthiques en vigueur et de respecter toutes les lois locales ainsi que les lois américaines sur le contrôle des exportations en vigueur et publiées par le gouvernement des États-Unis. De plus, le Distributeur obtiendra un certificat d'utilisateur final identique à l'Annexe C ci-jointe avant l'expédition à des tiers de tous produits de IPAC.

B. Les responsabilités et obligations générales du Distributeur incluent, sans toutefois s'y limiter, les suivantes :

1.   Le Distributeur développera à ses frais toutes les aides à la formation, à la promotion et à la commercialisation, y compris les frais de traduction et d'impression. IPAC mettra à la disposition du Distributeur des exemples de supports d'aide à la promotion, à la commercialisation et à la vente

# TRADUCTION

destinés aux États-Unis. IPAC se réserve le droit d'examiner et d'approuver lesdits matériels et procédures élaborés par le Distributeur pour une utilisation sur le territoire. Ces approbations ne doivent pas être retardées ni refusées sans motif.

2. Le Distributeur élaborera des étiquettes pour les produits et tout matériel promotionnel raisonnablement requis pour la conduite des affaires par le Distributeur. IPAC se réserve le droit de réviser et d'approuver lesdits étiquettes et matériaux avant leur utilisation. Cette approbation ne doit pas être refusée ni retardée sans motif. Tous les produits fournis au Distributeur doivent porter une étiquette IPAC en langue anglaise. Le Distributeur aura le droit de développer ses propres étiquettes à ses propres frais.

3. Le Distributeur coordonnera ses activités de vente de produits IPAC avec le Vice-président des ventes et du marketing de IPAC ou un autre représentant désigné par IPAC.

4. Le Distributeur ne modifiera pas ni n'ajoutera ou ne modifiera la composition ou les propriétés d'aucun produit IPAC pouvant avoir une incidence sur les spécifications du ou des produits.

## VII.  SUPPORT ET FORMATION

A. IPAC doit de temps à autre fournir au Distributeur les échantillons, catalogues, brochures et informations produits à jour que IPAC peut juger appropriés ou que le Distributeur peut raisonnablement exiger, afin d'aider le Distributeur à vendre les produits, et IPAC s'efforcera de répondre dans les meilleurs délais aux demandes d'informations techniques concernant les produits transmises par le Distributeur ou ses clients.

B. Pendant la durée de ce Contrat ;

i)       IPAC mettra à la disposition du Distributeur, à la date et à l'heure convenues par les parties, les services d'un employé dûment qualifié de IPAC pour l'aider à trouver des idées et des stratégies de commercialisation des produits.

ii)      Le Distributeur est autorisé à envoyer dans les locaux de IPAC (à la date et à l'heure convenues par les parties) des employés du Distributeur en vue d'une formation par IPAC aux questions sur les produits et leur commercialisation.

C  Les services devant être fournis par IPAC en vertu des clauses B (i) et (ii) doivent être gratuits, mais le Distributeur doit ;

i)       s'il a été convenu au préalable par écrit par IPAC et le Distributeur au cas par cas, rembourser à IPAC tous les frais de déplacement, de séjour et les autres frais raisonnablement engagés par l'un des employés de IPAC pour la fourniture de tels services ; et

ii)      rester responsable des salaires et des autres coûts liés à l'emploi, ainsi que de tous les frais de déplacement, d'hébergement et autres engagés par les employés du Distributeur qui sont envoyés dans les locaux de IPAC, à moins que IPAC n'accepte à l'avance par écrit de rembourser les frais de

| 4

# T R A D U C T I O N

déplacement du Distributeur.

## VIII. PRODUITS CONCURRENTS ET CONFIDENTIALITÉ

A. Pendant la durée du présent Contrat, le Distributeur ne fournira pas directement ses services à une autre entreprise directement en concurrence avec IPAC.

B. On entend par « informations confidentielles » dans le présent article, les informations communiquées au Distributeur par IPAC ou les informations communiquées à IPAC par le Distributeur, ou connues du Distributeur dans le cadre de leur affiliation mutuelle, généralement non connues dans l'industrie dans laquelle IPAC et le Distributeur exercent ou pourraient s'engager. Le Distributeur ne doit divulguer aucune information non connue du public, sans le consentement de IPAC, concernant les listes de clients, produits, processus et services de IPAC, y compris toute information sur la recherche, le développement, les inventions, la fabrication, les achats, la comptabilité, l'ingénierie, le marketing, le merchandising, la vente, les tarifs, les politiques internes et toute poursuite ou activité juridique. Les parties ne doivent pas, à tout moment que ce soit pendant la durée du présent Contrat ou par la suite, divulguer à toute personne, entreprise ou société l'une des informations confidentielles reçues par elle pendant la durée du présent Contrat, et toutes ces informations doivent être conservées de manière confidentielle et ne doivent en aucune manière être révélées à qui que ce soit, sauf si cela est requis par une procédure judiciaire ou sur l'ordre d'un tribunal compétent. Le Distributeur peut fournir à ses conseillers comptables et juridiques des informations financières résumées suffisantes pour lui permettre de se conformer aux obligations fiscales et autres exigences réglementaires auxquelles il est soumis.

## IX. TAXES

A. Aucune taxe de vente, d'utilisation, d'accise ou similaire n'a été incluse au motif que la transaction est présumée impliquer une revente par le Distributeur. Le Distributeur doit fournir à IPAC une preuve à l'appui de cette hypothèse et une preuve d'exonération fiscale appropriée, d'une forme acceptable pour toutes les autorités fiscales ou régulatrices qui demandent ces informations à IPAC.

B. Toutes taxes (y compris la TVA, les impôts sur le revenu, les taxes de timbre et autres taxes sur le chiffre d'affaires), taxes, droits, charges, redevances, ou évaluations de toute nature perçus par toute autorité gouvernementale ou toute juridiction en relation avec le présent Contrat, qui sont perçus auprès du Distributeur, le seront au compte du Distributeur et doivent être payés directement par le Distributeur à l'autorité gouvernementale ou à la juridiction compétente. Si IPAC est tenu par la loi ou autrement de payer un tel prélèvement et/ou des amendes, pénalités ou évaluations en raison du non-respect par le Distributeur des lois ou règlements applicables régissant le paiement de telles redevances par le Distributeur, le montant de tout paiement ainsi effectué par IPAC sera remboursé par le Distributeur à IPAC sur présentation des reçus de IPAC ou de toute autre preuve du paiement de ces redevances, déduction faite des économies d'impôt réalisées par IPAC. Le Distributeur se réserve le droit de contester de bonne foi tout ou partie de ces taxes, droits, redevances, charges, évaluations ou pénalités pouvant être imposés au Distributeur ou à toute autre personne en relation avec le présent Contrat ou ses activités ci-après.

# TRADUCTION

Patricia GRIMAUD-BALMERO

## X. GARANTIES

A.   Par la présente, IPAC garantit au Distributeur que :

    i) Tous les produits fournis dans le cadre de ce Contrat seront de qualité marchande et seront conformes aux spécifications techniques de IPAC. Le Distributeur comprend que IPAC développera et introduira de temps en temps des modifications et/ou modifications de produits. Le Distributeur accepte que ces modifications et/ou produits soient introduits dans sa gamme, sous réserve de l'approbation de l'autorité gouvernementale. Le Distributeur accepte d'introduire dans sa gamme le produit nouveau ou modifié dès que cela est commercialement raisonnable.

    ii) Les marques dont les détails d'enregistrement sont indiqués à l'égard des produits énumérés à l'annexe A sont enregistrées au nom de IPAC et IPAC a divulgué au Distributeur toutes les marques de commerce et noms de marque utilisés par IPAC en rapport avec les produits à la date du présent Contrat.

    iii) Il n'est pas établi de droit quelconque de tiers dans le territoire qui pourrait rendre illicites la vente des produits, ou l'utilisation de l'une des marques liées aux produits. Sauf disposition contraire dans les présentes,

B.   IPAC n'est pas responsable envers le Distributeur de toute responsabilité, réclamation, perte, dommage ou dépense de toute nature ou pour tout dommage direct, indirect, collatéral, ou dommages accessoires en relation avec ou découlant de ou causés directement ou indirectement par les produits ou leur utilisation, sauf expressément décrit ou prévu par le présent Contrat. Sauf disposition contraire aux présentes, le recours exclusif du Distributeur pour toute cause d'action relative à la violation de cette garantie est limitée au remplacement rapide par IPAC du produit défectueux, et la responsabilité de IPAC envers le consommateur pour toutes pertes ou tous dommages résultant d'une violation de la garantie du produit, y compris par négligence, ne doit en aucun cas excéder le prix d'achat du produit conformément au PREMIER ARTICLE des présentes ou, au choix de IPAC, le remplacement du produit.

C.   Assurance responsabilité produit. Le Distributeur s'engage à souscrire sa propre assurance responsabilité produit pour couvrir les éventuelles réclamations. Par la présente, IPAC accepte, à ses frais, pendant la durée du présent Contrat  de maintenir une assurance de responsabilité du fait des produits couvrant les réclamations introduites aux États-Unis dont l'assuré désigné est IPAC. Les montants assurés seront d'au moins 1 000 000 $ par événement et 2.000.000 $ au total. Cette assurance responsabilité produit couvre tous les produits vendus par IPAC au Distributeur.


## XI. BREVETS

    Si le Distributeur reçoit une plainte indiquant qu'un quelconque produit ou une partie de produit fabriqué ou distribué par IPAC viole un brevet, le Distributeur doit en informer IPAC rapidement par écrit et donner à IPAC les informations, l'assistance et l'autorité exclusive d'évaluer, de défendre et de régler cette plainte. IPAC doit alors à ses frais et suivant l'option (1) régler de telles plaintes, (2) procurer au Distributeur le droit d'utiliser et de vendre ces produits à ses clients, (3) remplacer ou modifier les produits pour éviter toute contrefaçon, (4) retirer les produits et en rembourser le prix d'achat au Distributeur, ou (5) se défendre contre une telle plainte. À condition que le Distributeur ait donné un tel avis en temps opportun, si un tribunal compétent conclut que ce produit constitue une contrefaçon, IPAC indemnisera le Distributeur

| 6

# T R A D U C T I O N

de tous les coûts et dommages accordés en raison de cette infraction et, si l'utilisation de ces produits est enjointe, IPAC devra, à ses propres frais et à son choix, prendre une ou plusieurs des actions aux points (2), (3), (4) ou (5) ci - dessus.

## VII. MARQUES DE COMMERCE ET NOMS COMMERCIAUX.

A.    IPAC autorise le Distributeur à utiliser ses marques de commerce ou ses noms commerciaux sur ou en relation avec les Produits uniquement dans le but d'exercer ses droits et de s'acquitter de ses obligations en vertu du présent Contrat. IPAC n'autorisera de la sorte aucune personne, entreprise ou société.

B.    Le Distributeur veille à ce que chaque référence et utilisation des marques de commerce ou noms commerciaux par le Distributeur soit approuvée de temps à autre par IPAC et accompagnée d'un accusé de réception, sous une forme approuvée par IPAC, attestant qu'il s'agit d'une marque ou nom commercial de IPAC.

C.    Le Distributeur ne doit pas

  i)    apporter de modifications aux produits ou à leur emballage

  ii)    modifier, supprimer ou altérer les marques de commerce, numéros ou autres moyens d'identification utilisés sur ou en relation avec les produits

  iii)    utiliser une des marques de commerce de quelque manière que ce soit qui pourrait nuire à leur caractère distinctif ou à leur validité ou à la bonne volonté de IAPAC en la matière ;

  iv)    utiliser en relation avec les produits des marques autres que celles de IPAC ou

  v)    utiliser des marques de commerce ou des appellations commerciales similaires à des marques de commerce ou des noms commerciaux de IPAC pouvant être source de confusion ou de déception.

D.    Sauf disposition contraire de la clause XII (1) ci-dessus, le Distributeur n'a aucun droit sur les marques de commerce ou noms commerciaux utilisés par IPAC en relation avec les Produits ou sur la notoriété qui leur est associée, et le Distributeur reconnaît par la présente que, sauf expressément prévu dans ce Contrat, il ne pourra acquérir aucun droit de propriété à l'égard d'aucune marque et d'aucun nom commercial de IPAC et que ces droits de propriété et leur notoriété restent conférés à IPAC.

E.    Le Distributeur doit, aux frais de IPAC, prendre toutes les mesures que IPAC peut raisonnablement exiger pour l'aider à maintenir la validité et la force exécutoire de la propriété intellectuelle de IPAC sur les produits pendant la durée du présent Contrat.

F.    Le Distributeur doit, à la demande de IPAC, signer les licences relatives à l'utilisation des marques et des noms commerciaux que IPAC peut raisonnablement exiger, à condition que les dispositions de

# TRADUCTION

toute licence ne soient pas plus onéreuses ou restrictives que les dispositions du présent Contrat.

G.  le Distributeur ne doit pas commettre ni autoriser une tierce partie à commettre un acte qui pourrait ou risquerait d'invalider ou serait incompatible avec la propriété intellectuelle de IPAC sur les produits, et ne doit pas omettre ni autoriser une tierce partie à omettre toute action qui, par son omission, aurait cet effet ou ce caractère.

H.  Le Distributeur doit notifier promptement et intégralement à IPAC toute violation réelle, potentielle ou présumée de la propriété intellectuelle de IPAC sur les produits dont le Distributeur est averti, ainsi que de toute plainte émanant d'une tierce partie dont il a connaissance sur le fait que l'importation des produits ou leur vente viole les droits d'une quelconque autre personne, et le Distributeur, à la demande et aux frais de IPAC, doit prendre toutes les actions raisonnablement nécessaires pour aider IPAC à engager ou à résister à toute procédure relative à une telle violation ou la plainte afférente.

## XIII. LIMITATION DE RESPONSABILITÉ

A. Sauf indiqué dans les sections précédentes et suivantes, la responsabilité totale de IPAC au Distributeur concernant toute réclamation, que ce soit de manière contractuelle, délictuelle ou autre, découlant de, liée à, ou résultant de la fabrication, la vente, la livraison, la revente, le remplacement ou l'utilisation de tout Produit ne doit pas dépasser le prix attribuable aux Produits ou à la partie de ceux-ci qui donne lieu à la réclamation.

B. En aucun cas IPAC n'est responsable envers le Distributeur des dommages spéciaux ou consécutifs, y compris, mais sans s'y limiter, les dommages pour perte de revenus, le coût du capital, les réclamations des clients pour les interruptions ou défaillances d'approvisionnement, et les coûts et les dépenses engagés en rapport avec le transport, les installations de substitution ou les sources d'approvisionnement. Nonobstant ce qui précède, chaque partie peut être responsable des dommages causés à l'autre partie au moyen de fraude, de transmission de fausses informations ou de violations de la loi. De tels dommages sont limités au coût des produits, du fret et des dommages réels.

## XIV. INDEMNISATION

A. Le Distributeur accepte d'indemniser et de dégager de toute responsabilité IPAC de et contre toute réclamation pour toutes pertes, responsabilité ou dommages, pécuniaires ou physiques, et tous honoraires et frais d'avocat raisonnables, découlant de, ou en relation avec des actes ou omissions de la part du Distributeur dans la distribution des produits conformément au présent Contrat. De tels actes ou omissions comprennent, mais sans s'y limiter, toute violation ou violation présumée du présent Contrat ou de l'une de ses dispositions ou garanties, ou tout violation ou non-respect de toutes les lois, réglementations ou tous les codes du territoire relatives à l'importation, la distribution et la vente des produits.

B.  Au cas où une réclamation, une demande ou une action serait intentée par un tiers, y compris, mais sans s'y limiter, toute autorité gouvernementale, contre une partie ayant droit à une indemnité en vertu de la Section XIV.A. ou XIV. B. ci-dessus, cette partie doit notifier sans tarder l'autre ou les autres partie(s), le cas échéant, de laquelle l'indemnité est ou peut valablement être requise, par écrit, et la partie ou les parties qui indemnisent doivent assumer leur propre défense, y compris en employant un avocat. En outre, dans le

| 8

# TRADUCTION

cas où une partie aux présentes prend connaissance de faits qui pourraient donner lieu à une telle réclamation, demande, ou action, cette partie doit notifier sans délai l'autre ou les autres partie(s) qui seraient tenues d'indemniser en vertu des présentes en relation avec une telle réclamation, demande, ou action, et cette autre partie ou les autres parties auront le droit de prendre les mesures qu'elles-mêmes jugeront appropriées pour résoudre le problème. La ou les parties indemnisées ont le droit d'employer un avocat distinct dans cette action et de participer à leur propre défense, mais les honoraires et les frais de cet avocat restent aux frais de la ou des parties indemnisées, à moins que leur recours n'ait été expressément autorisé par la ou les parties qui indemnisent. Tout règlement de toute action sujette à indemnisation en vertu des présentes requiert le consentement de la partie indemnisée et de la partie qui indemnise, consentement qui ne doit pas être refusé de manière déraisonnable et qui doit être donné dans les cinq (5) jours suivant la notification de ladite transaction. La ou les parties qui indemnisent ne seront pas responsables du règlement de toute action affectée sans leur ou leur consentement, mais si le litige est réglé avec le consentement de la ou des parties qui indemnisent, ou si le demandeur a rendu un jugement définitif à cet égard, la ou les parties qui indemnisent doivent libérer la partie indemnisée de toute perte ou responsabilité résultant de ce règlement ou de ce jugement. À la demande de la partie qui indemnise, celle-ci coopère avec la partie indemnisée et son avocat doit s'efforcer au mieux de contester une telle réclamation ou, le cas échéant, de déposer une demande reconventionnelle ou une contre-demande envers la partie qui fait valoir la réclamation, à condition que la partie qui indemnise rembourse à la partie indemnisée les frais raisonnables engagés dans le cadre de cette coopération sur présentation de reçus ou d'autres preuves de ces frais. La partie qui indemnise et ses représentants doivent avoir un accès total et complet, pendant des horaires raisonnables, à tous les livres, registres et fichiers de la partie indemnisée ayant expressément pour objet la défense de toute demande d'indemnisation formulée par la partie qui indemnise en vertu de la présente, ou à toute autre fin en direct rapport, à condition que la partie qui indemnise protège et maintienne la confidentialité de tous ces livres, registres et fichiers.

## XV. DURÉE ET RÉSILIATION

A. Le présent Contrat prendra effet à compter de la première date d'entrée en vigueur indiquée ci-dessus et sera maintenu ensuite pendant un
(1) an, sauf résiliation anticipée par accord mutuel entre les parties, ou autrement conformément aux conditions des présentes. Les parties s'efforceront de s'entendre sur les volumes de vente annuels minimaux pour que le Distributeur reste (après la première année) en tant que Distributeur exclusif pour les clients énumérés à l'Annexe B. Les volumes de vente ciblés pour la première année sont énumérés à l'Annexe B. Si les Parties ne réussissent pas à se mettre d'accord dans les soixante (60) jours suivant le premier anniversaire du présent Contrat, sur le volume des ventes annuelles futures, tel que démontré par une prolongation écrite mutuellement signée, le présent Contrat expirera un (1) an après sa date d'entrée en vigueur.

B. Outre les dispositions de la section XV.A. ci-dessus, le présent Contrat peut être résilié avec effet immédiat lors de l'un des événements suivants :

1. L'insolvabilité de l'une ou l'autre des parties ; le fait de souffrir de ou commettre un acte d'insolvabilité, ou l'incapacité de l'une des parties de payer ses dettes à l'échéance ou dans les 90 jours de la date d'échéance ;

2. La faillite ou la liquidation volontaire ou involontaire de l'une des parties, ou la nomination en son nom d'un séquestre ou d'un liquidateur ;

3. Une tentative de cession du présent Contrat, sous réserve des dispositions de la section XVI.A ci-

# TRADUCTION

dessous ;

4. Tout non-paiement par le Distributeur à IPAC de toute dette en vertu du présent Contrat, à condition que le Distributeur ait reçu une notification écrite de cette défaillance et qu'il dispose d'un délai de trente (30) jours pour remédier à cette défaillance mais ne l'ait pas fait ;

5. L'absence de la part d'une partie en défaut de remédier à une violation du présent Contrat dans les trente (30) jours suivant la notification par laquelle la violation a été notifiée par écrit par la partie respectant ce Contrat, indiquant la nature de la violation ou de la violation supposée.

6. Toute violation des termes de ce Contrat par le Distributeur, y compris, mais sans s'y limiter, les violations des lois américaines et européennes sur l'exportation.

7. En tout état de cause, l'une ou l'autre des parties peut, moyennant notification écrite à l'autre partie, mettre fin au présent Contrat moyennant un préavis de 90 jours.

C. En cas de résiliation ou d'expiration de ce Contrat:

- Le Distributeur accepte de coopérer avec IPAC, de restituer tous les documents à IPAC, et de faire tout ce qui est raisonnablement requis par IPAC afin de permettre à IPAC de continuer des activités viables avec les clients servis par le Distributeur ; et

D. En cas de résiliation du présent Contrat, le distributeur cessera immédiatement toute utilisation de tout et de toutes les marques IAPC et/ou des noms commerciaux et ne vendra aucune marchandise sous ces marques ou noms commerciaux ou tout autre nom similaire s ou des marques.

## XVI. DIVERS

A. Intégralité du Contrat. Le présent Contrat, ainsi que les annexes, les appendices et les pièces jointes aux présentes, constituent l'accord entre les parties et il n'existe aucun accord ou engagement autre que stipulé dans les présentes. Le présent Contrat remplace tous les accords antérieurs, écrits ou verbaux, existant ou pouvant exister entre les parties avant la date d'effet du présent Contrat. Le présent Contrat peut être amendé, modifié en tout ou partie, ou complété par un accord écrit faisant référence au présent Contrat et exécuté par les responsables autorisés des parties. Aucune partie aux présentes ne doit céder ses droits ou obligations en vertu du présent Contrat sans le consentement écrit préalable de l'autre partie. Sauf disposition contraire, le présente Contrat est contraignant et entrera en vigueur au bénéfice des parties aux présentes et de leurs successeurs et ayant droit respectifs autorisés.

B. Avis. Tout avis requis ou autorisé à être donné en vertu du présent Contrat doit être écrit et communiqué en adressant le même message à cette ou ces autres parties à l'adresse indiquée ci-dessous. Ces avis sont donnés à toutes les parties par (1) livraison le lendemain ou par priorité de livraison accélérée par un service de courrier de fret aérien international reconnu (par exemple UPS, Federal Express, DHL) (ci - après dénommé « Livraison Rapide »), (2) remise de l'avis en personne à cette ou ces autres parties, ou (3) transmission par télécopieur et envoi par courrier de l'original. Un tel avis est réputé avoir été donné trois (3) jours après la livraison en temps voulu à un service de courrier de fret aérien international reconnu ; dans le case de livraison en personne, au moment de ladite livraison ; ou, s'il s'agit d'une télécopie, le jour de la transmission, lorsqu'elle est effectuée pendant les heures ouvrables habituelles, ou si elle n'est pas transmise pendant les heures ouvrables habituelles, le jour ouvrable suivant.

Les avis à IPAC doivent être adressés et envoyés à:

# T R A D U C T I O N

IPAC.
7600 Dublin Blvd., Suite 240
Dublin, CA 94568 USA
Téléphone :   (925) 556-5530
Télécopie :   (925) 556-5531
Attn.:      Brian Cereghino, CEO


Les avis au Distributeur doivent être adressés et envoyés à :
BLACK GOLD SARL
4 Rue R.P. Louis Frolla
98000 Monaco Principality of Monaco
T.  +37793302942
P : +33647353844
À l'attention de :  Lorenzo Napoleoni, PDG

C. Séparabilité des dispositions. Une déclaration judiciaire ou administrative, émanant d'un tribunal compétent sur la nullité de l'une ou plusieurs des dispositions des présentes n'invalidera pas les dispositions restantes du présent Contrat dans aucune juridiction, ni n'aura d'effet sur la validité ou l'interprétation du présent Contrat en dehors de cette juridiction. Les parties s'engagent cependant à négocier de bonne foi pour trouver une disposition de remplacement la plus similaire possible à la disposition invalide, en tenant compte des intentions de chaque partie en ce qui concerne le présent Contrat.

D. Renonciation à la conformité. Tout manquement par l'une des parties aux présentes à faire respecter à tout moment les conditions du présent Contrat ne doit pas être interprété comme une renonciation à son droit d'appliquer toutes les conditions du présent Contrat.

E. Disputes. Toute contestation ou réclamation découlant de ou en relation avec le présent Contrat ou la violation ou son manquement présumé, qui ne peut être réglé à l'amiable, seront réglés par voie d'arbitrage conformément aux règles d'arbitrage commercial de l'Association d'arbitrage international et les dispositions de la présente section. Toute partie peut entamer un arbitrage en notifiant par écrit à l'autre partie son intention d'arbitrer et en déposant auprès du Centre pour l'arbitrage commercial international situé à San Francisco, Californie (ou dans tout autre lieu du Centre agréé par les parties) trois (3) copies de cet avis et trois (3) exemplaires du présent Contrat ainsi que les frais de dépôt appropriés. L'arbitrage doit être effectué devant trois (3) arbitres nommés conformément à ces règles. La procédure d'arbitrage aura lieu du Centre convenu par les parties et sera soumise aux règles d'arbitrage susmentionnées. Les arbitres peuvent accorder toute réparation légale et/ou équitable à laquelle une partie peut prétendre en vertu du droit ou de la théorie légale en vertu de laquelle la partie demande réparation, à condition, toutefois, qu'aucune réclamation ne peut être faite pour tout dommage spécial, indirect ou consécutif, ou dommages-intérêts punitifs découlant de ou liés au présent Contrat, ou tout acte, omission ou événement survenant à cet égard, sauf que les dommages-intérêts punitifs peuvent être accordés pour une faute intentionnelle ou sans motif. La sentence arbitrale doit être rendue dans les trois (3) mois suivant la nomination du troisième arbitre. La sentence donnée par les trois arbitres ou la majorité de ceux-ci, est définitive et contraignante pour les parties et ne

# TRADUCTION

peut donner lieu à aucun recours. La sentence ne doit pas servir de précédent ou d'autorité dans toute procédure ultérieure, à condition toutefois, que si la partie perdante ne se conforme pas à la sentence, la partie gagnante peut demander à un tribunal compétent d'obtenir une ordonnance confirmant la sentence conformément aux lois applicables. La sentence peut être exécutée devant tout tribunal compétent. Sauf disposition contraire de la loi ou requis par ordonnances des tribunaux, le contenu de toute procédure d'arbitrage doit rester confidentiel pour toutes les parties et les arbitres ; cependant, le fait qu'une telle procédure existe ou qu'une sentence ait été rendue ne doit pas nécessairement rester confidentiel. Les coûts de la procédure, y compris les honoraires et les frais des avocats, des comptables et des témoins, ainsi que la rémunération des arbitres, sont évalués par les arbitres à l'égard les parties conformément à la détermination de la faute par l'arbitre.

F. Loi applicable. Les droits et obligations des parties en vertu du présent Contrat ne sont pas régis par les dispositions de la Convention des Nations Unies de 1980 sur les contrats de vente internationale de marchandises; ces droits et obligations sont par contre régis par la loi de la Californie, aux États-Unis, y compris par les dispositions du Code de commerce uniforme.

G. Légendes ; exemplaires. Les sous-titres du présent Contrat sont uniquement fournis à des fins de commodité et ne doivent en aucun cas être considérés comme faisant partie de la construction ou de l'interprétation d'une disposition du présent Contrat. Le présent Contrat peut être exécuté en plusieurs exemplaires, dont chacun sera réputé être un original, mais tous les deux constituent un seul et même instrument.

H. Autres instruments. Les parties aux présentes conviennent de signer et de remettre ces instruments et de prendre toute autre mesure raisonnablement nécessaire ou raisonnablement requise par une autre partie afin de réaliser les transactions et accords envisagés dans le présent Contrat.

EN FOI DE QUOI, les parties aux présentes ont signé le présent Contrat à la première date écrite ci-dessus par leurs représentants dûment autorisés.

International Petroleum Products
& Additives Company, Inc.
Par (*Signature*)
Brian J Cereghino, CEO

Date 10 septembre 2016

Black Gold S.A.R.L.
(*Stamp BLACK GOLD S.A.R.L.*)
Par (*Signature*)
Lorenzo Napoleoni, CEO

Date 9 septembre 2016

| 12

# TRADUCTION

## ANNEXE A

## PRODUITS

Le terme « **Produits** » désigne et fait référence, individuellement et/ou collectivement, à tous les Additifs ou composants fabriqués et distribués par la Société et vendus aussi bien aux fabricants qu'aux grossistes selon la liste figurant à la présente Annexe A, et comprend toutes les modifications, corrections, mises à jour, améliorations, dérivés ou perfectionnements qui y sont apportés, ainsi que la documentation préparée pour leur utilisation. Pendant la durée du présent Contrat, la Société peut modifier l'Annexe A afin d'y inclure d'autres Produits ou de supprimer des Produits existants. La Société doit en notifier le Représentant commercial par écrit soixante (60) jours civils à l'avance.

## Produits distribués

A. Les produits suivants de la Société incluent :

Tous les additifs et composants fabriqués et distribués de la société vendus à la fois aux fabricants et aux grossistes, qui peuvent changer de temps à autre
tel que déterminé exclusivement par la Société.

| 13



# TRADUCTION

### ANNEXE B
### Comptes clients exclusifs

Le budget minimum total des ventes pour 2016 requis pour les comptes clients exclusifs du Distributeur sera en dollars américains ci - dessous à l'Annexe B 1.

A)  Pour toutes les années suivant 2016, la Société et le Distributeur examineront les ventes en fin d'année et prévoiront les objectifs du budget des ventes pour l'année suivante. La Société fixera ensuite un objectif raisonnable et communiquera au Distributeur, dans les 90 jours suivant la fin de chaque année (au 31 décembre), le nouveau niveau de vente minimum de ventes afin de maintenir l'exclusivité des comptes de clients nommés à l'Annexe B 1) pour l'année suivante. Le Distributeur aura un droit exclusif aux Clients, cette exclusivité étant déterminée d'année en année par la Société.

B)  Les clients resteront exclusifs au distributeur tant qu'ils resteront actifs, c'est-à-dire en ayant acheté des quantités importantes de produits de la Société au cours des douze mois précédents (comme ci-dessus).

### Annexe B1
### Comptes clients

| COMPTE | PAYS | BUDGET 2015 | BUDGET 2016 |
|---|---|---|---|
| Silver | Espagne | | |
| Iada | Espagne | | |
| Cogelsa | Espagne | | |
| Brugarolas | Espagne | | |
| Olipes | Espagne | | |
| Krafft | Espagne | | |
| Trusaco | Espagne | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | BUDGET DE VENTE TOTAL | $525 000 |

| 14

# TRADUCTION

## Appendice C

## CERTIFICATION D'UTILISATION FINAL / D'UTILISATEUR FINAL

**De :** International Petroleum Product & Additives Company, Inc.

**À :**  *BLACK GOLD SARL*

**Réf. : Conformité avec les Réglementations d'exportation des États-Unis**

1. Veuillez confirmer en signant ci-dessous que vous et/ou l'entité citée ci-dessous reconnaissez que les produits IPAC sont soumis à des contrôles d'exportation en vertu des lois et réglementations des États-Unis, y compris les Réglementations de l'Administration des exportations, et l'engagement du client à respecter strictement les lois et réglementations de contrôle des exportations des États-Unis applicables à la réception, à la possession, à l'utilisation et à la disposition des produits IPAC par le client.

2. Veuillez confirmer et vérifier en signant ci-dessous que vous et/ou l'entité citée ci-dessous n'exporterez, réexporterez, transférerez ni ne détournerez aucun des produits IPAC, ni aucune information (technologie) relative aux produits IPAC à : (i) tout pays faisant l'objet d'un embargo du gouvernement américain sur l'exportation ou le commerce (ACTUELLEMENT : CRIMÉE (RÉGION DE L'UKRAINE), CUBA, IRAN, CORÉE DU NORD, SOUDAN et SYRIE), ou tout ressortissant ou résident d'un tel pays sous embargo ; ou (ii) toute personne ou entité figurant sur la liste du gouvernement des États-Unis des parties interdites et restreintes (y compris la Liste des parties interdites par le Département du Commerce, la Liste des ressortissants spécialement désignés et des personnes refusées du Département du Trésor (Liste SDN), et la Liste BIS (Bureau de l'industrie et de la sécurité) du Département du Commerce des États-Unis).

3. Vous et/ou l'entité citée ci-dessous certifiez que n'utiliserez pas les produits IPAC, ni ne les mettrez à la disposition de toute autre personne ou entité, dans le cadre de toute activité directement ou indirectement liée à la prolifération des armes de destruction massive (armes nucléaires, chimiques ou biologiques ou missiles).  Idéalement, le client doit attester :  i) de l'utilisation finale prévue des produits IPAC ; et ii) du lieu d'utilisation des produits IPAC, bien que je reconnaisse que certains clients peuvent être réticents à fournir ces informations affirmatives pour des raisons légitimes, concurrentielles et commerciales.

| Signature  BLACK GOLD S.A.R.L. | Date  9 septembre 2016 |
|---|---|
| Nom (en caractères d'imprimerie ou à la main) *LORENZO NAPOLEONI* | Nom de la Société (en caractères d'imprimerie ou à la main) *BLACK GOLD SARL* |
| Titre (en caractères d'imprimerie ou à la main)  _____Représentant | Adresse (en caractères d'imprimerie ou à la main) 4 rue R.P. Louis Frolla 98000 MONACO, PRINCIPAUTÉ DE MONACO |

CETTE AUTORISATION INTERDIT LE MOUVEMENT DES PRODUITS EN CRIMÉE (RÉGION DE L'UKRAINE),  CUBA, IRAN, CORÉE DU NORD,  SOUDAN ET SYRIE.

| 15

## *ATTESTATION DE TRADUCTION EXACTE*

Je soussignée, Catherine Lewi, certifie en toute bonne foi que la traduction ci-dessus en langue française a été faite par moi-même en ma qualité de Traductrice professionnelle certifiée d'anglais en français par l'ATA (American Translators Association) et représente la version complète et conforme du document original en langue anglaise.

*Catherine Lewi – New York, NY 10028 – USA*
*Tél. : +1-858-401-0127 - e-mail : catherine.lewi@yahoo.com*



Verify at www.atanet.org/verify

_____
Signature

28 JUILLET 2019
_____
Date

STATE OF NEW YORK, COUNTY OF NEW YORK

The foregoing instrument was acknowledged before me
this 22 day of JULY, 2019 by CATHERINE LEWI.

Charmaine Raphael, Notary Public 01RA6217652
COMMISSION EXPIRES FEBRUARY 16, 2022

Patricia GRIMALDI-PALMERO
Huissier

Tél. 97 77 49 49
20 bd de Suisse
98000 MONACO

Patricia GRÉGOIRO-PALMERO
Huissier

TEL 57 77 44 49
20, rue de Suisse
9-8000 MONACO

# ANNEXE

# 3

# TRADUCTION

CENTRE INTERNATIONAL DE RÉSOLUTION DES DIFFÉRENDS

Tribunal d'arbitrage international

---

Réf. : 01-18-0001-9728

Dans l'affaire de l'arbitrage entre :

INTERNATIONAL PETROLEUM PRODUCTS AND ADDITIVES COMPANY, INC.,

c.

BLACK GOLD, S.A.R.L., LORENZO NAPOLEONI et SOFIA NAPOLEONI

---

**SENTENCE FINALE**

Je soussigné, L'ARBITRE SIGNATAIRE, ayant été désigné comme Arbitre conformément aux deux accords d'arbitrage conclus entre les parties susmentionnées et datés du 1er janvier 2016, et ayant été dûment assermenté, et ayant dûment entendu et examiné les preuves et les allégations des parties, DÉCIDE par la présente ce qui suit :

* * * * * * *

**COMPÉTENCE ARBITRALE**

Les Réclamations en vigueur du Demandeur conformément à sa Demande d'arbitrage sont énoncées dans l'État détaillé des requêtes vérifié et amendé par le Demandeur en date du 10 août 2018 (« Réclamations »). Certaines des Réclamations découleraient du Contrat de représentation commerciale en date du 1er janvier 2016 entre le Demandeur, International Petroleum Products et Additives Company, Inc., ainsi que ses filiales et sociétés affiliées (collectivement dénommées « IPAC ») et le Défendeur Black Gold S.a.r.l. (« Black Gold ») (le « Contrat de représentation commerciale »). D'autres Réclamations découleraient du Contrat de distributeur exclusif conclu entre les mêmes parties en date du 1er janvier 2016 (le « Contrat de distributeur exclusif »). Le Contrat de représentation commerciale et le Contrat de distributeur exclusif contiennent chacun

# TRADUCTION

PATRICIA GRUE DE PALMERO
traducteur
Tél. 97 77 48 48
20 Bd de Suisse
98000 MONACO

une clause en vertu de laquelle les parties ont convenu que la loi de la Californie régissait le contrat. Le Contrat de représentation commerciale, Article 17 ; le Contrat de distributeur exclusif Section XVI.F.

Le Contrat de représentation commerciale et le Contrat de distributeur exclusif comprennent chacun un accord d'arbitrage.

Le Contrat de représentation commerciale Article 19 ; le Contrat de distributeur exclusif Section XVI.E. Les règles d'arbitrage auxquelles les parties ont souscrit aux termes du Contrat de représentation commerciale et du Contrat de distributeur exclusif  sont les règles d'arbitrage commercial ("Règles") de l'Association américaine d'arbitrage (« American Arbitration Association »). Le Contrat de représentation commerciale Article19 ; le Contrat de distributeur exclusif Section XVI.E. Voir l'Ordonnance préliminaire n° 3 § 5:14-23.

Une autre Réclamation découle de l'Accord de résiliation et de renonciation mutuelle conclu par les mêmes parties à compter du 1er mars 2018 (« Accord de résiliation »). Réclamations à la page 15, par. 3. Après un exposé complet des parties et examen par l'Arbitre, l'Arbitre a déterminé qu'il n'existait aucune compétence arbitrale à l'égard de la Réclamation découlant de l'Accord de résiliation. Ordonnance préliminaire n° 3 - Décision sur la compétence arbitrale (17 septembre 2018) § 6:14-22.

Les Réclamations en vertu du Contrat de représentation commerciale et du Contrat de distributeur exclusif étaient formulées non seulement contre Black Gold, mais également contre deux personnes associées avec Black Gold : Lorenzo Napoleoni et Sophia Napoleoni. Après un exposé complet des parties et un examen par l'Arbitre, l'Arbitre a déterminé qu'il n'existait aucune compétence arbitrale sur les Réclamations à l'encontre de Lorenzo Napoleoni et Sofia Napoleoni en vertu du Contrat de représentation commerciale. Décision préliminaire n° 3 - Décision sur la compétence arbitrale (17 septembre 2018) § 6:25-7:24 ; 8:5-7. L'Arbitre a en outre déterminé que, dans la mesure où le Demandeur cherche à faire valoir des Réclamations en réparation par arbitrage dans le cadre du Contrat de distributeur exclusif, l'Arbitre soussigné est d'avis que trois Arbitres auraient compétence en matière d'arbitrage à l'égard des Réclamations formulées à l'encontre du Défendeur Black Gold. La compétence arbitrale a été suffisamment démontrée à l'égard des Réclamations dirigées contre les Défendeurs individuels Lorenzo Napoleoni et Sofia Napoleoni, mais pour statuer sur la

# TRADUCTION

compétence arbitrale en vertu du Contrat de distributeur exclusif, il serait nécessaire de prendre en considération et de prendre une décision par une instance constituée de trois Arbitres, à moins que les parties ne conviennent de soumettre à ce seul Arbitre leurs différends en vertu du Contrat de distributeur exclusif. Le 21 septembre 2018, toutes les parties ont convenu par écrit de soumettre à cet Arbitre unique leurs différends relatifs au Contrat de distributeur exclusif, notamment le différend relatif à l'existence d'une compétence arbitrale concernant les Réclamations contre Lorenzo Napoleoni et Sofia Napoleoni.

Pour les motifs énoncés dans l'ordonnance préliminaire n° 3 - Décision sur la compétence arbitrale (17 septembre 2018), il n'existe aucune compétence arbitrale en ce qui concerne les Réclamations contre Lorenzo Napoleoni et Sofia Napoleoni en vertu du Contrat de distributeur exclusif concernant les Réclamations contre Black Gold dans le cadre du Contrat de distributeur exclusif.

Comme stipulé dans l'ordonnance préliminaire n° 4 (2 octobre 2018), il a été confirmé par accord écrit entre les parties le 21 septembre 2018 que l'audience sur le fond de cet arbitrage aurait lieu du 4 au 6 février 2019. Les parties ont mutuellement renoncé à cette clause du Contrat de distributeur exclusif qui aurait exigé que « la sentence arbitrale soit rendue dans un délai de trois (3) mois à compter de la nomination » de l'Arbitre.

**POSITIONS DES PARTIES**

Les faits de l'affaire et les arguments juridiques des parties à leur sujet sont exposés en détail dans les observations respectives des parties. Tous ces faits et arguments ne doivent pas être répétés en détail ici.

**Les témoins**

Les témoins qui ont fourni un témoignage écrit et oral sous serment dans le cadre de cet arbitrage sont les suivants : Brian Cereghino (Président-PDG de IPAC), Dr. Francisco Coppola (témoin expert de Black Gold), Dr. Jeffrey Crow (Vice-président de la technologie de IPAC), Alan Krock (Directeur financier de IPAC), Lorenzo Napoleoni (Président-PDG de Black Gold) et Dr. David L. Wooton (témoin expert pour IPAC). Chacun de ces témoins a fourni un témoignage écrit direct. Chacun a adopté son témoignage écrit direct sous serment à l'audience de cet arbitrage. Chacun a

# T R A D U C T I O N

ensuite été interrogé sous serment au cours de l'audience, notamment lors d'un contre-interrogatoire, d'un interrogatoire supplémentaire et d'un interrogatoire par l'Arbitre. M. Peter Dijke (témoin expert de Black Gold) a présenté un témoignage écrit sous la forme d'une déclaration sous peine de parjure soumise avant l'audience du présent arbitrage. Il n'a pas témoigné oralement à l'audience de l'arbitrage, pour les raisons indiquées ci-après.

### Résumé de la position du Demandeur

Cette section résume en gros les parties pertinentes de la position du Demandeur. IPAC est une entreprise de fabrication et de vente d'additifs pour le pétrole. Conformément au Contrat de représentation commerciale et au Contrat de distributeur exclusif, Black Gold a conclu des contrats dans lesquels elle acceptait d'être représentant commercial de IPAC et distributeur exclusif de ce dernier. Conformément à ces contrats, Black Gold a accepté de préserver la confidentialité des informations relatives à IPAC et de ne pas fournir de service ou d'assistance pour des produits concurrents. Aux termes de ces accords, Black Gold avait accès à des informations sensibles et confidentielles de IPAC, notamment l'identité des clients directs et des clients indirects de IPAC (via la distribution des produits IPAC par Black Gold), ainsi que la quantité et les prix des produits IPAC commandés par ces clients. Malgré les contrats de Black Gold avec IPAC, le PDG de Black Gold, Lorenzo Napoleoni, a noué des relations avec Steven Plitt, ancien employé de IPAC, afin de créer une entreprise concurrente d'additifs, PXL. Cela n'a pas été divulgué à IPAC à l'époque. Peu de temps avant de quitter IPAC, M. Plitt s'est adressé à lui-même par courrier électronique des informations confidentielles (telles que définies ci-après) auxquelles il avait déjà accès sur le réseau restreint de IPAC pour une utilisation légitime dans le cadre des activités de IPAC. Ce qu'il s'est envoyé par courrier électronique incluait un fichier Microsoft Excel confidentiel protégé par un mot de passe, détaillant l'identité, le fournisseur, le prix et la composition relative de chaque composant de chacun des produits IPAC. Transcription d'audience (« Tr. ») 147: 4-148: S; 190: 5-193: l. Ce qu'il s'est adressé à lui-même contenait également une grande quantité d'informations confidentielles de IPAC concernant les ventes et les prix de IPAC. Tr. (192) 7-24

D'ici décembre 2017, alors que Black Gold maintenait ses relations avec IPAC, mais à l'insu de IPAC, PXL avait déjà mis au point des additifs pour lubrifiants concurrents qui ressemblaient tellement aux produits IPAC que des experts en ont conclu que ceux-ci étaient des produits de

# TRADUCTION

contrefaçon, bien que PXL ne dispose pas d'installations d'essai, ni d'aucune capacité de formulation, d'expertise technique ou en malaxage, et d'aucun chimiste.

Vers la fin de l'année 2017, Black Gold a rejeté les demandes de réunion de IPAC. En février 2018, Black Gold a indiqué qu'elle souhaitait mettre fin à la relation entre les parties. Par la suite, IPAC a accepté de payer des frais de résiliation à Black Gold en vertu d'un Accord de résiliation. IPAC a accepté de payer des frais de résiliation fondés sur le produit des ventes historique plutôt que sur les prévisions, ce qui, selon IPAC, allait à l'encontre de sa pratique habituelle.

IPAC affirme qu'après la résiliation des accords, Black Gold a conservé les informations de IPAC, notamment des informations commerciales confidentielles, en violation de son obligation contractuelle de retourner ces informations. IPAC affirme en outre que Black Gold n'a fait aucun effort pour transférer à IPAC une activité viable vis-à-vis de ses clients distributeurs, en violation de son obligation contractuelle de le faire. Les revenus de IPAC relatifs aux comptes gérés par Black Gold, qui étaient auparavant stables, ont diminué en 2017, tandis que MM. Napoleoni et Plitt travaillaient, comme on l'a découvert par la suite, à offrir des produits concurrents via PXL. Après l'Accord de résiliation, les ventes des comptes clients pour lesquels IPAC demande des dommages et intérêts ont chuté brusquement, tombant à zéro vers la fin de 2018.

À la suite des actions de Black Gold par l'intermédiaire de son PDG et copropriétaire, M. Napoleoni, IPAC affirme qu'elle a subi un préjudice de 1 404 398,24 dollars U.S. et que le comportement de Black Gold justifie l'imposition d'une injonction de réparation, des honoraires et frais d'avocat et des dommages exemplaires.

**Résumé de la position du Défendeur**

Cette section récapitule dans leurs grandes lignes les parties pertinentes de la position du Défendeur. Black Gold affirme que son PDG, M. Napoleoni, pensait avoir supprimé toutes les informations confidentielles de IPAC qui étaient en possession de Black Gold, « après la résiliation ». Témoignage écrit de Napoleoni §23 (il semble apparemment après que les parties ont conclu l'Accord de résiliation). Black Gold affirme en outre que, conformément aux demandes de découverte de IPAC dans le présent arbitrage et aux ordonnances de l'Arbitre concernant ces demandes, le PDG de Black Gold, M. Napoleoni, a été chargé de procéder à des recherches

# TRADUCTION

électroniques d'informations et de rechercher tous les documents pertinents dans la présente affaire. Pour respecter pleinement et correctement cette obligation, il a contacté une personne possédant plus de connaissances et de compétences en informatique que lui-même. Témoignage écrit de Napoleoni § 21; Tr. 575 :75-78 :22. D'après les instructions données par son contact à M. Napoleoni, concernant l'ordinateur Apple utilisé par M. Napoleoni pour les affaires IPAC, le PDG de Black Gold, M. Napoleoni, a déclaré qu'il avait ensuite procédé à ce que le Défendeur appelle (sans définition ni explication) une « recherche approfondie » et ce faisant, a trouvé les informations dont il avait dit qu'il pensait les avoir effacées. Black Gold admet que ces informations comprennent des factures, des informations marketing, des listes de prix et des fiches techniques de produits IPAC. Tr. 575:16-L8 ; Témoignage écrit de Napoleoni C [21. Selon Black Gold, il s'agissait des éléments et des informations que Black Gold a fournies à l'avocat du Demandeur durant cet arbitrage. Témoignage écrit de Napoleoni [22; Tr. 575:75-78:22.

Le PDG de Black Gold, M. Napoleoni, a déclaré qu'il pensait avoir supprimé toutes les informations relatives à IPAC, ce qui était conforme aux dictats des accords conclus par les parties et que Black Gold pensait qu'il en avait totalement et complètement empêché l'utilisation ou l'accès et que les données seraient écrasées. Témoignage écrit de Napoleoni § 23. Black Gold affirme n'avoir consulté aucun document IPAC avant cet arbitrage et n'avoir conservé aucune information de IPAC, ce qui serait non conforme aux termes du Contrat de représentation commerciale ou du Contrat de distributeur exclusif. Témoignage écrit de Napoleoni § 24. Black Gold affirme en outre qu'il n'a pas utilisé, consulté ou partagé les informations de IPAC après la fin de la relation entre les parties. Témoignage écrit de Napoleoni § 25.

Black Gold fait valoir qu'il n'y a aucune preuve que IPAC ait subi des dommages à la suite des informations sur IPAC que le PDG de Black Gold, M. Napoleoni, a tenté de supprimer sans succès. Black Gold soutient qu'il n'existe aucune preuve de la manière dont les informations pourraient avoir causé, auraient causé ou causeraient des torts, des préjudices ou des dommages à IPAC. Tr. 148:1224; 149:11-150:10; 575:1-18. Black Gold reconnaît que IPAC lui a fourni du matériel de vente et de marketing pour la promotion et la vente de ses produits, y compris les prix de vente et les fiches techniques, dans le but de vendre ses produits. Témoignage écrit de Napoleoni § 15; Tr. 575 :16-18. En résumé, Black Gold affirme qu'il n'y a eu aucune violation d'une quelconque

# TRADUCTION

disposition contractuelle de Black Gold concernant les informations de IPAC ; mais s'il y a eu violation, Black Gold fait valoir que IPAC n'a présenté aucune preuve démontrant que l'infraction présumée lui aurait causé un préjudice ou des dommages.

Le PDG de Black Gold, M. Napoleoni, a déclaré que IPAC n'avait jamais communiqué de formules de produits ou d'informations similaires à Black Gold. Témoignage écrit de Napoleoni § 15. Black Gold affirme qu'il n'y a aucune preuve que Black Gold ait jamais possédé de telles informations techniques sensibles de IPAC et, en conséquence, fait valoir que Black Gold n'aurait pas pu transmettre de telles informations à qui que ce soit, y compris PXL.

Black Gold fait valoir que le Contrat de distributeur exclusif avait une durée spécifiquement définie allant du 1er janvier 2016 au 1er janvier 2017, puis expirant le 1er janvier 2017, un an après la date d'effet. Black Gold fait en outre valoir que les obligations auxquelles Black Gold aurait manqué selon IPAC, en 2017 et 2018, ont expiré au début de 2017 avec l'expiration du Contrat de distributeur exclusif écrit et n'étaient pas en vigueur au moment de la fin de la relation entre les parties en mars 2018. Cependant, Black Gold n'adresse pas directement le fait que le Contrat de distributeur exclusif prévoit que l'obligation de protéger les informations IPAC définies dans ce document en tant que « Informations confidentielles » existe à la fois pendant et après la durée du Contrat de distributeur exclusif. Contrat de distributeur exclusif Section VIII.B.

Black Gold reconnaît qu'en vertu de la législation californienne, « la partie qui a commis l'infraction a uniquement la responsabilité de placer la partie non-défaillante dans la même position que si l'infraction en question n'avait pas eu lieu. Ou bien, pour formuler ceci encore d'une troisième manière, la partie fautive est responsable uniquement de donner à la partie non-défaillante le bénéfice du marché dans la mesure où la violation spécifique l'a privée de son marché. » *Postal Instant Press, Inc. c. Seal*y 43 Cal.App.4th 1704, 1709 (1996). Black Gold affirme toutefois que IPAC n'a pas démontré le préjudice qu'elle dit avoir subi.

Enfin, Black Gold fait valoir qu'il n'est pas « fautif » au sens de cette expression dans le Contrat de distributeur exclusif qui exige que : « Les coûts de la procédure, y compris les honoraires et les frais des avocats, des comptables et des témoins, ainsi que la rémunération des Arbitres, sont évalués par les Arbitres contre les parties conformément à la décision de l'Arbitre en matière de faute. » Contrat de distributeur exclusif Section XVI.E.

# T R A D U C T I O N

Patricia ORLANDO-PALMERO
Notaire
PO Bd de Suisse
MONACO MONACO

## L'Accord de résiliation.

Les parties sont en désaccord sur les conséquences éventuelles de leur Accord de résiliation sur cet arbitrage. Le paragraphe 3 de l'Accord de résiliation prévoit une renonciation réciproque entre les parties pour « toute réclamation, obligation ou responsabilité de quelque nature que ce soit, connue ou inconnue », qu'elles « ont ou pourraient à l'avenir avoir directement ou indirectement découlant de (ou en relation avec) le Contrat [de représentation commerciale] ». Appendice du Demandeur C-3 au § 3. Le paragraphe 4 de l'Accord de résiliation prévoit toutefois que les obligations associées aux sections 8, 12 et 13 du Contrat de représentation commerciale restent en vigueur après la fin du Contrat.

L'Accord de résiliation ne fait pas référence à la section 1542 du Code civil, qui dispose :

Une libération générale ne s'étend pas aux réclamations dont le créancier ou la partie qui libère ne connaît pas ou ne soupçonne pas l'existence en sa faveur au moment de l'exécution de la libération et qui, s'il en avait eu connaissance, aurait considérablement affecté son règlement avec le débiteur ou la partie libérée.

En raison de la Section 1542, une libération générale ne s'étendra pas aux réclamations inconnues où « il est clair que le manque de connaissances de [la partie] a eu une incidence importante sur les conditions du règlement ». *Casey c. Proctor*, 59 Cal. 2d 97, 105 (1963).

Il est clair que, d'après les éléments de preuve, si IPAC avait été informée des activités du PDG de Black Gold, Lorenzo Napoleoni, elle n'aurait jamais accepté les conditions de l'Accord de résiliation. M. Napoleoni n'a jamais informé IPAC qu'il était devenu PDG de PXL pendant la durée du Contrat de représentation commerciale. Tr. à 486:24-487:4, 495:18-25; *voir* le Témoignage écrit de Cereghino § 10. Et IPAC n'était pas au courant de ce que PXL, dirigée par le PDG de Black Gold, M. Napoleoni, avait formulé des additifs d'imitation concurrents pendant la durée du Contrat de représentation commerciale et de ses obligations relatives aux informations confidentielles de IPAC, chronologie démontrée, *entre autres*, par la Fiche technique 2017 pour le PXL 5003. Voir Tr. à 257:1-15, 257:20-25; voir aussi Tr. à 87: 20-88:19; Témoignage direct de Wooton à 3; Tr. à 211: 9-19, 213:2-9; Témoignage écrit de Cereghino à 10: 27-11:2; Pièce du Demandeur C-11 à Pièce B (fiche technique PXL 5003 de NAPOLEONI HCAEO-0005-06).

# TRADUCTION

Lorsque IPAC a appris l'existence de PXL, elle ne savait pas que celle-ci exerçait ses activités dans le secteur des additifs. Dans un courriel adressé le 1er mars 2017 à IPAC, M. Plitt, ancien employé de IPAC et cofondateur de PXL, a informé IPAC qu'il avait créé PXL avec son fils en tant que « société de conseil ». Voir Pièce du Demandeur. C-10 à PLITT00067 (pièce 11 de la déposition de Napoleoni).

La question de savoir si des réclamations inconnues ont été divulguées est une question de fait. *Butler c. Vons Cos.*, 140 Cal. App. 4th 943, 950 (2006) (citant des cas) ; *Huddleson. c. Huddleson*, 187 Cal. App. 3d 1564, 1572-73 (1986) (la libération générale ne faisait pas obstacle à une réclamation ultérieure inconnue au moment de la libération). Comme l'Arbitre l'a noté précédemment, l'Accord de résiliation « ne contient aucune renonciation aux droits en vertu de la Section 1542 du Code civil de la Californie ». Ordonnance préliminaire n° 3 à 3. M. Krock a témoigné qu'il avait rédigé l'Accord de résiliation en réponse à la demande de M. Napoleoni de mettre fin à la relation entre les parties. *Voir* Tr. à 358:6-18; Pièce du Demandeur C-5 à IPAC000030 (lettre de Cereghino à Napoleoni ; « Alan m'a expliqué lors de cette réunion que vous avez évoqué la nécessité de mettre fin à l'accord, …. »). Aucune clause du Contrat de distributeur exclusif, du Contrat de représentation commerciale et de l'Accord de résiliation ne contenait de dérogation à la Section 1542. *Voir* Audience Tr. à 288:5-7, 289:24-290: 1, 290:12-14. L'absence de dérogation en vertu de la Section 1542 dans l'Accord de résiliation était intentionnelle, ce qui était contraire aux autres accords IPAC qui contenaient des dérogations en vertu de la Section 1542. Voir Tr. à 290:14-17.

Compte tenu des conditions du Contrat de représentation commerciale qui, suivant accord des parties dans l'Accord de résiliation, resteraient en vigueur après l'Accord de résiliation, compte tenu de la méconnaissance par IPAC du comportement de Black Gold, de l'absence de toute référence à la Section 1542 dans l'Accord de résiliation, et du témoignage non contredit que l'absence de dérogation aux termes de la Section 1542 était intentionnelle, les revendications que IPAC cherche à faire valoir dans le présent arbitrage ne sont pas exclues par l'Accord de résiliation conclu entre les parties.

# T R A D U C T I O N

**DISCUSSION**

### Obligations juridiques de Black Gold envers IPAC

Les Articles 8, 12 et 13 du Contrat de représentation commerciale prévoient ce qui suit :

ARTICLE 8. Propriété. En cas de résiliation du présent Contrat pour quelque raison que ce soit par l'une ou l'autre des parties, le REPRÉSENTANT COMMERCIAL ***doit immédiatement renvoyer à IPAC*** à l'adresse indiquée ci-dessus, ou à l'adresse désignée au États-Unis par IPAC par préavis, ***de manière sécurisée*** et à ses frais exclusivement, toutes les pièces en sa possession ou sous son contrôle et appartenant à IPAC, y compris, mais sans s'y limiter, la documentation, les matériels de promotion, les exemplaires de bons de commande et fichiers associés, les dessins des clients et autres documents concernant IPAC, , aux frais du REPRÉSENTANT COMMERCIAL.

ARTICLE 12. Obligation de propriété. Le REPRÉSENTANT COMMERCIAL convient que pendant la durée du présent Contrat ***et pendant la période qui suit de cinq (5) ans, ni lui ni ses dirigeants, personnels et agents ne pourront divulguer*** à qui que ce soit aucune information confidentielle de IPAC, y compris, mais sans s'y limiter, des informations concernant les ventes, l'identité des clients et clients potentiels, la quantité et le type de Produits expédiés ou vendus, les prix et méthodes de tarification, les retours de Produits, les produits non annoncés et les informations confidentielles concernant les produits et les procédés, et toute autre information dont la communication à autrui nuirait aux intérêts d'IPAC.

ARTICLE 13. Limitation de responsabilité et indemnisation. LE REPRÉSENTANT COMMERCIAL EST EXONÉRÉ DE TOUTE RESPONSABILITÉ CONCERNANT TOUS LES DOMMAGES INDIRECTS, SPÉCIAUX OU CONSÉCUTIFS, DE QUELQUE NATURE QUE CE SOIT SUBIS PAR IPAC, Y COMPRIS, MAIS SANS S'Y LIMITER, EN CAS DE PERTE DE PROFITS OU DE TOUTE AUTRE PERTE ÉCONOMIQUE RÉSULTANT DU PRÉSENT CONTRAT OU QUI Y SERAIENT ASSOCIÉS, ***SAUF SI LE REPRÉSENTANT COMMERCIAL AGIT DE FAÇON NON AUTORISÉE AU-DELÀ DU CADRE DU PRÉSENT CONTRAT***, Y COMPRIS EN CAS D'ACTES ILLICITES. IPAC ET LE REPRÉSENTANT COMMERCIAL CONVIENNENT QUE LA RELATION ÉTABLIE AUX TERMES DU PRÉSENT CONTRAT SE LIMITE À LA CONSULTATION ET À LA REPRÉSENTATION SELON LA DÉFINITION CI-DESSU.S. AUX PRÉSENTES. IPAC ACCEPTE DE DÉFENDRE, D'INDEMNISER ET DE DÉGAGER DE TOUTE RESPONSABILITÉ LE CONSULTANT À L'ÉGARD DE TOUTE RÉCLAMATION, MOTIF D'ACTION EN JU.S.TICE, RESPONSABILITÉ, COÛTS, HONORAIRES RAISONNABLES D'AVOCAT ET DOMMAGES-INTÉRÊTS QUE POURRAIT ENCOURIR LE REPRÉSENTANT COMMERCIAL DANS LE CADRE DE L'EXÉCUTION DES ACTIVITÉS AUTORISÉES ET LÉGALES AU PRÉSENT CONTRAT.

Contrat de représentation commerciale, Articles 8, 12 et 13 (non souligné dans l'original).

La Section VIII.B. du Contrat de distributeur exclusif prévoit :

Tel qu'utilisé dans la présente section, on entend par « informations confidentielles », les informations communiquées au Distributeur par IPAC ou les informations communiquées à

# TRADUCTION

IPAC par le Distributeur, ou connues du Distributeur dans le cadre de leur affiliation mutuelle, généralement non connues dans l'industrie dans laquelle IPAC et le Distributeur exercent ou pourraient s'engager. Le Distributeur ne doit divulguer aucune information non connue du public, sans le consentement de IPAC, concernant les listes de clients, produits, processus et services de IPAC, y compris toute information sur la recherche, le développement, les inventions, la fabrication, les achats, la comptabilité, l'ingénierie, le marketing, le merchandising, la vente, les tarifs, les politiques internes et toute poursuite ou activité juridique. ***Les parties ne doivent pas, à tout moment que ce soit pendant la durée du présent Contrat ou par la suite, divulguer à toute personne, entreprise ou société l'une des informations confidentielles reçues par elle pendant la durée du présent Contrat***, et toutes ces informations doivent être conservées de manière confidentielle et ne doivent en aucune manière être révélées à qui que ce soit, sauf si cela est requis par une procédure judiciaire ou sur l'ordre d'un tribunal compétent. Le Distributeur peut fournir à ses conseillers comptables et juridiques des informations financières résumées suffisantes pour lui permettre de se conformer aux obligations fiscales et autres exigences réglementaires auxquelles il est soumis.

Contrat de distributeur exclusif Section VIII.B. (emphase ajoutée).

La Section XV.C. du Contrat de distributeur exclusif prévoit que, lors de la résiliation ou de l'expiration du Contrat de distributeur exclusif, Black Gold était tenue de « coopérer avec IPAC, de restituer tous les documents à IPAC, et de faire tout ce qui est raisonnablement requis par IPAC afin de permettre à IPAC de continuer des activités viables avec les clients servis par le Distributeur ». Contrat de distributeur exclusif à la Section XV.C.

Les « informations confidentielles » telles que citées dans l'Article 12 du Contrat de représentation commerciale et/ou dans la Section VIII.B du Contrat de distributeur exclusif, sont collectivement désignées dans les présentes comme « informations confidentielles de IPAC ». L'Article 12 du Contrat de représentation commerciale indique une durée de cinq ans, à compter de la fin dudit contrat, de l'obligation de non divulgation des informations confidentielles de IPAC. La Section VIII.B. du Contrat de distributeur exclusif, cependant, n'indique pas de durée. En plus de protéger les informations confidentielles de IPAC de manière permanente, et pas seulement pendant cinq ans après la fin du Contrat de représentation commerciale, la section VIII.B du Contrat de distributeur exclusif semble également protéger des catégories plus larges d'informations confidentielles de IPAC que ne le fait l'Article 12 du Contrat de représentation commerciale.

# TRADUCTION

## Violation par Black Gold de ses obligations envers IPAC

À titre préliminaire, le Défendeur affirme dans son mémoire après l'audience qu'il « est important de noter que IPAC n'a à aucun moment formellement désigné aucun de ses informations ou de ses biens pouvant bénéficier d'une protection du secret commercial en vertu du Code de procédure civile de la Californie. 2019,210 » Mémoire final d'arbitrage du Défendeur à 7:24-26. Le Défendeur Black Gold affirme le même argument dans sa Réponse finale d'arbitrage à 22:25-27. Comme le Défendeur le répète à maintes reprises, il convient de répéter et d'incorporer ici une décision de l'ordonnance préliminaire n° 5 dans le présent arbitrage :

> « Le Défendeur a fait valoir, comme indiqué dans son mémoire supplémentaire du 25 octobre 2018, que la section 2019.210 du Code de procédure civile de la Californie s'applique à cet arbitrage. » Ceci n'est pas correct. *Le Code de procédure civile de Californie, section 2019.210, fait partie du Titre 4 de la Partie 4 du Code de procédure civile de Californie (collectivement dénommés ci-après « la Loi sur la découverte civile »). Cette loi régit la manière dont le processus de découverte préalable est mené dans un procès devant la Cour supérieure de Californie. Lors d'un arbitrage, en revanche, seules certaines parties de la Loi sur la découverte civile peuvent s'appliquer - et même celles-ci peuvent s'appliquer « [uniquement si les parties prévoient de le faire dans le cadre de leur accord, ... Code de procédure civile de Californie Article 1283.1 (b).* En l'absence des articles 1283.l (b) et 1283.05 du Code de procédure civile de Californie, tout arbitrage en vertu d'un contrat contenant une clause soumise à la loi californienne risquerait de se dérouler selon l'ensemble des procédures de communication des informations applicables dans le cadre d'un litige en Cour supérieure de Californie. Toutefois, l'article 1283.l (b) du Code de procédure civile de Californie est la loi et les accords d'arbitrage des parties applicables dans la présente affaire n'adoptent pas l'option de découverte autorisée dans ladite loi. »

Ordonnance préliminaire n° 5 à 2: 14-28 (emphase ajoutée). L'affirmation répétée du Défendeur est incorrecte et non pertinente.

Le PDG de Black Gold est M. Napoleoni et la société n'a aucun autre employé. Tr. à 497: 20-22 (Napoleoni). M. Napoleoni est actionnaire de Black Gold et son coactionnaire est son épouse Sofia Napoleoni. Voir Tr. à 469:14-470: 2 (discussion de la Pièce du Demandeur C-5 à IPAC000018).

Pendant la durée des accords entre les parties qui font l'objet de cet arbitrage, le PDG de Black Gold, M. Napoleoni, a discuté avec Steven Plitt de IPAC et le Dr. Jeffrey Crow, de IPAC, en vue de créer une nouvelle entreprise capable de concurrencer IPAC. Tr. 554:5-14; 555:3-6. Le Dr. Crow est titulaire d'un doctorat en chimie analytique, est un employé de IPAC depuis 2006 et, en tant que

# TRADUCTION

Vice-président de la Technologie, il est responsable de la recherche et du développement des produits IPAC. Témoignage écrit de Crow § 1. Dr. Crow a témoigné que lors de ces discussions avec Le PDG de Black Gold, M. Napoleoni, et avec Steven Plitt de IPAC, Dr. Crow était préoccupé par la façon dont ils pourraient procéder dans une nouvelle entreprise sans utiliser les informations confidentielles de IPAC, et il a « en permanence insisté que vous auriez besoin de faire très attention à ce que tout ce que vous avez fait soit distinct de IPAC » et que « avec le temps, il est devenu évident que cela allait être très difficile à faire » et que c'était « l'une des raisons pour lesquelles [il] a décidé de ne pas poursuivre » avec la nouvelle entreprise. Tr. 59:24-60:13. M. Plitt, cependant, a décidé de quitter son emploi à IPAC pour créer une nouvelle entreprise avec Le PDG de Black Gold, M. Napoleoni, afin de concurrencer IPAC.

Peu de temps avant que M. Plitt ne quitte son emploi chez IPAC, il s'est adressé par courrier électronique un ensemble complet d'informations confidentielles de IPAC qui permettrait à un concurrent de copier délibérément (c.-à-dire d'imiter) les produits IPAC. Pièce du Demandeur C-10 lors du dépôt de la Pièce 19 ; Témoignage écrit de Crow §§ 6-10, 12-13, and 22-35. M. Plitt a agi de la sorte bien qu'il n'avait aucun motif commercial en relation avec IPAC ; lorsqu'il avait un besoin légitime d'utiliser ces informations hautement confidentielles dans le cadre des activités de IPAC, il y accédait via Citrix sur le système informatique de IPAC. Tr. 147:20-148:5.

Par la suite, mais toujours pendant la durée du Contrat de représentation commerciale, le PDG de Black Gold, M. Napoleoni, et M. Plitt, ayant récemment quitté son emploi chez IPAC, ont créé conjointement une nouvelle société chargée de gérer leurs nouvelles activités. Il est incontestablement prouvé que le PDG de Black Gold, M. Napoleoni avec M. Plitt ont cofondé ensemble PXL Chemicals, BV aux Pays-Bas, dont le PDG de Black Gold, M. Napoleoni était (et semble toujours être) PDG et actionnaire. Tr. 505:17-19; 543:21-544:6; 545:4-546:8. Les faits se sont produits alors que le Contrat de représentation commerciale était encore en vigueur et environ six mois après expiration du Contrat de distributeur exclusif : les registres officiels des Pays-Bas indiquent que le 31 juillet 2007 était la date de constitution de PXL Chemicals BV. (IPAC0000032, jointe à la Déclaration de réclamations vérifiée et modifiée du Demandeur).

PXL Chemicals LLC aux États-Unis était une autre nouvelle société constituée alors que le Contrat de représentation commerciale était encore en vigueur et dix jours après expiration du

**T R A D U C T I O N**

Patricia GRIMAUD-PALMERO
Huissier
Tél. 57.77.48.48
20 Rd du Suisse

Contrat de distributeur exclusif. Les archives publiques du bureau du secrétaire d'État de l'Ohio établissent que PXL Chemicals LLC a été créée dans l'Ohio le 10 janvier 2017. https://bizimage.sos.state.oh.us/api/image/pdf/201700902960 (dernier accès le 1er mai 2019) (Statuts de l'Organisation pour une Société À Responsabilité Limitée Nationale). M. Plitt habite dans l'état de l'Ohio. Tr. 546:19-25. PXL (qu'il s'agisse de PXL Chemicals LLC et/ou de PXL Chemicals BV) s'est présenté comme une entreprise unitaire avec deux établissements. Voir Pièce du Demandeur C-5 à IPAC000028-29 (page Web PXL, identifiant M. Plitt comme « fondateur / PDG », M. Napoleoni comme « fondateur / directeur de l'exploitation » et divulguant les adresses « aux États-Unis » et « internationales »). Globalement, les éléments de preuve présentés dans le présent arbitrage ne permettent pas de déterminer si le PDG de Black Gold, M. Napoleoni, était également impliqué dans la création de PXL Chemicals LLC aux États-Unis. PXL Chemicals LLC est, avec Le PDG de Black Gold, M. Napoleoni, actionnaire de PXL Chemicals BV. Tr. 505:10-19.

À certains moments pertinents aux présentes, PXL Chemicals LLC ainsi que PXL Chemicals BV se sont présentés au marché et au grand public sur Internet à l'adresse www.pxlchemicals.com. *Voir* https://www.pxlchemicals.com/contact (présentant les bureaux de PXL dans l'Ohio et aux Pays-Bas) (dernier accès le 1er mai 2019). Moins de cinq mois après la création de PXL Chemicals BV, par le PDG de Black Gold, M. Napoleoni, et le récent employé de IPAC, M. Plitt, les deux sociétés de PXL avaient des produits additifs qui existaient déjà depuis suffisamment longtemps pour que leurs fiches techniques soient mises à jour « à compter du 1er décembre 2017 » indiquant www.pxlchemicals.com et « PXL Chemicals LLC et ses filiales ». Témoignage écrit de Wooton à 2 (dernier paragraphe) ; Napoleoni HCAEO-0004 - Napoleoni HCAEO-0008.

Black Gold avait convenu, lors de la résiliation ou de l'expiration du Contrat de distributeur exclusif, « de coopérer avec IPAC, de restituer tous les documents à IPAC, et de faire tout ce qui est raisonnablement requis par IPAC afin de permettre à IPAC de continuer des activités viables avec les clients servis par le Distributeur. » Contrat de distributeur exclusif à la section XV.C. Black Gold a omis d'agir en ce sens. Au lieu de cela, il n'a restitué aucun document de IPAC à IPAC avant de le faire dans le cadre de cet arbitrage. Il a omis d'inclure IPAC dans les communications nécessaires avec les clients IPAC. Témoignage écrit de Cereghino § 3. La conduite de Black Gold, au lieu de

# T R A D U C T I O N

permettre à IPAC de « continuer des activités viables avec les clients servis par le Distributeur »,
comme prévu à la Section

XV.C. du Contrat de distributeur exclusif, a en fait entraîné une forte baisse d'activité subie par IPAC.
Témoignage écrit de Krock § 29; Tr. 341:2-5, 342:24-343:1.

Les éléments de preuve présentés dans le présent arbitrage, qui consistent en des opinions
d'experts proposés au nom des deux parties, sont essentiels. Et les avis des experts sont
diamétralement opposés.

Le Dr. David L. Wooten, expert du Demandeur, possède d'excellentes références et une
grande expérience. Selon sa facture accompagnant la demande de remboursement du Demandeur,
Dr. Wooten a consacré beaucoup de temps à son travail pour rendre son avis. Aucun fondement n'a
été présenté pour remettre en question son indépendance, son expertise ou la qualité et
l'exactitude de ses expertises.

La proposition de l'expert du Défendeur, le Dr. Francesco Coppola, est considérablement
déficiente. Elle souffre de son manque d'expérience pertinente, car le Dr. Coppola n'a jamais
développé de produit additif. Tr. 236:7-8; 274:12-20. Elle souffre de son manque d'indépendance,
car il travaille pour une société (Axxon Oil) de la famille de la femme (et coactionnaire de Black Gold)
du PDG de Black Gold, M. Napoleoni et pour laquelle société M. Napoleoni travaille également, et
laquelle société utilise des additifs PXL, et le Dr. Coppola a présenté ses opinions en tant que faveur
et non en tant qu'expert indépendant contre compensation. Tr. 236: 22-24; 238: 21-25; 239: 1-21;
256: 2-4. La proposition de l'expert du Défendeur, le Dr. Coppola, souffre également du peu de
temps significatif consacré à la préparation de son analyse et de ses opinions, puisqu'il n'y a consacré
qu'une après-midi. Tr. 251 :15-17.

Le Défendeur cite également, dans son mémoire après la déposition, la déclaration écrite
de son expert Peter Dijke. À l'audience, le Défendeur a retiré son offre de M. Dijke en tant que
témoin et n'a pas demandé à M. Dijke de déposer à l'audience. Tr. 240 :11-16. Toutefois, le
Demandeur a néanmoins présenté pour preuve le témoignage écrit direct de M. Dijke, présenté par
le Défendeur avant l'audience. Tr. 240:17-20. Par la suite, eu égard à la position du Demandeur
concernant le témoignage écrit direct de M. Dijke, le Défendeur a de nouveau eu l'occasion de faire

# TRADUCTION

témoigner M. Dijke à l'audience, mais le Défendeur a choisi de ne pas le faire. Tr. 445:14-17. La crédibilité du témoignage direct écrit de M. Dijke souffre d'un manque d'expérience, car il n'est pas chimiste. Il souffre également d'un manque d'indépendance, car il travaille pour PXL, qui selon la remarque de Dr. Wooton, fabrique des imitations des produits IPAC et qui a des liens avec le PDG de Black Gold, M. Napoleoni, et l'ancien employé de IPAC, M. Plitt, comme indiqué ci-après.

L'Arbitre conclut que le témoin expert du Demandeur, le Dr. Wooton, est plus qualifié dans le cadre de cette affaire que les témoins experts du Défendeur, le Dr. Coppola et M. Dijke, que les opinions du Dr. Wooton sont plus crédibles que les leurs et qu'elles sont celles d'un expert dont l'indépendance ne souffre apparemment pas de parti pris ni d'autre problème - à l'instar des experts du Défendeur, le Dr. Coppola et M. Dijke, dont les relations soulèvent d'importantes questions de partialité et de doutes quant à leur indépendance en la matière.

Le Dr. Wooton, témoin expert du Demandeur, a déclaré que certains produits PXL sont des produits de contrefaçon des produits IPAC. L'Arbitre juge le témoignage d'expert du Dr. Wooton crédible et convaincant. L'Arbitre conclut, sur la base de l'ensemble des éléments de preuve présentés dans cet arbitrage, que Black Gold, par l'intermédiaire de son PDG, M. Napoleoni, a violé les sections 8 et 12 du Contrat de représentation commerciale et les sections VIII.B. et XV.C. du Contrat de distributeur exclusif, ce qui constitue une cause importante du développement, de la commercialisation et de la vente des produits PXL, que l'expert du Demandeur, le Dr. Wooton, a déclarés être des imitations de produits IPAC et qui, selon le témoignage d'Alan Krock, employé de IPAC, ont causé la baisse dramatique et inexpliquée des ventes de IPAC, et que Black Gold n'a pas fait « tout ce qui est raisonnablement requis par IPAC afin de permettre à IPAC de continuer des activités viables avec les clients servis par le Distributeur ». Contrat de distributeur exclusif Section XV.C.

Black Gold a présenté pour la première fois à IPAC, dans le cadre de cet arbitrage, plusieurs centaines de documents d'informations confidentielles de IPAC, telles que des informations sur les listes de clients, les produits, les processus, les services, la recherche, le développement, les inventions, la fabrication, les achats, la comptabilité, l'ingénierie, le marketing, le merchandising, la vente, les prix et les politiques internes. Témoignage écrit de Cereghino §§ 18-19; Pièce du Demandeur C-10 à BlackGoldDepo0277-89 (Pièce 3 à la transcription de la déposition de

# T R A D U C T I O N

Napoleoni) ; Pièce du Demandeur C-10 à 22:21-23:25. Cela incluait spécifiquement les listes de prix. Tr. 149:7-10.

L'argument de Black Gold selon lequel, après la résiliation des contrats entre les parties, son PDG, M. Napoleoni, pensait avoir détruit les informations confidentielles de IPAC détenues par Black Gold, et qu'il aurait seulement réalisé au cours de cet arbitrage qu'il avait omis de le faire, n'a pas de sens. Détruire les informations confidentielles de IPAC détenues par Black Gold n'était pas une option en vertu des accords entre les parties. Le Contrat de représentation commerciale stipulait que le matériel devait être "immédiatement renvoyé à IPAC... de manière sécurisée..." et à ses frais par Black Gold. Contrat de représentation commerciale à l'Article 8. Le Contrat de distributeur exclusif exigeait que Black Gold « restitue tous les documents à IPAC ». Contrat de distributeur exclusif à la section XV.C. La non-restitution et le défaut par Black Gold de remise du matériel à IPAC jusqu'au milieu du présent arbitrage constituait une violation du Contrat de représentation commerciale et du Contrat de distributeur exclusif. En outre, l'Accord de résiliation conclu entre les parties stipulait de manière affirmative que les obligations du Contrat de représentation commerciale étaient maintenues conformément à leur durée initiale, au-delà de la résiliation du Contrat de représentation commerciale. Accord de résiliation Section 4.

Black Gold affirme en outre que, même si elle n'a pas renvoyé les documents d'IPAC avant le milieu de cet arbitrage, y compris les documents contenant ce que les accords entre les parties ont défini comme informations confidentielles de IPAC, rien ne prouve que Black Gold ait utilisé ces informations de manière abusive. Mais compte tenu de la totalité des preuves et de la crédibilité des témoins, l'argument de Black Gold n'est pas convaincant. M. Napoleoni, PDG de Black Gold, et M. Plitt de IPAC ont décidé de créer une entreprise pour concurrencer IPAC. Ils ont essayé de persuader le Dr. Crow de IPAC de se joindre à eux. Il a choisi de ne pas le faire, en grande partie parce qu'il ne voyait pas comment ces personnes pourraient créer une telle entreprise sans utiliser abusivement les informations confidentielles de IPAC.

Le PDG de Black Gold, M. Napoleoni, et l'ex-employé de IPAC, M. Plitt, ont décidé de créer PXL. Le Dr. Wooton a témoigné que les produits PXL étaient des contrefaçons des produits IPAC. Témoignage écrit de Wooton au § 3. En outre, des clients ont déclaré aux représentants des ventes IPAC en Europe que « PXL indique à ses clients que les produits [PXL] sont d'utilisation sûre, car ils

# TRADUCTION

sont une imitation des formulations de IPAC ». Témoignage écrit de Cereghino à 10:27-11:2. À la suite des actions de Black Gold à ces égards, les ventes de IPAC ont subi une chute dramatique et inexpliquée.

Enfin, Le PDG de Black Gold, M. Napoleoni, a témoigné comme suit en réponse aux questions de l'Arbitre. La question spécifique était la suivante : si les informations confidentielles de IPAC telles que celles contenues dans le tableau que M. Plitt s'était envoyé à lui-même par courrier électronique avant de cofonder PXL avec M. Napoleoni, comment les produits PXL avaient-ils pu être formulés aussi rapidement et aussi semblables aux produits IPAC, comme le pense le Dr. Wooton qui estime que ce sont des contrefaçons ? Tr. A 549 :24-550 :18. Le PDG de Black Gold, M. Napoleoni, a finalement déclaré: « *Tout cela était à ma disposition*, et oui. C'est tout. » Tr. 550:17-18 (emphase ajoutée). Au cours de cette partie de son témoignage, M. Napoleoni a donné à l'Arbitre l'impression et la compréhension claires, distinctes et mémorables que, immédiatement après avoir témoigné « Tout cela était à ma disposition » et avant de prononcer le mot « oui », il avait fait une pause et aurait souhaité ne pas faire cet aveu, surtout dans le contexte de la question à laquelle il répondait, que « tout cela était à ma disposition », et qu'il s'est alors retenu de répondre à la question suivante. Ce témoignage du PDG de Black Gold, M. Napoleoni, a gravement porté atteinte à sa crédibilité lorsqu'il a nié toute utilisation abusive des informations confidentielles de IPAC et a gravement nui à la force de persuasion des arguments de Black Gold.

Dans le cadre d'une résolution négociée d'un différend concernant Black Gold dans sa recherche et production d'informations à IPAC lors de cet arbitrage, Black Gold a promis de produire un tableau au lieu d'effectuer des recherches d'informations stockées électroniquement à l'aide des termes de recherche de IPAC destinés aux informations financières, commerciales et de revenus et certains autres sujets connexes. Ordonnance préliminaire n° 5 à 4:1-4. Black Gold a brisé cette promesse et a plutôt fourni tardivement un tableau contenant beaucoup moins d'informations que le tableau promis. Mais les conclusions proposées que IPAC demande instamment de tirer de ce que Black Gold a fait à cet égard sont trop détaillées pour pouvoir être fondées sur l'absence d'informations contenues dans le tableau que Black Gold a fourni tardivement et sur le fait que Black Gold n'a pas tenu ses promesses. La conclusion qui peut être tirée en toute confiance et avec justification, cependant, est une conclusion générale selon laquelle Black Gold a manqué à sa

# TRADUCTION

promesse, parce que s'il avait tenu sa promesse, les informations supplémentaires que Black Gold aurait fournies à IPAC auraient été préjudiciables aux arguments de Black Gold dans cet arbitrage.

Black Gold est responsable des actes de son PDG, M. Napoleoni, à la fois en tant que Défendeur supérieur par lequel le commettant est responsable des actes de son mandataire, et également en ce qui concerne les performances de Black Gold telles qu'indiquées dans les sections VIII.B. et XV.C. du Contrat de distributeur exclusif et des performances de Black Gold et de ses « dirigeants, employés et mandataires », comme indiqué à l'Article 12 du Contrat de représentation commerciale.

En résumé, les éléments de preuve montrent de manière convaincante que Le PDG de Black Gold, M. Napoleoni :

- Pendant la durée des accords entre les parties, M. Plitt, employé de IPAC, et Le Dr. Crow, l'un des employés de IPAC, ont discuté de la création d'une nouvelle entreprise pour concurrencer IPAC, de sorte que le Dr. Crow a conclu que ce serait « très difficile » sans utiliser abusivement les renseignements confidentiels de IPAC ;
- ensuite a été créée PXL avec l'ex-employé de IPAC, M. Plitt, pendant la durée du Contrat de représentation commerciale, tandis que Black Gold et son PDG, M. Napoleoni, disposaient de centaines de documents contenant des informations confidentielles de IPAC, et également après que M. Plitt ait envoyé à lui-même par courrier électronique un fichier Microsoft Excel protégé par un mot de passe confidentiel, détaillant l'identité, le fournisseur, le prix et la composition relative de chaque composant de chacun des produits IPAC, sans motif commercial légitime vis-à-vis de IPAC ;
- ont ainsi fait en sorte, que ce soit seul ou de concert avec d'autres personnes, que PXL dès sa formation détenait des informations confidentielles de IPAC ;
- alors qu'elle était en possession d'informations confidentielles de IPAC, PXL a été amenée, seule ou de concert avec d'autres, à formuler, fabriquer, commercialiser et vendre des produits concurrents des produits IPAC dans un délai aussi court et avec une telle similitude qu'un expert expérimenté et crédible a témoigné que les produits PXL sont « si étonnamment similaires aux produits IPAC qu'ils peuvent être qualifiés de produits de

Patricia GRILLAUD-PALMERO
Huissier
Tél. 07 77 43 43
20 53 de Suisse
90000

# T R A D U C T I O N

contrefaçon », et que les clients ont signalé à IPAC que PXL disaient à ses clients que les produits PXL étaient des imitations des formulations de IPAC.

- quand l'Arbitre lui demanda comment, si les informations confidentielles de IPAC n'étaient pas utilisées de même que les informations contenues dans le tableau que M. Plitt s'était adressé à lui-même par courrier électronique avant de fonder PXL avec M. Napoleoni, comment les produits PXL avaient-ils pu être formulés aussi rapidement et aussi semblables aux produits IPAC, comme le pense le Dr. Wooton qui estime que ce sont des contrefaçons, le PDG de Black Gold, M. Napoleoni, a admis que « tout cela était à ma disposition » ;

- tous ces éléments permettent de tirer une conclusion de l'ensemble des éléments de preuve selon lesquels Black Gold, par l'intermédiaire de son PDG, M. Napoleoni, soit seul ou de concert avec d'autres personnes, a détourné et utilisé à mauvais escient les informations confidentielles de IPAC pour formuler, fabriquer, commercialiser et vendre les produits de PXL ; et

- Black Gold a omis de « coopérer avec IPAC, de restituer tous les documents à IPAC, et de faire tout ce qui est raisonnablement requis par IPAC afin de permettre à IPAC de continuer des activités viables avec les clients servis par le Distributeur. »

Contrat de distributeur exclusif à la Section XV.C.

La violation par Black Gold du Contrat de représentation commerciale et du Contrat de distributeur Exclusif a été prouvée par la totalité des preuves, y compris, mais sans s'y limiter, ce qui précède.

**Causalité**

La législation californienne prévoit que la mesure des dommages-intérêts « est le montant qui indemnisera la partie lésée pour tous les préjudices subis de manière indirecte, ou qui, dans le cours normal des choses, en résulteraient vraisemblablement ». Code civil 3300 ; *voir Brandon et Tibbs c. George Kevorkian Accountancy Corp.*, 226 Cal. App. 3d 442 455 (1990) (« L'objet fondamental des dommages-intérêts est l'indemnisation et, en droit des contrats, la théorie est que la partie lésée par une violation devrait recevoir autant que possible l'équivalent des avantages d'une prestation. » Lorsque les dommages-intérêts perdus sont des dommages qui « découlent

# T R A D U C T I O N

directement et nécessairement d'une violation de contrat », les dommages-intérêts perdus font partie des dommages-intérêts généraux recouvrables. *Mission Beverage Co. c. Pabst Brewing Co.*, 15 Cal. App. 5th 686, 710 (2017) (citant *Lewis Jorge Constr. Mgmt., Inc. c. Pomona Unified School Dist.*, 34 Cal. 4th 960, 968 (2004)). Les accords entre les parties ne précisent pas si les dommages pour pertes de profits font ou non partie des catégories de dommages-intérêts sujets à une limitation des dommages et intérêts dans chaque accord. « La Cour Suprême de Californie a expliqué *que les pertes de profits résultant d'accords collatéraux constituaient souvent des dommages directs dans les affaires concernant* des cultures, des produits destinés à la revente ou *un accord créant une relation de vente exclusive. Id.* à 971-72. » Wendi J. Berkowitz, *Pertes de profits : Dommages directs ou consécutifs?*

https://www.americanbar.andgroups/litigation/committees/business-torts-unfair-competition/articles/20l6/spring2016-lost-profits-direct-or-consequential-damages/ (dernier accès le 15 avril 2019)(emphase ajoutée), citant *Lewis Jorge*, 34 Cal. 4th à 971-72. « Dans ces cas, le « risque de perte de profits résultant de transactions connexes ou dérivées est tellement évident (...) qu'il faut présumer que la partie responsable de l'infraction a dû les envisager au début du contrat. » *Id.*, citant *Lewis Jorge*, 34, cal. 4th à 971-72. Les dommages-intérêts pour pertes de profits peuvent faire partie des dommages-intérêts généraux recouvrables, et ils le font en vertu des faits de la présente affaire.

En conséquence, la limitation des dommages-intérêts dans le Contrat de distributeur exclusif, section XVI.E. --qui ne spécifie pas de limitation des « pertes de profits », ne s'applique pas dans ce cas. Les dommages pour pertes de profits, sur les faits de la présente affaire, sont des dommages directs recouvrables. La limitation des dommages dans le Contrat de représentation commerciale ne s'applique pas, pour la même raison. Elle ne s'applique pas non plus indépendamment parce que Black Gold « commet/a commis des actes non autorisés allant au-delà de la portée du présent Contrat de représentation commerciale ... ». Contrat de représentation commerciale Article 13. Ainsi, même si les dommages pour pertes de profits dans le cadre de la présente affaire devaient être considérés comme des dommages indirects/consécutifs, les dommages pour pertes de profits ne sont pas exclus au titre du Contrat de représentation

# TRADUCTION

commerciale. Un montant approprié de dommages pour pertes de profits est recouvrable par IPAC dans le cadre de cet arbitrage.

### Dommages causés à IPAC en raison des manquements de Black Gold à ses obligations

IPAC cherche à obtenir des dommages pour pertes de profits, calculées sur la base des données historiques des ventes de IPAC. La loi californienne reconnaît cela comme une base acceptable pour déterminer les pertes de profits futurs. *Sargon Enters., Inc. c. University of Southern Cal.*, 55 Cal. 4th 747, 774 (2012) (« Les données historiques, telles que le volume d'activité passé, fournissent une base acceptable pour déterminer les pertes de profits futurs. ») (citant *Berge c. International Harvester Co.*, 142 Cal. App. 3d 152, 161-62 (1983)). Les pertes de profits subies par IPAC peuvent être déterminées avec une certitude raisonnable et les dommages peuvent être attribués correctement ici. *Voir Sargon Enters.*, 55 Cal. 4th à 774-75 (« Lorsque le fait des dommages est certain, le montant des dommages ne doit pas être calculé avec une certitude absolue ... La loi exige seulement que l'on utilise une base raisonnable de calcul des dommages-intérêts, qui peuvent être calculés même si le résultat obtenu est approximatif. ») (citant *GHK Assocs. c. Mayer Group, Inc.*, 224 Cal. App.

3d 856, 873-74 (1990)) (souligné dans l'original).

Une partie des dommages pour pertes de profits demandés par IPAC n'est toutefois pas suffisamment étayée par les éléments de preuve.

Les réclamations de IPAC au titre de chacun des deux contrats sont traitées à leur tour.

En vertu du Contrat de représentation commerciale, IPAC cherche à obtenir des Dommages pour pertes de profits non seulement jusqu'à sa fin initiale, soit le 31 décembre 2018, mais également jusqu'en 2019 - la première année de ce que IPAC définit comme un renouvellement automatique pour des périodes supplémentaires de trois ans. Toutefois, le Contrat de représentation commerciale autorise les parties à résilier le contrat sans motif avec un préavis de soixante jours. Contrat de représentation commerciale Article 5 (b). D'une part, comme indiqué précédemment, il est clair que si IPAC avait connu les activités du PDG de Black Gold, Lorenzo Napoleoni, elle n'aurait jamais accepté les termes de l'Accord de résiliation. D'autre part, sur la base des éléments de preuve présentés dans le présent arbitrage, l'Arbitre conclut qu'il est

# TRADUCTION

considérablement plus probable qu'une, ou potentiellement les deux parties auraient invoqué le terme de résiliation dans le Contrat de représentation commerciale à la section 5 (b) plutôt que de permettre le renouvellement prétendument « automatique ». En conséquence, compte tenu de tout ce qui précède, les dommages pour pertes de profits auxquels IPAC a droit en vertu du Contrat de représentation commerciale sont pour l'année 2017 (196 491,06 $) et pour l'année 2018 (405 329,72 $), mais pas pour l'année 2019. Témoignage écrit de Krock §§ 33-34.

IPAC réclame également des dommages pour pertes de profits pour la violation du Contrat de distributeur exclusif pour 2017 et 2018. Le Contrat de distributeur exclusif n'envisageait pas le renouvellement automatique après sa première période d'un an. Les parties auraient plutôt dû s'entendre sur des objectifs de volumes de vente, autrement le Contrat de distributeur exclusif prendrait fin un an après sa date d'entrée en vigueur. Contrat de distributeur exclusif Section XV.A. Un tel accord supplémentaire n'a pas eu lieu. Par conséquent, les dommages pour pertes de profits auxquels IPAC a droit en vertu du Contrat de distributeur exclusif portent sur l'année 2017 (à 85 881,78 dollars US) mais pas sur l'année 2018. Témoignage écrit de Krock § 22.

Les éléments de preuve présentés dans le présent arbitrage ne permettent pas de conclure le volume des autres dommages causés à IPAC par les violations de Black Gold, par les actes de son PDG, M. Napoleoni ou autrement, du Contrat de représentation commerciale et du Contrat de distributeur exclusif.

### Recours par voie d'injonction

IPAC plaide en faveur d'une mesure injonctive interdisant Black Gold, jusqu'au 31 décembre 2020, « de vendre tout additif en concurrence avec les produits additifs de IPAC que Black Gold a vendus en tant que distributeur ou représentant commercial de IPAC en 2016-2018 ». Mémoire après l'audience du Demandeur à 41:11-13. Black Gold soutient qu'aucune mesure injonctive n'est justifiée ; et que même si c'était le cas, la portée de la demande d'injonction demandée par IPAC est excessive.

« L'Arbitre peut accorder tout recours ou réparation qu'il juge juste et équitable et dans le cadre de l'accord des parties, y compris, mais sans s'y limiter, de l'exécution spécifique d'un contrat. » Règles à R-47 (a).

# TRADUCTION

Dans la présente affaire, les termes d'arbitrage respectifs des deux contrats comportaient une clause d'arbitrage générale couvrant tous les différends découlant des contrats ou en rapport avec les contrats, sans exclure une mesure injonctive. De telles conditions d'arbitrage donnent à l'Arbitre le pouvoir d'émettre une injonction permanente. Règles à R-47 (a) ; voir Stephen P. Beddell et Louis K. Ebling, *Equitable Relief in Arbitration: A Survey of American Case Law* (Enquête sur la jurisprudence américaine), 20 Loy. U. Chi. L.J. 39, 43 (1988) (« Les Arbitres sont habilités à prononcer des injonctions permanentes lorsque leurs pouvoirs sont conférés par une clause d'arbitrage large. »); *voir Id.* au n° 31 et les cas qui y sont cités. Le Contrat de distributeur exclusif prévoit en outre expressément que l'Arbitre « peut accorder tout redressement juridique et/ou équitable auquel une partie peut avoir droit en vertu de la loi ou de la théorie juridique en vertu de laquelle la partie demande un redressement... » Contrat de distributeur exclusif à la Section XVI.E.

L'Arbitre peut émettre une injonction permanente. Règles à R-47 (a); *Swan Magnetics, Inc. c. Superior Court of Santa Clara County*, 56 Cal. App. 4th 1504, 1507 (1997) ; *J. Brooks Secs., Inc. c. Vanderbilt Secs., Inc.*, 126 Misc. 2d 875,484 N.Y.S.2d 472 (N.Y. Sup. Ct. 1985) ; *voir généralement* Stephen P. Beddell et Louis K. Ebling, *Equitable Relief in Arbitration : A Survey of American Case Law*, 20 Loy. U. Chi. L. J. 39, 43-45, 71-73 (1988).

Les éléments de preuve présentés dans le présent arbitrage montrent qu'une injonction est justifiée, mais dans une mesure différente de celle demandée par IPAC. Comme indiqué ci-dessus, les éléments de preuve dans le présent arbitrage établissent que des informations confidentielles de IPAC, telles que définies par contrat entre les parties, ont été divulguées par Black Gold, par l'intermédiaire de son PDG, M. Napoleoni, de concert avec une ou plusieurs autres entités et/ou personnes, et qu'elles ont été détournées et utilisées à mauvais escient et semble encore l'être, de manière non autorisée, pour développer rapidement, commercialiser et vendre des produits concurrents qui, selon le témoignage d'un expert qualifié et crédible sont des « produits de contrefaçon » des produits de IPAC (Témoignage écrit de Wooton à 3) et dont les clients sur le marché ont déclaré avoir été informés par PXL que ses produits étaient des imitations de produits IPAC. Témoignage écrit de Cereghino à L0:27-11 2. Et il se peut que Black Gold utilise abusivement les informations confidentielles de IPAC d'autres manières et que la loi californienne autorise l'application d'une injonction contre ces non parties.

# TRADUCTION

La loi de Californie autorise l'émission d'une injonction définitive pour prévenir la violation d'une obligation existant en faveur du Demandeur, dans l'une ou plusieurs de quatre situations. Cal. iv. Code Article 3422. Trois de ces quatre situations sont présentes ici. Premièrement, il s'agit d'un cas dans lequel une indemnité pécuniaire ne permettrait pas un redressement adéquat. Code civil de la Californie Article 3422.1. L'indemnité offre un certain redressement, mais pas tout à fait adéquat, en particulier en ce qui concerne toute utilisation non autorisée en cours de ce que les parties ont convenu en vertu du Contrat de représentation commerciale et du Contrat de distributeur exclusif constituent les informations confidentielles de IPAC. Deuxièmement, c'est un cas dans lequel il serait extrêmement difficile d'obtenir le montant de l'indemnité qui procurerait un redressement suffisant, notamment en ce qui concerne toute utilisation non autorisée en cours de ce que les parties ont convenu en vertu du Contrat de représentation commerciale et du Contrat de distributeur exclusif constituent les informations confidentielles de IPAC. Code civil de la Californie Article 3422.2. Troisièmement, la restreinte par injonction est nécessaire pour éviter de multiples procédures. Code civil de la Californie Article 3422.3. En l'absence d'injonction dans la présente sentence finale, accompagnée de la procédure d'exécution accélérée des sentences arbitrales prévue par le droit applicable aux États-Unis et dans la plupart des autres pays au sens de la Convention des Nations Unies sur la reconnaissance et l'exécution des sentences arbitrales étrangères (New York, 10 juin 1958), il pourrait y avoir une multiplicité de procédures pour statuer à nouveau sur diverses questions tranchées dans la présente Sentence finale.

Une injonction centrée sur la prévention de l'utilisation abusive de ce que les parties ont convenu dans leur Contrat de représentation commerciale et leur contrat de distribution exclusif détermine que les informations confidentielles de IPAC constituent l'étendue appropriée des mesures injonctives. Une injonction axée sur la prévention de la concurrence, que les informations confidentielles de IPAC soient ou non utilisées à mauvais escient, ne constitue pas la portée appropriée des mesures d'injonction.

En ce qui concerne la question de savoir à qui une injonction peut s'appliquer, « alors que la loi interdit généralement aux tribunaux [ou aux Arbitres] de nommer des non parties [dans une injonction], elle autorise dans certaines circonstances un tribunal à appliquer une injonction contre une non-partie ». *Hassel c. Bird*, 5 Cal. 5th 522, 550 (2018) (opinion concordante de Kruger, J.) (en

Patricia GRIMALDI-PALMERO
Hüissier
Tel. 9772 48 48
20 Bd de Suisse
98000 MONACO

# TRADUCTION

italique dans l'original). « En l'absence une telle règle, les parties autorisées pourraient "jouer des jeux de passe-passe" juridictionnels », c'est-à-dire « annuler un décret d'injonction en accomplissant des actes interdits avec ou par l'intermédiaire de non parties à la procédure initiale ». *Id.*, citant *People c. Conrad*, 55 Cal.App.4th 896, 902 (1997). « Pour cette raison, comme [la Cour suprême de Californie] l'a observé il y a plus d'un siècle, même si les injonctions ne sont [habituellement] adressées qu'aux parties nommées dans une action, il est "de pratique courante" de rendre l'injonction s'appliquer également à des catégories de personnes par l'intermédiaire desquelles la partie ordonnée peut agir, telles que les mandataires, préposés, employés, aides, assistants, etc., bien qu'elles ne soient pas parties à l'action. » *Id.*, citant *Berger c. Cour supérieure* 175 Cal. 719, 721 (1917) (« *Berger* »). Comme expliqué dans Berger, les non parties peuvent être liées par une injonction lorsqu'elles ont connaissance de l'injonction, sont des préposés ou mandataires de la partie visée, ou agissent « en combinaison ou en collusion avec elles ou en faisant valoir leurs droits ou leurs revendications. » *Id.* en 722, citant *Rigas c. Livingson* (1904) 178 N.Y. 20, 24). Lesdites non parties qui violent les conditions de l'injonction « avec préavis de l'injonction sont déclarées coupables d'outrage pour désobéissance au jugement. » Berger, 721 Cal. à 721; accord, par ex., *Regal Knitwear Co. c. Board*, 324 U.S. 9, 14 (l945) (« *Regal Knitwear* »).

La loi californienne stipule clairement que des injonctions peuvent être exécutées à l'encontre de non parties ayant reçu notice de l'injonction et qui ont aidé, incité, ou autrement agi de concert avec ou en soutien de la partie visée pour violer l'injonction. Encore une fois, la Cour suprême de la Californie a expliqué pendant plus d'un siècle que «[dans] les questions d'injonction, cependant, il est pratique courante de faire en sorte que l'injonction s'applique également à des catégories de personnes par lesquelles la partie invitée peut agir, telles que: mandataires, préposés, employés, aides, assistants, etc., bien qu'elles ne soient pas parties à l'action, et cette pratique a toujours été confirmée par les tribunaux, et toute partie qui enfreint les termes du préavis est déclarée coupable d'outrage pour désobéissance au jugement" ». *Berger*, 175 Cal. à 721. Le but « est simplement de rendre l'injonction effective contre tous ceux à travers lesquels la partie ordonnée peut agir », empêchant ainsi que les actes interdits dans l'injonction soient accomplis par d'autres personnes agissant de concert avec ou en soutien de la partie visée. *Id.* (italique omis).

# T R A D U C T I O N

La Cour suprême de Californie a continué de réaffirmer dans les temps modernes ce principe bien établi de la loi californienne. *Ross c. Superior Court* 19 Cal.3d 899, 908-909 (1977) (« *Ross* ») (concluant que les non parties étaient passibles d'une injonction en tant qu'agents des Défendeurs nommés) ; *dans l'affaire Berry* 68 Cal.2d 137, 155-156 (1968) (« *Berry* ») (reconnaissant que « donner des injonctions à des personnes » qui "contribuent à ou participent activement" avec des parties spécifiquement nommées, est approuvé par la longue tradition et la pratique établie »).

La loi fédérale des États-Unis prévoit de même que les non parties peuvent être enjointes. La Cour suprême des États-Unis a expliqué il y a plus de cent vingt (120) ans qu'il était indifférent qu'une partie non partie ait reçu ou non notification de l'application d'injonction ou se soit vu notifier une copie de l'injonction aussi longtemps qu'elle avait été informée de l'émission d'une injonction par le tribunal. *Voir l'affaire Lennon* 166 U.S. 548, 554 (1897) (« *Lennort* »). Cette règle a été confirmée par la Cour suprême des États-Unis dans *Regal Knitwear*. Les non parties « qui reçoivent un avis effectif » de l'injonction et agissent « de concert ou participation activement » avec la partie enjointe peuvent être liées par ses conditions. *Voir Regal Knitwear*, 324 U.S. à 15 (le fait de savoir si une injonction peut être exécutée à l'encontre d'une non-partie « dépend de l'évaluation de ses relations et de son comportement et non de la simple interprétation des termes de l'ordonnance »). De même, comme le prévoient les règles fédérales de procédure civile édictées en vertu d'une loi fédérale, les non parties peuvent être liées par une injonction. Fed. R. Civ. P. 65 (d)(2) (publié en vertu de 28 U.S.C. 2072) ; *Blockowicz c. Williams*, 630 F.3d 563, 567 (7th Cir. 2010) (« *Blockowicz* »).

*Berger, Ross et Berry*, entre autres autorités, établissent clairement que, en vertu de la loi californienne, les tribunaux peuvent exécuter une injonction contre une non-partie. *Regal Knitwear, Lennon., Blockowicz* et Fed. R. Civ. P. 65 (d)(2) (publié en vertu de 28 U.S.C. 2072) établissent clairement le même principe sous le régime fédéral américain. Une non-partie assujettie à l'exécution d'une telle injonction doit en être avertie et doit avoir aidé, encouragé ou agi de concert avec la partie enjointe, ou en participant à celle-ci ou en support de celle-ci ou en combinaison avec elle ou en complotant avec elle, que ce soit en tant qu'assistants, complices, co-conspirateurs, mandataires, préposés, employés ou autrement, pour violer l'injonction. Des conclusions de preuve qui évaluent la notification à une non-partie et ses agissements de concert ou par participation avec

# TRADUCTION

une partie enjointe, peuvent être entendues lors d'une audience pour outrage au tribunal compétent, lorsque le Demandeur ou Requérant cherche à exécuter l'injonction contre une non-partie. *Voir Ross*, 19 Cal.3d à 903-904 ; *Regal Knitwear*, 324 U.S. à 16.

Si une non-partie à cet arbitrage prétend plus tard que l'injonction émise dans la présente Sentence Finale, après confirmation par le ou les tribunaux compétents ne peut pas être exécutée à l'encontre de cette non-partie au présent arbitrage uniquement parce qu'elle ne se trouvait pas dans la compétence arbitrale de l'Arbitre lors de sa décision sur les réclamations de IPAC dans le présent arbitrage ou parce qu'elle n'était pas désignée comme Défendeur dans le présent arbitrage, cette prétention ne serait étayée ni par la loi californienne ni par la loi fédérale américaine. Voir, par exemple, *Berger, Ross, Berry, Regal Knitwear, Lennon, Blockowicz* et Fed. R. Civ. P. 65 (d)(2) (publié en vertu de 28 U.S.C 2072) ; voir aussi *Hassel*, 5 Cal. 5th à 586 (opinion dissident des juges Cuellar, J. et Stewart) (« La thèse de Yelp selon laquelle elle ne peut être enjointe parce qu'elle n'était pas nommée Défendeur dans la plainte sous-jacente de *Hassell* n'est pas étayée par la loi californienne ou la loi fédérale ») (Dans l'affaire *Hassel*, la Cour suprême de Californie avait annulé à la majorité relative la décision de la juridiction inférieure qui avait imposé une injonction contre la non-partie Yelp en application de la Loi sur la décence des communications, Communications Decency Act, 47 U.S.C § 230, statut qui n'est pas pertinent pour le présent arbitrage).

Diverses personnes et/ou entités qui ne sont pas parties à cet arbitrage mais qui, en fonction des faits, peuvent être présentées au cours de procédures postérieures à l'exécution devant les tribunaux compétents, peuvent enfreindre l'injonction émise aux présentes après en avoir avisé ces personnes et/ou entités et après que la présente Sentence Finale ait été confirmée par lesdits tribunaux en tant que leur jugement, si ces personnes et/ou entités ne se conforment pas à l'injonction. L'application de l'injonction à de telles personnes et/ou entités relève nécessairement de la compétence de ce ou ces tribunaux. À cet égard, l'Arbitre note que toutes les personnes et/ou entités potentielles qui ont été identifiées dans les éléments de preuve dans le présent arbitrage se trouvent soit aux États-Unis, soit dans d'autres pays qui sont également des États contractants de la Convention des Nations Unies sur la reconnaissance et l'exécution des sentences arbitrales étrangères (New York, 10 juin 1958) et des tribunaux qui y sont assujettis et subordonnés à la mise en œuvre des mécanismes d'exécution accélérés établis par ces procédures.

# TRADUCTION

**Dommages exemplaires**

IPAC demande l'attribution de dommages exemplaires. Pour ce faire, IPAC s'appuie principalement sur la Section 3294 du Code civil de la Californie. Cet article de la loi s'applique toutefois à « une action en violation d'une obligation qui ne découle pas d'un contrat... ». Code civil de la Californie Section 3294. Les obligations en cause dans cet arbitrage découlent en partie du contrat. Dans cette mesure, les dommages exemplaires ne sont pas disponibles ici en vertu de la Section 3294. IPAC s'appuie également sur la Section 3426.3 (c) du Code civil de la Californie. Cette Section dispose qu'un tribunal [ou un Arbitre] « peut accorder » des dommages exemplaires pour appropriation illicite de secrets commerciaux en cas d'appropriation illicite intentionnelle et malveillante. L'Arbitre a donc toute latitude pour accorder des dommages exemplaires en vertu de la Section 3426.3 (c) du Code civil de la Californie, si ses conditions sont remplies. Black Gold s'est engagée dans une « appropriation illicite » au sens de la Section 3426.1 (b) du Code civil de la Californie. Black Gold s'est engagé dans une appropriation « volontaire » au sens de la section 3426.3 (c) du Code civil de la Californie.  Que Black Gold se soit engagée ou non dans une appropriation illicite « malveillante » au sens de la section 3426.3 (c) du Code civil de la Californie est plus difficile à évaluer. Mais il n'est pas nécessaire de décider si la conduite de Black Gold était « malveillante » ou non, car l'Arbitre exerce son pouvoir discrétionnaire de ne pas accorder de dommages exemplaires en vertu de la Section 3426.3 (c) du Code civil de la Californie.

## Honoraires d'avocat, coûts et dépenses d'arbitrage et rémunération de l'Arbitre

Les règles d'arbitrage convenues par les parties comprennent des dispositions concernant les honoraires d'avocat, les frais et dépenses d'arbitrage, ainsi que la rémunération de l'Arbitre. Règles R-47 (c), R 47 (d), R-53, R-54 et R-55. L'ordonnance préliminaire n° 13 a porté ces règles à l'attention des parties. « Dans la décision finale, l'Arbitre évaluera les honoraires, les dépenses et la rémunération prévus aux règles R-53, R-54 et R-55. L'Arbitre peut répartir entre les parties les honoraires, frais et rémunération dont les montants sont déterminés tel qu'approprié par l'Arbitre. » Règle R-47 (c). À son tour, la règle R-53 traite en outre des frais administratifs, la règle R-54 traite en outre des dépenses et la règle R-55 traite également de la rémunération des Arbitres. En ce qui concerne les honoraires d'avocat, la règle R-47 (d) ii prévoit ce qui suit :

# TRADUCTION

« d) La sentence du ou des Arbitres peut inclure :...
ii. une indemnité pour honoraires d'avocat si toutes les parties ont demandé une telle indemnité ou si la loi ou leur convention d'arbitrage l'autorise. »

Lors du présent arbitrage, toutes les parties ont demandé à plusieurs reprises et de manière constante l'adjudication des honoraires d'avocat - dans la demande d'arbitrage du Demandeur, dans la Déclaration de réclamations vérifiée et modifiée du Demandeur, dans la réponse du Défendeur à la Déclaration de réclamations vérifiée et modifiée, dans le mémoire suivant l'audience de chaque partie et dans le mémoire en réponse après l'audience de chaque partie.

Le Contrat de distributeur exclusif des parties stipule en outre, à la section XVI.E., dans la partie pertinente, que dans tout arbitrage prévu par la convention d'arbitrage aux présentes :

« Les coûts de la procédure, y compris les honoraires et les frais et dépenses avocat, des comptables et des témoins, ainsi que la rémunération des Arbitres, sont évalués par les Arbitres contre les parties conformément à la décision de l'Arbitre en matière de faute. »

Dans cet arbitrage, le Défendeur Black Gold est la partie en faute au sens de la partie susmentionnée du Contrat de distributeur exclusif des parties. Voir Ordonnance de procédure n° 13. Le Contrat de représentation commerciale entre les parties stipule que « [c]haque partie supporte les coûts qui lui sont associés « lors de tout arbitrage. Contrat de représentation commerciale à la section 19. Cela n'est toutefois pas pertinent, étant donné que le Demandeur aurait dû engager les mêmes montants au titre du Contrat de distributeur exclusif que si l'arbitrage avait eu lieu en fonction à la fois du Contrat de distributeur exclusif et du Contrat de représentation commerciale.

Le Demandeur a présenté une demande visant à obtenir des honoraires et des frais d'avocats, de comptables et de témoins d'un montant de 307 138,65 dollars US. L'autre élément de la section XVI.E du Contrat de distributeur exclusif, la rémunération de l'Arbitre, peut facilement être calculé sans requête du Demandeur, comme indiqué dans l'ordonnance de procédure No. 13, et est également indiquée dans les Règles R-47(c) et R-55.

Le Défendeur a soumis son opposition à la requête du Demandeur. L'opposition du Défendeur porte principalement sur l'argument selon lequel le Demandeur ne devrait pas recevoir autant pour les honoraires d'avocat que ce qu'il demande, étant donné que seul le Contrat de distributeur exclusif comporte une clause d'honoraires d'avocat, contrairement au Contrat de

# T R A D U C T I O N

représentation commerciale. Toutefois, l'opposition du Défendeur ignore totalement la règle R-47 (d). Plus particulièrement, l'opposition du Défendeur ignore la règle R-47 (d) ii. Comme indiqué ci-dessus, cette règle - à laquelle les parties sont convenues dans leurs termes d'arbitrage à la fois dans le Contrat de représentation commerciale et dans le Contrat de distributeur exclusif - prévoit qu'une indemnité au titre des honoraires d'avocat peut être adjugée « *si toutes les parties ont demandé une telle sentence* ou si cela est autorisé par la loi ou par leur accord d'arbitrage. » Article R-47 d) ii (italique ajoutée). <1692>Répondant à cette norme applicable, toutes les parties ont demandé à plusieurs reprises et systématiquement l'adjudication des honoraires d'avocat - dans la demande d'arbitrage du Demandeur, dans la Déclaration de réclamations vérifiée et modifiée du Demandeur, dans la réponse du Défendeur à la Déclaration de réclamations vérifiée et modifiée, dans le mémoire suivant l'audience de chaque partie et dans le mémoire en réponse après l'audience de chaque partie.

L'opposition du Défendeur à la demande d'indemnisation du Demandeur, aux lignes 23 à 27 de la page 14, interprète mal une partie de l'ordonnance préliminaire n° 13 et formule des hypothèses incorrectes fondées sur cette interprétation erronée. La nature et la portée des hypothèses mal interprétées et erronées du Défendeur sont abordées ci-dessus dans le raisonnement de la présente Sentence finale. Elles ne doivent donc pas être traitées séparément ici.

Le Défendeur a présenté diverses objections en matière de preuve avec son opposition à la demande de remboursement du Demandeur. Ces objections sont rejetées. Règle R-34 (b). En outre, les règles d'arbitrage auxquelles les parties sont convenues dans leurs deux accords prévoient que « la conformité aux règles de preuve légales ne sera pas nécessaire ». Règle R-34 (a).

L'Arbitre a examiné la requête du Demandeur et l'opposition du Défendeur à son égard. Le montant de 305 138,65 dollars US correspondant aux frais de procédure, qui comprend les honoraires et les frais des avocats, des comptables et des témoins, ainsi que le montant de la rémunération de l'Arbitre, comme indiqué ci-après, sont par la présente jugés appropriés et établis suivant à la fois les Règles R-47 (c), R-47 (d) ii et R-54 et le Contrat de distributeur exclusif, section XVI.E. Toutefois, le montant demandé par le Demandeur de 2 000 dollars US pour les frais de déplacement et de repas de deux témoins du Demandeur n'est pas suffisamment prouvé pour deux raisons et ne sera donc pas accordé. Premièrement, ces témoins vivent et travaillent dans la même

# TRADUCTION

région métropolitaine où l'audience d'arbitrage a eu lieu. Aucune explication n'a été fournie sur les raisons pour lesquelles 2 000 dollars US de frais de déplacement local et de repas ont été engagés ou bien pourquoi ces dépenses seraient appropriées. Deuxièmement, contrairement à l'exigence de l'ordonnance préliminaire n° 13 (3:4-10), le Demandeur n'a soumis aucune copie de facture à l'appui de sa demande d'un montant de 2 000 dollars US. Le Défendeur s'oppose également au remboursement de 1 505,89 dollars US pour des frais de voyage, d'hébergement, de restauration et de reprographie liés à la déposition convenue entre les parties de Black Gold à New York. Le Défendeur demande si les dépenses seraient liées à la participation de Alan Krock de IPAC à la déposition. Mais la facture du cabinet d'avocats du Demandeur, ainsi que la déclaration de l'avocat du Demandeur, établissent de manière adéquate que ce montant était pour le voyage de l'avocat du Demandeur de San Francisco à New York, ainsi que pour les frais liés à cette déposition.

L'attribution des honoraires d'avocat aux présentes, calculée sans attribuer de portions spécifiques du montant des honoraires d'avocat engagés pour l'un ou l'autre des deux contrats, est par la présente établie, conformément à la règle R-47 (d) ii, de manière indépendante, bien que le Contrat de représentation commerciale n'inclue pas de conditions pour les honoraires d'avocat. Toutes les parties ont demandé à plusieurs reprises une telle indemnité au titre des honoraires d'avocat tout au long du présent arbitrage. Règle R-47 d) ii.

### QUESTION DE LA DÉSIGNATION DE CONFIDENTIALITÉ

L'avocat du Défendeur a désigné une partie de l'audition au fond comme étant « Hautement confidentielle - Uniquement pour les avocats » aux termes de l'Ordonnance conservatoire stipulée dans le présent arbitrage. M. Napoleoni, PDG de Black Gold, a soumis cette partie des témoignages concernant les installations de laboratoire PXL, une partie des revenus de PXL, certains clients de PXL et certaines activités de formulation de produits de PXL. Tr. 537:10-538: 3 et 560:9-570: 6 (ci-après « le témoignage désigné »).

# TRADUCTION

Le Demandeur, IPAC, demande que le témoignage désigné soit « déclassé » à non confidentiel, ou au moins à « confidentiel », plutôt que de conserver sa désignation de « Hautement confidentiel - Uniquement pour les avocats ». Le Demandeur affirme notamment que « dans le cas contraire, IPAC sera laissée dans la position incongrue d'avoir prouvé que ses informations confidentielles ont été utilisées, mais sans aucun moyen de demander réparation d'autres parties, en particulier l'unité de mélange sous-traitée de PXL. » Mémoire suivant l'audience du Demandeur à 45:14-16. Le Demandeur, IPAC, a également contesté la désignation du témoignage désigné, en utilisant la procédure que les parties ont stipulée et que l'Arbitre a approuvée dans l'ordonnance préliminaire n° 6 - Ordonnance conservatoire stipulée (5 novembre 2018). Le Défendeur Black Gold a eu l'occasion de répondre plus en détails à la contestation du Demandeur, IPAC, concernant la désignation du témoignage désigné.

Le Défendeur, Black Gold, affirme que le témoignage désigné a été dûment désigné en vertu de l'ordonnance conservatoire stipulée et qu'il devrait rester désigné comme « Hautement confidentiel - Uniquement pour les avocats ». Dans son principal exposé après l'audience, le Défendeur Black Gold n'a exposé aucun motif substantiel à l'appui de ces affirmations. Réponse du Défendeur concluant le mémoire d'arbitrage à 36:2-10. Toutefois, dans sa réponse à la requête du Demandeur, IPAC, concernant la désignation de Black Gold, le Défendeur, Black Gold, cite divers précédents californiens à l'appui de sa désignation et soutient que la situation en l'espèce est analogue à celle-ci.

Lors de l'audition de cet arbitrage, les deux avocats du Défendeur ont désigné le témoignage désigné en vertu de l'ordonnance conservatoire stipulée, et ils n'ont fait aucune déclaration précisant au nom de qui ils le désignaient. De même, le mémoire de Black Gold ne l'indique pas clairement. Les informations contenues dans le témoignage désigné ne semblent pas appartenir à Black Gold, mais plutôt à l'une ou aux deux sociétés PXL qui sont non parties. Aucun argument au nom de l'une ou des deux sociétés PXL non parties n'a été soumis identifié comme tel dans le présent arbitrage. Cela étant dit, cependant, le témoin qui a donné le témoignage désigné était M. Napoleoni, qui est à la fois le PDG du Défendeur Black Gold et le Directeur général de PXL Chemicals BV, société non-partie. L'avocat du Défendeur, Black Gold, a confirmé à nouveau, en réponse à la

# TRADUCTION

contestation du Demandeur, que M. Napoleoni souhaite que la désignation contestée soit maintenue.

Certaines parties de la désignation relative au témoignage désigné que l'avocat du Défendeur a faite en vertu de l'Ordonnance conservatoire stipulée paraissent appropriées pour les sociétés PXL non parties. L'Ordonnance conservatoire stipulée indique que les informations désignées comme « CONFIDENTIEL » désignent les informations pouvant bénéficier d'une protection en vertu du Code de procédure civile de Californie. Instruction préliminaire no 6 au par. 2.2. L'ordonnance conservatrice stipule que les informations désignées par l'expression « HAUTEMENT CONFIDENTIEL – UNIQUEMENT POUR LES AVOCATS », constituent des informations extrêmement sensibles qui pourraient autrement être qualifiées du terme « CONFIDENTIEL », dont la divulgation à une autre partie ou à une non partie créerait un risque important de préjudice grave qui ne pourrait pas être évité par des moyens moins restrictifs. Ordonnance préliminaire no 6 au par. 2.7. Le témoignage désigné - à l'exception de deux points d'information - semble constituer une information devant être protégée pour les sociétés PXL non parties suivant le Code de procédure civile de Californie en tant que « HAUTEMENT CONFIDENTIEL – UNIQUEMENT POUR LES AVOCATS » conformément à l'ordonnance conservatrice stipulée. L'identité et l'emplacement de la société (l'unité de mélange) nommée dans le témoignage désigné concernant les produits PXL, dont le Dr. Wooton a prouvé de façon convaincante qu'ils étaient des contrefaçons des produits IPAC, ne constituent toutefois pas des informations qui seraient protégées en vertu du Code de procédure civile - qui est la norme que les parties ont choisie et adoptée dans l'Ordonnance conservatoire stipulée. Instruction préliminaire no 6 au par. 2.2. Les parties ont convenu dans l'Ordonnance conservatoire stipulée que la partie désignante devait supporter le fardeau de la persuasion de toute contestation de la désignation. Ordonnance préliminaire n° 6 à 8:24-25. Le Défendeur n'a pas supporté ce fardeau de persuasion quant à l'identité et au lieu de cette société « d'unité de mélange », pour lesquels il n'a pas démontré avoir un besoin légitime ni une autorité légitime de confidentialité en vertu de l'ordonnance préliminaire no 6 - Ordonnance conservatoire stipulée (5 novembre 2018).

L'Ordonnance conservatoire stipulée dispose que l'Arbitre peut ordonner un changement de traitement des informations désignées dans cette ordonnance. Ordonnance préliminaire n° 6 - Ordonnance conservatoire stipulée (5 novembre 2018) à la page 4, ligne 14 ; page 9, lignes 3 et 14 ;

# TRADUCTION

page 10, ligne 12 ; page 15, lignes 26-27. La désignation du témoignage dans la transcription de l'audience, à la page 566, lignes 22 à 24 et de la page 567, ligne 14 à page 568, ligne 2, est déclassée par les présentes et n'est plus soumise à aucune protection en vertu de l'Ordonnance préliminaire n° 6 - Ordonnance conservatoire stipulée  (5 novembre 2018). Le reste du témoignage désigné contesté dans la transcription du 6 février 2019 portant sa désignation initiale est maintenu comme « HAUTEMENT CONFIDENTIEL – UNIQUEMENT POUR LES AVOCATS » en vertu de l'Ordonnance préliminaire n° 6 - Ordonnance conservatoire stipulée (5 novembre 2018).

# TRADUCTION

entreprise ou une société une des Informations confidentielles de [IPAC] qu'elle a reçues pendant la durée du présent contrat).

2. Le Défendeur, Black Gold, versera à la société Demanderesse, International Petroleum Products and Additives Company, Inc., ci-après appelée « IPAC », des dommages-intérêts d'un montant de **687 702,56 dollars US**, et ce montant est donc inclus dans le Montant total final indiqué au paragraphe 5 ci-dessous.

3. Le Défendeur Black Gold doit payer au Demandeur IPAC la somme de **305 138,65 dollars US** en recouvrement des frais de procédure, y compris les honoraires et frais des avocats, des comptables et des témoins. Ce montant est donc inclus dans le Montant total final indiqué au paragraphe 5 ci-dessous.

4. Les frais et dépens administratifs du Centre international pour la résolution des différends (« ICDR ») de l'Association d'arbitrage américaine, totalisant **18 975,00 dollars US**, et la rémunération et les dépenses de l'Arbitre, totalisant **100 038,01 dollars US** seront supportés par le Défendeur Black Gold. Par conséquent, le Défendeur doit rembourser au Demandeur la somme de **101 352,37 dollars US** correspondant à la partie desdits honoraires et frais excédant les coûts répartis précédemment avancés par le Défendeur. Ce montant est donc inclus dans le Montant total final indiqué au paragraphe 5 ci-dessous.

5. Dans les trente (30) jours à compter de la date à laquelle la présente Sentence Finale est transmise aux parties, le Défendeur, Black Gold, devra payer au Demandeur IPAC le Montant total final de **1 094 193,58 dollars US**.

6. Cette Sentence finale satisfait intégralement à toutes les Réclamations soumises au présent arbitrage. Toute réclamation non expressément accordée aux présentes est refusée.

Je certifie par la présente que, aux fins de l'article 1 de la Convention de New York de 1958 sur la reconnaissance et l'exécution des sentences arbitrales étrangères, cette Sentence finale a été rendue à San Francisco, Californie, États-Unis d'Amérique.

*Mark C. Dosker*

Date : 29 mai 2019        _____

Arbitre Mark C. Dosker



# T R A D U C T I O N

\* \* \* \* \* \* \*

**SENTENCE**

Pour les raisons susmentionnées, j'attribue comme suit :

1. Les « informations confidentielles IPAC », telles qu'utilisées dans la présente, sont définies à la page 11 de la présente Sentence Finale. Le Défendeur Black Gold S.a.r.l., ci-après dénommé « Black Gold », ainsi que toute personne ou entité agissant de concert avec lui ou en participant à son action ou en soutien ou conjointement avec lui, en collusion ou en conspiration avec lui, que ce soit les assistants, complices, co-conspirateurs, mandataires, préposés, employés ou autres, sont définitivement interdits :

(a) de fabriquer, commercialiser ou vendre tout produit formulé ou autrement fabriqué à l'aide d'informations confidentielles de IPAC ;

(b) d'utiliser autrement toute information confidentielle de IPAC ;

(c) de divulguer à toute autre personne ou entité toute information confidentielle de IPAC ;

(d) de posséder des informations confidentielles IPAC, autrement que l'avocat de Black Gold qui possède une copie des documents produits dans le cadre de cet arbitrage ;

(e) dans la mesure, le cas échéant, où les paragraphes 1 (a) - 1 (d) ci-dessus ne l'ordonnent pas, de prendre toute autre mesure avant le 1er janvier 2024 qui violerait l'Article 12 du Contrat de représentation commerciale (cet Article survit au Contrat conformément au paragraphe 4 de l'Accord de résiliation) ; et

(f) dans la mesure, le cas échéant, non déjà prévu aux paragraphes 1 (a) à 1 (d) ci-dessus, de prendre toute mesure qui, à tout moment, enfreindrait la section VIII.B. du Contrat de distributeur exclusif (qui prévoit notamment que « les parties ne doivent, à aucun moment pendant la durée du présent accord ou ultérieurement, divulguer à une personne, une

# TRADUCTION

Commonwealth du Massachusetts

Comté de Dukes County          } SS :

Je soussigné, Mark C. Dosker, affirme par les présentes sous serment en tant qu'Arbitre que je suis la personne décrite aux présentes et qui a exécuté cet instrument, qui est ma Sentence finale.

*Mark C. Dosker*

Date : 29 mai 2019          _____

Arbitre Mark C. Dosker

Commonwealth du Massachusetts

Comté de Dukes County          } SS :

Le 29 mai 2019, Mark C. Dosker, est apparu devant moi et est apparu comme l'individu décrit dans et qui a exécuté l'acte susmentionné. Il a reconnu qu'il a exécuté ledit acte.

*BRYANN DARCY*

Notaire Public

[SCEAU]
BRYANN DARCY
NOTAIRE PUBLIC
COMMONWEALTH OF MASSACHUSETTS
Ma commission expire le 16 mars 2023

## *ATTESTATION DE TRADUCTION EXACTE*

Je soussignée, Catherine Lewi, certifie en toute bonne foi que la traduction ci-dessus en langue française a été faite par moi-même en ma qualité de Traductrice professionnelle certifiée d'anglais en français par l'ATA (American Translators Association) et représente la version complète et conforme du document original en langue anglaise.

*Catherine Lewi – New York, NY 10028 – USA*
*Tél. : +1-858-401-0127 - e-mail : catherine.lewi@yahoo.com*

American Translators Association

Catherine Lewi
English into French
Certification #437484

Certified Translator

Verify at www.atanet.org/verify

Signature

28 JUILLET 2019

Date

STATE OF NEW YORK, COUNTY OF NEW YORK

The foregoing instrument was acknowledged before me
this 28 day of July, 2019, by CATHERINE LEWI

Charmaine Raphael, Notary Public 01RA6217652
COMMISSION EXPIRES FEBRUARY 16, 2022



# EXHIBIT

# 3

## INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitration Tribunal

Re: 01-18-0001-9728

In the Matter of the Arbitration between:

INTERNATIONAL PETROLEUM PRODUCTS AND ADDITIVES COMPANY, INC.,

    v.

BLACK GOLD, S.A.R.L, LORENZO NAPOLEONI, and SOFIA NAPOLEONI

## FINAL AWARD

I, THE UNDERSIGNED ARBITRATOR, having been designated as arbitrator in accordance with the two arbitration agreements entered into between the above-named parties and dated January 1, 2016, and having been duly sworn, and having duly heard and considered the proofs and allegations of the parties, do hereby AWARD as follows:

\* \* \* \* \* \* \*

### ARBITRAL JURISDICTION

The Claimant's operative claims pursuant to its Demand for Arbitration are set forth in the Claimant's Verified Amended Detailed Statement of Claims dated August 10, 2018 ("Claims"). Some of the Claims are alleged to arise under the Sales Representative Agreement dated as of January 1, 2016 between Claimant International Petroleum Products and Additives Company, Inc. together with its subsidiaries and affiliates (collectively "IPAC") and Respondent Black Gold S.a.r.l. ("Black Gold") (the "Sales Representative Agreement"). Other Claims are alleged to arise under the Exclusive Distributor Agreement between the same parties, dated as of January 1, 2016 (the "Exclusive Distributor Agreement"). Each of the Sales Representative

Page 1 of 38

Patricia Ceil...
Hunster
Tel. 97 77 49 46
20 Bd de Suisse
...MONACO

Agreement and the Exclusive Distributor Agreement contains a term by which the parties agreed that California law governs the agreement.   Sales Representative Agreement Section 17; Exclusive Distributor Agreement Section XVI.F.

Each of the Sales Representative Agreement and the Exclusive Distributor Agreement includes an arbitration agreement. Sales Representative Agreement Section 19; Exclusive Distributor Agreement Section XVI.E.  The arbitration rules which the parties agreed to under both the Sales Representative Agreement and the Exclusive Distributor Agreement are the American Arbitration Association's Commercial Arbitration Rules ("Rules").  Sales Representative Agreement Section 19; Exclusive Distributor Agreement Section XVI.E. *See* Preliminary Order No. 3 at 5:14-23.

One other Claim arises under the same parties' Termination Agreement and Mutual Release effective March 1, 2018 (the "Termination Agreement").  Claims at page 15 para. 3. After full briefing by the parties and consideration by the Arbitrator, the Arbitrator determined that there is no arbitral jurisdiction over the Claim arising under the Termination Agreement. Preliminary Order No. 3 -- Ruling on Arbitral Jurisdiction (September 17, 2018) at 6:14-22.

The Claims under the Sales Representative Agreement and the Exclusive Distributor Agreement were alleged not only against Black Gold, but also against two individuals associated with it:   Lorenzo Napoleoni and Sophia Napoleoni.   After full briefing by the parties and consideration by the Arbitrator, the Arbitrator determined that there is no arbitral jurisdiction over the Claims as against Lorenzo Napoleoni and Sofia Napoleoni under the Sales Representative Agreement.   Preliminary Order No. 3 -- Ruling on Arbitral Jurisdiction (September 17, 2018) at 6:25 – 7:24; 8:5-7. The Arbitrator further determined that to the extent that Claimant seeks to pursue Claims for relief in arbitration under the Exclusive Distributor Agreement, the undersigned Arbitrator is of the opinion that there would be arbitral jurisdiction of three arbitrators over the Claims against Respondent Black Gold and that no arbitral jurisdiction has been sufficiently shown as to the Claims against the individual Respondents

Lorenzo Napoleoni and Sofia Napoleoni, but that actually making decisions about arbitral jurisdiction under the Exclusive Distributor Agreement would require consideration and decision by a panel of three arbitrators, unless the parties agree to submit to this single Arbitrator their disputes under the Exclusive Distributor Agreement. On September 21, 2018 all parties did so agree in writing to submit to this single Arbitrator their disputes under the Exclusive Distributor Agreement including the dispute as to whether there is arbitral jurisdiction as to the Claims against Lorenzo Napoleoni and Sofia Napoleoni.

For the reasons as were stated in Preliminary Order No. 3 -- Ruling on Arbitral Jurisdiction (September 17, 2018), there is no arbitral jurisdiction as to the Claims against Lorenzo Napoleoni and Sofia Napoleoni under the Exclusive Distributor Agreement and there is arbitral jurisdiction as to the Claims against Black Gold under the Exclusive Distributor Agreement.

As ruled in Preliminary Order No. 4 (October 2, 2018), by the parties' agreement confirmed in writing on September 21, 2018 that the hearing on the merits of this arbitration would be held on February 4-6, 2019, the parties have mutually waived that term of the Exclusive Distributor Agreement which would have required that the "arbitration award shall be given within three (3) months from appointment" of the arbitrator.

## THE PARTIES' POSITIONS

The facts of the case and the parties' legal arguments about them are set forth in detail in the parties' respective submissions. All those facts and arguments need not be repeated in complete detail here.

### The Witnesses

The witnesses who provided sworn written and oral testimony in this arbitration are: Brian Cereghino (Chief Executive Officer of IPAC), Dr. Francisco Coppola (expert witness for Black Gold), Dr. Jeffrey Crow (Vice President of Technology of IPAC), Alan Krock (Chief Financial Officer of IPAC), Lorenzo Napoleoni (Chief Executive Officer of Black Gold) and Dr.

Patricia GRIMAUD-PALMERO
Huissier
Tel. 07 77 08 49
20-24 de Suisse
...

David L. Wooton (expert witness for IPAC). Each of those witnesses provided written direct testimony. Each adopted his written direct testimony under oath at the hearing of this arbitration. Each was further examined under oath during the hearing – including on cross-examination, redirect examination and on examination by the Arbitrator. Mr. Peter Dijke (expert witness for Black Gold) provided written testimony in the form of a declaration under penalty of perjury submitted prior to the hearing of this arbitration. He did not provide oral testimony at the hearing of the arbitration, for the reasons noted below.

### Summary of Claimant's Position

This section broadly summarizes pertinent parts of Claimant's position. IPAC is a petroleum additive manufacturing and sales company. Pursuant to the Sales Representative Agreement and the Exclusive Distributor Agreement, Black Gold entered into contracts in which it agreed to be a sales representative of IPAC and to be an exclusive distributor for IPAC. Pursuant to those agreements, Black Gold agreed to maintain the confidentiality of IPAC information and to not provide service or assistance as to competing products. During the terms of those agreements, Black Gold had access to sensitive and confidential IPAC information, including the identity of IPAC's direct customers and indirect customers (through Black Gold's distribution of IPAC products), and the quantity and pricing of IPAC products ordered by those customers. Despite Black Gold's contracts with IPAC, during the term thereof Black Gold's CEO Lorenzo Napoleoni entered into a relationship with Steven Plitt, a former IPAC employee, to establish a competing additives business, PXL. This was not disclosed to IPAC at the time. Mr. Plitt, shortly before leaving IPAC, e-mailed to himself IPAC Confidential Information (as defined below) to which he already had access on IPAC's restricted network for legitimate use in IPAC's business. What he e-mailed to himself included a confidential password-protected Microsoft Excel file detailing the identity, vendor, price, and relative composition for each component in each of IPAC's products. Hearing Transcript ("Tr.") 147:4-148:5; 190:5-193:1. What he e-mailed to himself also included large amounts of other IPAC Confidential Information relating to IPAC sales and pricing. Tr. 192:7-24.

By December 2017, while Black Gold's relationship with IPAC continued but unbeknownst to IPAC, PXL had already developed competing lubricant additives that were so strikingly similar to IPAC products that expert testimony has now concluded they were knock-off products, despite PXL having no test facilities, no formulation capability, no blending or other technical expertise, and no chemists.

Toward the end of 2017, IPAC's requests for a meeting were rebuffed by Black Gold. In February 2018, Black Gold indicated that it wished to terminate the parties' relationship. Subsequently, IPAC agreed to pay a termination fee to Black Gold pursuant to a Termination Agreement.  IPAC agreed to pay a termination fee based on historic rather than anticipated sales revenue, which IPAC alleges was contrary to its normal practice.

IPAC asserts that after the agreements terminated, Black Gold retained IPAC's information, which included confidential business information, in violation of its contractual obligations to return that information.  IPAC further asserts that Black Gold did not make any effort to transfer to IPAC a viable business with respect to Black Gold's distribution customers, in violation of its contractual obligation to do so.  IPAC's revenues regarding accounts serviced by Black Gold, which had previously been at a steady state, dropped off in 2017, while as was later discovered Messrs. Napoleoni and Plitt were working to offer competing products through PXL. After the Termination Agreement, sales for the customer accounts for which IPAC seeks damages fell precipitously, dropping to zero by the latter part of 2018.

As a result of Black Gold's actions through its CEO and co-owner Mr. Napoleoni, IPAC asserts that it has suffered damages in the nature of lost profits in the amount of US$1,404,398.24 and that Black Gold's conduct warrants the imposition of injunctive relief, recovery of attorneys' fees and costs, and exemplary damages.

### Summary of Respondent's Position

This section broadly summarizes pertinent parts of Respondent's position.  Black Gold asserts that its CEO Mr. Napoleoni thought he had deleted all of IPAC's Confidential

Information which was in Black Gold's possession, "after the termination". Napoleoni Written Testimony ¶23 (apparently meaning after the parties entered into the Termination Agreement). Black Gold further asserts that pursuant to IPAC's discovery requests in this arbitration and the Arbitrator's Orders concerning those requests, when Black Gold's CEO Mr. Napoleoni was told to conduct electronic searches for information and to look for all relevant documents in the course of discovery in this case, to fully and properly comply with this obligation he contacted someone he knew with more computer knowledge and skill than he himself had. Napoleoni Written Testimony ¶ 21; Tr. 575:7-578:22. From the instructions that Mr. Napoleoni was given by his contact, regarding the Apple computer Mr. Napoleoni used for IPAC business, Black Gold's CEO Mr. Napoleoni testified that he then conducted what Respondent calls (without any definition or explanation) a "deep search", and in doing so found the information that he said he had thought he had deleted. Black Gold concedes that this information included IPAC invoices, marketing information, pricing lists and product data sheets. Tr. 575:16-18; Napoleoni Written Testimony ¶ 21. These, Black Gold states, were the materials and information that Black Gold produced to Claimant's counsel during this arbitration. Napoleoni Written Testimony ¶ 22; Tr. 575:75-78:22.

Black Gold's CEO Mr. Napoleoni states that he thought he had deleted all the IPAC information, that doing so was consistent with the dictates of the parties' agreements, and that Black Gold believed that he had fully and completely deleted it from further use or access and that it would be overwritten. Napoleoni Written Testimony ¶ 23. Black Gold asserts that it did not access any IPAC materials prior to this arbitration and did not retain any IPAC information in non-compliance with the terms of the Sales Representative Agreement or Exclusive Distributor Agreement. Napoleoni Written Testimony ¶24. Black Gold further asserts that it did not use, access or share IPAC's information after the parties' relationship ended. Napoleoni Written Testimony ¶ 25.

Black Gold argues that there is no evidence that IPAC incurred any damages as a result of the IPAC information that Black Gold's CEO Mr. Napoleoni attempted but failed

to delete.  Black Gold argues there is no evidence of how the information, could, would or did cause any harm, injury or damages IPAC. Tr. 148:12-24; 149:11-150:10; 575:1-18. Black Gold acknowledges that IPAC provided it with sales and marketing materials for the promotion and sale of its products, including selling prices and data sheets, for the purpose of trying to sell IPAC's products.  Napoleoni Written Testimony ¶ 15; Tr. 575:16-18.   In summary, Black Gold argues that there was no breach of any contractual provision by Black Gold concerning IPAC information; but to the extent that there was a breach, Black Gold argues that IPAC failed to present any evidence showing that such alleged breach caused IPAC any injury or damages.

Black Gold's CEO Mr. Napoleoni states that IPAC never shared any product formulas or similar information with Black Gold.  Napoleoni Written Testimony ¶ 15.  Black Gold argues that there is no evidence that Black Gold ever possessed any such sensitive technical information of IPAC, and, accordingly, argues that Black Gold could not have passed any such information to anyone, including PXL.

Black Gold argues that the Exclusive Distributor Agreement had a specifically defined term lasting from January 1, 2016 to January 1, 2017, and then terminated on January 1, 2017, one year after the effective date.  Black Gold further argues that the obligations that IPAC claims Black Gold breached, in 2017 and 2018, expired at the beginning of 2017 with the expiration of the written Exclusive Distributor Agreement and were not in effect at the time that the parties' relationship ended in March 2018.  Black Gold does not squarely address, however, the fact that the Exclusive Distributor Agreement provides that the obligation to protect the IPAC information defined therein as "Confidential Information" exists both during the term of the Exclusive Distributor Agreement and thereafter.  Exclusive Distributor Agreement Section VIII.B.

Black Gold acknowledges that under California law, "the breaching party is only liable to place the nonbreaching party in the same position as if the specific breach had not occurred.  Or, to phrase it still a third way, the breaching party is only responsible to give the

COVINGTON COGGE
Servings the bar and the
Tel D777 08 48

nonbreaching party the benefit of the bargain to the extent the specific breach deprived that

party of its bargain." *Postal Instant Press, Inc. v. Sealy* 43 Cal.App.4th 1704, 1709 (1996).

But Black Gold asserts that IPAC has failed to substantiate its alleged damages.

Lastly, Black Gold argues that it is not at "fault" within the meaning of that term in

the Exclusive Distributor Agreement requiring that: "The costs of the proceeding, including the

fees and costs of attorneys, accountants, and witnesses, and the compensation of the arbitrators,

shall be assessed by the arbitrators against the parties according to the arbitrators' determination

of fault." Exclusive Distributor Agreement Section XVI.E.


**The Termination Agreement.**

The parties disagree about what effect, if any, their Termination Agreement has on this

arbitration. Paragraph 3 of the Termination Agreement provides for a mutual release between

the parties for "any and all . . . claims . . . or other obligations or liabilities of any nature,

whether known or unknown", that they "now have or may in the future have directly or

indirectly have arising out of (or in connection with) the [Sales Representative] Agreement."

Claimant's Exh. C-3 at ¶ 3. Paragraph 4 of the Termination Agreement, however, provides

that obligations associated with Sections 8, 12, and 13 of the Sales Representative Agreement

survive.

The Termination Agreement does not refer to Civil Code Section 1542, which provides:

> A general release does not extend to claims that the creditor or releasing party does not
> know or suspect to exist in his or her favor at the time of executing the release and that, if
> known by him or her, would have materially affected his or her settlement with the debtor
> or released party.

Due to Section 1542, a general release will not extend to unknown claims where "it is clear that

[the party's] lack of knowledge materially affected the terms of the settlement." *Casey v.*

*Proctor*, 59 Cal. 2d 97, 105 (1963).

It is clear that from the evidence that if IPAC had known of Black Gold CEO Lorenzo

Napoleoni's activities, it never would have agreed to the terms of the Termination Agreement.

Mr. Napoleoni never informed IPAC that he had become managing director of PXL during the pendency of the Sales Representative Agreement. Tr. at 486:24-487:4, 495:18-25; *see* Cereghino Written Testimony ¶ 10. And IPAC was unaware that PXL, under Black Gold's CEO Mr. Napoleoni, had formulated knock-off competing additives during the term of the Sales Representative Agreement and its obligations regarding IPAC Confidential Information, which timing is evidenced by, *inter alia*, the December 2017 datasheet for PXL 5003. *See* Tr. at 257:1-15, 257:20-25; *see also* Tr. at 87:20-88:19; Wooton Direct Testimony at 3; Tr. at 211:9-19, 213:2-9; Cereghino Written Testimony at 10:27-11:2; Claimant's Exh. C-11 at Exh. B (PXL 5003 datasheet at NAPOLEONI HCAEO-0005-06).

When IPAC first became aware of PXL's existence, it did not know that PXL was engaged in the additives business. In a March 1, 2017 email to IPAC, ex-IPAC employee and PXL co-founder Mr. Plitt informed IPAC that he had formed PXL with his son, as a "consultant company". *See* Claimant's Exh. C-10 at PLITT00067 (Napoleoni deposition exhibit 11).

Whether unknown claims have been released is a question of fact. *Butler v. Vons Cos.,* 140 Cal. App. 4th 943, 950 (2006) (citing cases); *Huddleson v. Huddleson,* 187 Cal. App. 3d 1564, 1572-73 (1986) (general release did not bar later claim unknown at time of release). As the Arbitrator noted previously, the Termination Agreement "contains no waiver of rights under California Civil Code Section 1542." Preliminary Order No. 3 at 3. Mr. Krock testified that he drafted the Termination Agreement in response to Mr. Napoleoni's request to terminate the parties' relationship. *See* Tr. at 358:6-18; Claimant's Exh. C-5 at IPAC000030 (Cereghino letter to Napoleoni; "Alan has explained to me in that meeting, you brought up the need to terminate the agreement, . . . ."). None of the Exclusive Distributor Agreement, Sales Representative Agreement, and Termination Agreement contained a Section 1542 waiver. *See* Hearing Tr. at 288:5-7, 289:24-290:1, 290:12-14. The absence of a Section 1542 waiver in the Termination Agreement was intentional, standing in contrast to other IPAC agreements that did contain Section 1542 waivers. *See* Tr. at 290:14-17.

In view of the terms of the Sales Representative Agreement which the parties agreed in the Termination Agreement would survive the Termination Agreement, IPAC's lack of knowledge concerning Black Gold's conduct, the absence of any reference to Section 1542 in the Termination Agreement, and the uncontradicted testimony that the absence of a Section 1542 waiver was intentional, the claims IPAC seeks to pursue in this arbitration are not precluded by the parties' Termination Agreement.

### DISCUSSION

#### Black Gold's Legal Duties to IPAC

Sections 8, 12 and 13 of the Sales Representative Agreement provide:

> SECTION 8. Property. Upon Termination of this Agreement for any reason by either party, all items belonging to IPAC in the possession or control of the SALES REPRESENTATIVE, including but not limited to literature, sales aids, purchase order copies and files, customer drawings and other documentation relating to IPAC, *shall be promptly and safely returned to IPAC* at its address first listed above, or elsewhere in the USA as designated by notice from IPAC, at the sole expense of SALES REPRESENTATIVE.

> SECTION 12. Proprietary Obligation. The SALES REPRESENTATIVE agrees that during the term of this Agreement *and for a period of five (5) years thereafter, it and its officers, employees and agents shall not disclose* to anyone, any confidential information of IPAC, including, but not limited to, sales information, identity of customers and prospective customers, quantity and kind of Products shipped or sold, prices and methods of pricing, Product returns, unannounced products, confidential product and process information, and such other information which, if disclosed to others, would be detrimental to the best interests of IPAC.

> SECTION 13. Limitation of Liability and indemnification. IN NO EVENT WILL SALES REPRESENTATIVE BE LIABLE TO IPAC FOR ANY INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES OF ANY NATURE OR KIND WHATSOEVER, INCLUDING BUT NOT LIMITED TO, LOSS OF PROFITS OR OTHER ECONOMIC LOSS ARISING OUT OF, OR IN CONNECTION WITH THIS AGREEMENT *UNLESS SALES REPRESENTATIVE COMMITTS UNAUTHORIZED ACTS BEYOND THE SCOPE OF THIS SALES REPRESENTATIVE AGREEMENT* INCLUDING ILLEGAL ACTS. IPAC AND SALES REPRESENTATIVE AGREES THE RELATIONSHIP UNDER THIS AGREEMENT IS LIMITED TO CONSULTATION AND REPRESENTATION AS SET FORTH ABOVE. THE IPAC AGREES TO DEFEND, INDEMNIFY, AND HOLD HARMLESS CONSULTANT FOR ALL CLAIMS, CAUSE OF ACTION, LIABILITIES, COSTS, REASONABLE

ATTORNEY'S FEES AND DAMAGES WHICH SALES REPRESENTATIVE MAY INCUR WITHIN THE SALES REPRESENTATIVE'S AUTHORIZED AND LEGAL SCOPE OF ACTIVITIES WHILE ENGAGED IN THE PERFORMANCE OF THIS AGREEMENT.

Sales Representative Agreement Sections 8, 12 and 13 (emphasis added).

Section VIII.B. of the Exclusive Distributor Agreement provides:

As used in this Section, "Confidential Information" means information disclosed to the Distributor by IPAC or information disclosed to IPAC by Distributor, or known by the Distributor and IPAC as a consequence of, or through, the affiliation with each other, not generally known in the industry in which IPAC and Distributor are active or may become engaged. Distributor shall not disclose any not publicly known information about IPAC's customer lists, products, processes, and services, including information relating to research, development, inventions, manufacture, purchasing, accounting, engineering, marketing, merchandising, selling, pricing, internal policies, and any lawsuits, or legal work without the consent of IPAC. *The parties shall not, at any time, either during the term of this Agreement or thereafter, divulge to any person, firm, or corporation any of the Confidential Information received by it during the term of this Agreement,* and all such information shall be kept confidential and shall not, in any manner, be revealed to anyone except as may be required by legal process or the order of any court of competent jurisdiction. Distributor may provide summary level financial information to its accounting and legal advisors sufficient to allow Distributor to comply with tax and other regulatory requirements to which it is subject.

Exclusive Distributor Agreement Section VIII.B. (emphasis added).

Section XV.C. of the Exclusive Distributor Agreement provides that upon termination or expiration of the Exclusive Distributor Agreement, Black Gold was required to "cooperate with IPAC, to surrender all records to IPAC, and to do whatever is reasonably required by IPAC in order to continue a viable business with IPAC the customers served by the distributor." Exclusive Distributor Agreement at Section XV.C.

The information referred to as "Confidential Information" in either or both of the Sales Representative Agreement Section 12 and the Exclusive Distributor Agreement Section VIII.B. is collectively herein referred to as "IPAC Confidential Information". Sales Representative Agreement Section 12 has a five-year duration, after the term of that agreement, of the obligation not to disclose IPAC Confidential Information. Exclusive Distributor Agreement Section VIII.B., however, has no time duration. In addition to protecting IPAC Confidential Information

Patricia GRIMAUD-PALMERO
Huissier
Tel. 9777 48 48
20 Bd de Suisse

permanently, and not just for five years after the term of the Sales Representative Agreement,

Exclusive Distributor Agreement Section VIII.B also appears to protect broader categories of

IPAC Confidential Information than does Sales Representative Agreement Section 12.

### Breaches by Black Gold of its Duties to IPAC

As a threshold matter, Respondent asserts in its post-hearing brief that it "is important to

note that IPAC, at no time, made any formal designation that any of its information or property

qualified for trade secret protection pursuant to Cal. Code of Civil Proc. §2019.210."

Respondent's Closing Arbitration Brief at 7:24-26.  Respondent Black Gold similarly so asserts

in its Reply Closing Arbitration Brief at 22:25-27.  Because Respondent repeatedly still so

asserts, it is worth repeating and incorporating here a ruling from Preliminary Order No. 5 in this

arbitration:

> "Respondent has submitted, as stated in its supplemental submission of October 25, 2018,
> that California Code of Civil Procedure Section 2019.210 applies to this arbitration.  That
> is not correct.  *California Code of Civil Procedure Section 2019.210 is a portion of Title
> 4 of Part 4 of the California Code of Civil Procedure (collectively hereinafter "the Civil
> Discovery Act").  That governs how discovery is conducted in litigation in California
> Superior Court.  In arbitration, by contrast, only certain portions of the Civil Discovery
> Act can apply – and even those may apply "[o]nly if the parties by their agreement so
> provide,…".  Cal. Code. Civ. Proc. Section 1283.1(b).*  If it were not for California Code
> of Civil Procedure Sections 1283.1(b) and 1283.05, every arbitration under an agreement
> containing a California law governing clause might be at risk of having to be conducted
> using all the discovery procedures which apply in litigation in California Superior Court.
> But *California Code of Civil Procedure Section 1283.1(b) is the law, and the parties'
> arbitration agreements applicable in this case do not adopt the discovery option allowed
> in it."*

Preliminary Order No. 5 at 2:14-28 (emphasis added).  Respondent's renewed assertion is

incorrect and irrelevant.

Black Gold's CEO is Mr. Napoleoni, and the company has no other employees. Tr. at

497:20-22 (Napoleoni).  Mr. Napoleoni is a shareholder of Black Gold and his co-shareholder is

his wife Sofia Napoleoni.  *See* Tr. at 469:14-470:2 (discussing Claimant's Exh. C-5 at

IPAC000018).

During the term of the parties' agreements which are the subject of this arbitration, Black Gold's CEO Mr. Napoleoni discussed with IPAC's Steven Plitt and IPAC's Dr. Jeffrey Crow forming a new business that would compete with IPAC. Tr. 554:5-14; 555:3-6. Dr. Crow holds a Ph.D. in Analytical Chemistry, has been employed by IPAC since 2006, and as Vice President, Technology, for IPAC he is responsible for the research and development of IPAC's products. Crow Written Testimony ¶1. Dr. Crow testified that during those discussions with Black Gold's CEO Mr. Napoleoni and IPAC's Steven Plitt, Dr. Crow was concerned about how could they proceed in such a new business without using IPAC Confidential Information, and he "continued to stress you would have to be very careful that everything you did was separate from IPAC", and that "over time it became clear that was going to be very difficult to do" and that this was "one of the reasons [he] did decide to not proceed" in the new business. Tr. 59:24-60:13.  Mr. Plitt, however, decided to depart from his employment at IPAC to form a new business with Black Gold's CEO Mr. Napoleoni to compete with IPAC.

Shortly before Mr. Plitt departed his employment at IPAC, he e-mailed to himself an extensive set of IPAC Confidential Information that would enable a competitor to deliberately copy (i.e., knock-off) IPAC products. Claimant's Exh. C-10 at Depo Exh. 19; Crow Written Testimony at ¶¶ 6-10, 12-13, and 22-35. Mr. Plitt did this notwithstanding there being no IPAC business reason for him to do so: when he had a legitimate need for that highly confidential information for use in IPAC's business, he accessed it via Citrix on IPAC's computer system. Tr. 147:20-148:5.

Thereafter, but still during the term of the Sales Representative Agreement, Black Gold's CEO Mr. Napoleoni and IPAC's recently-departed employee Mr. Plitt jointly founded a new corporation to conduct their new business.  The evidence is undisputed that Black Gold's CEO Mr. Napoleoni together with Mr. Plitt co-founded PXL Chemicals, BV in the Netherlands, of which Black Gold's CEO Mr. Napoleoni was (and apparently still is) Managing Director and also a shareholder.  Tr. 505:17-19; 543:21-544:6; 545:4-546:8.  That occurred while the Sales Representative Agreement's term was still in force and about six months after the Exclusive

Patricia GRIMAUD-PALMERO
Huissier
20 Ed de Suisse

Distributor Agreement's term expired: official corporate records of the Netherlands show that July 31, 2017 was the date of incorporation of PXL Chemicals BV. (IPAC0000032, attached to Claimant's Verified Amended Statement of Claims.)

Another new corporation formed while the Sales Representative Agreement's term was still in force, and ten days after the Exclusive Distributor Agreement's term expired, was PXL Chemicals LLC in the United States. Public records in the Ohio Secretary of State's office establish that PXL Chemicals LLC was formed in Ohio on January 10, 2017. https://bizimage.sos.state.oh.us/api/image/pdf/201700902960 (last accessed May 1, 2019) (Articles of Organization for a Domestic Limited Liability Company). Mr. Plitt lives in Ohio. Tr. 546:19-25. PXL (whether PXL Chemicals LLC and/or PXL Chemicals BV) has held itself out as a unitary business with two locations *See* Claimant's Exh. C-5 at IPAC000028-29 (PXL web page, identifying Mr. Plitt as "Founder/CEO", Mr. Napoleoni as "Founder/COO" and disclosing "United States" and "International" addresses). Overall, the evidence in this arbitration is inconclusive as to whether Black Gold's CEO Mr. Napoleoni was also involved in forming PXL Chemicals LLC in the United States. PXL Chemicals LLC is, together with Black Gold's CEO Mr. Napoleoni, a shareholder of PXL Chemicals BV. Tr. 505:10-19.

At times relevant hereto both PXL Chemicals LLC and PXL Chemicals BV held themselves out to the market and the general public on the internet at www.pxlchemicals.com. *See* https://www.pxlchemicals.com/contact (showing PXL offices in both Ohio and the Netherlands)(last accessed May 1, 2019). Less than five months after PXL Chemicals BV was founded, by Black Gold's CEO Mr. Napoleoni and recent ex-IPAC employee Mr. Plitt, the two PXL companies had additive products which already had existed long enough that they had their Technical Data Sheets "updated" as of December 1, 2017 referencing www.pxlchemicals.com and "PXL Chemicals LLC and its subsidiaries". Wooton Written Testimony at 2 (last paragraph); Napoleoni HCAEO-0004 -Napoleoni HCAEO-0008.

Black Gold had agreed that upon termination or expiration of the Exclusive Distributor Agreement, it would "cooperate with IPAC, to surrender all records to IPAC, and to do whatever

is reasonably required by IPAC in order to continue a viable business with IPAC the customers served by the distributor." Exclusive Distributor Agreement at Section XV.C. Black Gold failed to do so. Instead, it did not surrender any IPAC records to IPAC until doing so in this arbitration. It failed to include IPAC in necessary communications with IPAC customers. Cereghino Written Testimony ¶3. Instead of Black Gold's conduct allowing IPAC "to continue a viable business with IPAC the customers served by the distributor", as provided for in Section XV.C. of the Exclusive Distributor Agreement, Black Gold's conduct allowed only for IPAC to suffer a steep drop-off of business. Krock Written Testimony ¶29; Tr. 341:2-5, 342:24-343:1.

The evidence in this arbitration in the nature of opinions from proffered experts on behalf of the two parties is crucial. And the experts' opinions are diametrically opposed to each other.

Claimant's proffered expert Dr. David L. Wooten has excellent credentials and experience. According to his invoice submitted with Claimants' Cost Application, he spent a material amount of time on his work in rendering his opinion. There has been no basis presented on which to question his independence, his expertise or the quality and accuracy of his expert opinions.

Respondent's proffer of its expert Dr. Francesco Coppola suffers considerably. It suffers from his lack of relevant experience, as he has never developed an additive product. Tr. 236:7-8; 274:12-20. It suffers from his lack of independence, as he works for a company (AxxonOil) of the family of the wife (and Black Gold co-shareholder) of Black Gold's CEO Mr. Napoleoni and for which company Mr. Napoleoni also works and which company uses PXL additives, and Dr. Coppola proffered his opinions as a favor rather than as an independent expert does for charge. Tr. 236:22-24; 238:21-25; 239:1-21; 256:2-4. Respondent's proffer of its expert Dr. Coppola also suffers from lack of significant time spent preparing his analysis and opinions, as he spent only one afternoon doing so. Tr. 251:15-17.

Respondent also cites, in its post-hearing brief, the written statement of its expert Peter Dijke. At the hearing, Respondent withdrew its proffer of Mr. Dijke as a witness and did not produce Mr. Dijke to testify at the hearing. Tr. 240:11-16. Claimant, however, put into evidence

Patricia GRIMAUD-PALMERO
Huissier

Tél. 97 77 48 48
20 Bd de Suisse

nonetheless the written direct testimony of Mr. Dijke which Respondent had submitted prior to the hearing.  Tr. 240:17-20.  Thereafter, in view of Claimant's positon about Mr. Dijke's written direct testimony, Respondent was again given the opportunity to have Mr. Dijke testify at the hearing, but Respondent chose not to do so.  Tr. 445:14-17.  The credibility of the written direct testimony of Mr. Dijke suffers from a lack of experience, as he is not a chemist.   It also suffers from a lack of independence, as he works for PXL which Dr. Wooton opined is making knock-offs of IPAC products and which has the connections with Black Gold's CEO Mr. Napoleoni and ex-IPAC employee Mr. Plitt as stated herein.

The Arbitrator finds that Claimant's expert witness Dr. Wooton is more qualified for purposes of this matter than Respondent's expert witness Dr. Coppola and Mr. Dijke, that Dr. Wooton's opinions are more credible than theirs, and that his opinions are those of an expert with no apparent bias or other issue about his independence -- unlike Respondent's expert Dr. Coppola and Mr. Dijke whose relationships give rise to significant questions of bias and doubts about their independence in this matter.

Claimant's expert witness Dr. Wooton testified that certain PXL products are knock-offs of IPAC products.  The Arbitrator finds Dr. Wooton's expert testimony credible and persuasive. The Arbitrator concludes, based on the totality of the evidence in this arbitration, that Black Gold through its CEO Mr. Napoleoni breached the Sales Representative Agreement Sections 8 and 12 and the Exclusive Distributor Agreement Sections VIII.B. and XV.C., which breaches were a contributing cause of the development and marketing and sale of the PXL products which Claimant's expert Dr. Wooton testified were knock-offs of IPAC products and of what IPAC's Alan Krock testified was the steep and otherwise unexplained drop-off in IPAC sales rather than Black Gold doing "whatever is reasonably required by IPAC in order to continue a viable business with IPAC the customers served by the distributor."  Exclusive Distributor Agreement Section XV.C.

Black Gold produced to IPAC in this arbitration, for the first time, several hundred documents which are IPAC Confidential Information, such as information relating to customer

lists, products, processes, services, research, development, inventions, manufacture, purchasing, accounting, engineering, marketing, merchandising, selling, price and internal policies. Cereghino Written Testimony ¶¶ 18-19; Claimant's Exh. C-10 at BlackGoldDepo0277-89 (Exh. 3 to Napoleoni Deposition Transcript); Claimant's Exh. C-10 at 22:21-23:25. This specifically included price lists. Tr. 149:7-10.

Black Gold's argument that after termination of the parties' agreements its CEO Mr. Napoleoni thought he had destroyed the IPAC Confidential Information which Black Gold had, and allegedly only realized during this arbitration that in fact he had failed to do so, misses the mark. Destroying the IPAC Confidential Information which Black Gold had was not an option under the parties' agreements. The Sales Representative Agreement required the material to be "promptly and safely returned to IPAC…" by Black Gold at its expense. Sales Representative Agreement at Section 8. The Exclusive Distributor Agreement required Black Gold to "surrender all records to IPAC". Exclusive Distributor Agreement at Section XV.C. Black Gold's failure to return the material to IPAC and to surrender it to IPAC, until midway through this arbitration, was a breach of the Sales Representative Agreement and the Exclusive Distributor Agreement. Moreover, the parties' Termination Agreement affirmatively provided that those obligations in the Sales Representative Agreement continued in accordance with their original term beyond the termination of the Sales Representative Agreement. Termination Agreement at Section 4.

Black Gold further argues that even though it did not in fact return IPAC's material until midway through this arbitration, including material containing what the parties' agreements defined as IPAC Confidential Information, there is no evidence that Black Gold misused any of that information. But considering the totality of the evidence, and the credibility of the witnesses, Black Gold's argument is not persuasive. Black Gold's CEO Mr. Napoleoni and IPAC's Mr. Plitt decided to form a business to compete with IPAC. They tried to persuade IPAC's Dr. Crow to join them. He chose not to, in significant part because he could not see how those people could form such a business without misusing IPAC Confidential Information.

Patricia GRIMAUD-FALMERO

Tel. 97 77 48 48

98000 MONACO

Black Gold's CEO Mr. Napoleoni and IPAC's ex-employee Mr. Plitt decided to form PXL.  Dr.

Wooton testified that PXL products were knock-offs of IPAC products.  Wooton Written

Testimony at 3.  Moreover, customers have reported to IPAC sales people in Europe that "PXL

tells its customers that the [PXL] products are safe to use because they are knock offs of IPAC's

formulations."  Cereghino Written Testimony at 10:27-11:2.  IPAC's sales following from Black

Gold's actions in these regards suffered a steep and otherwise unexplained drop-off.

Finally, Black Gold's CEO Mr. Napoleoni testified as follows in response to questioning

from the Arbitrator.  The specific question was this -- if no use were made of IPAC Confidential

Information like that in the spreadsheet which IPAC's Mr. Plitt had e-mailed to himself before

co-founding PXL with Mr. Napoleoni, how could the PXL products be formulated so quickly

and so close as they are to IPAC products as to be opined by Dr. Wooton to be knock-offs?  Tr.

at 549:24-550:18.  Black Gold's CEO Mr. Napoleoni ultimately testified that "*I had it available*,

and yeah. That's it." Tr.  550:17-18 (emphasis added).  During that portion of testimony, Mr.

Napoleoni gave the Arbitrator the clear and distinct and memorable impression and

understanding that immediately upon testifying "I had it available, and", Mr. Napoleoni paused

and appeared that, after saying the word "and" and before saying the word "yeah", he wished

that he had not admitted, especially in the context of the question he was responding to, that he

"had it available" -- and that he thereupon stopped himself from answering further.  That

testimony by Black Gold's CEO Mr. Napoleoni gravely hurt his credibility as to his denials of

any improper use of IPAC Confidential Information, and gravely hurt the persuasiveness of

Black Gold's arguments.

In a negotiated resolution of a dispute about Black Gold searching for and producing

information to IPAC in this arbitration, Black Gold promised to produce a spreadsheet in lieu of

carrying out searches of electronically stored information using IPAC's search terms directed to

financial, sales and income information and certain other related topics.  Preliminary Order No. 5

at 4:1-4.  Black Gold broke that promise and instead quite belatedly provided a table with much

less information than its promised spreadsheet.  But the proposed inferences IPAC urges to be

drawn from what Black Gold did in that regard are too detailed to draw based on the absence of information in the table Black Gold did belatedly provide and based on Black Gold's breaking its promise. The inference that can be drawn with full confidence and justification, however, is a general inference that Black Gold broke its promise because if it had kept its promise then the additional information Black Gold would have produced to IPAC would have been damaging to Black Gold's arguments in this arbitration.

Black Gold is responsible for the actions of its CEO Mr. Napoleoni, both as a matter of *respondeat superior* by which the principal is responsible for the acts of its agent, and also as to the performance of Black Gold as set forth in Sections VIII.B. and XV.C. of the Exclusive Distributor Agreement and the performance of Black Gold and its "officers, employees and agents" as set forth in Section 12 of the Sales Representative Agreement.

In sum, the evidence persuasively shows that Black Gold's CEO Mr. Napoleoni:

- During the term of the parties' agreements, discussed with then IPAC-employee Mr. Plitt and IPAC employee Dr. Crow the forming of a new business to compete with IPAC, such that Dr. Crow concluded it would be "very difficult" to do so without misusing IPAC Confidential Information;

- thereafter, formed PXL with ex-IPAC employee Mr. Plitt during the term of the Sales Representative Agreement while Black Gold and its CEO Mr. Napoleoni had hundreds of documents containing IPAC Confidential Information and also after Mr. Plitt e-mailed himself a confidential password-protected Microsoft Excel file detailing the identity, vendor, price, and relative composition for each component in each of IPAC's products, with no legitimate IPAC business reason for doing so;

- thereby caused, whether alone or in concert with others, PXL from its formation to possess IPAC Confidential Information;

- while in possession of IPAC Confidential Information, caused, whether alone or in concert with others, PXL to formulate and make and market and sell competitor products of IPAC products in such a short time and with such similarity that an experienced and credible expert has testified that the PXL products are "so strikingly similar to IPAC's products that they can be called knock-off products", and that customers reported to IPAC that PXL was telling its customers that PXL products are knock-offs of IPAC's formulations,

- when questioned by the Arbitrator as to how was it that if no use were made of IPAC Confidential Information like that in the spreadsheet IPAC's Mr. Plitt had e-mailed to himself before co-founding PXL with Mr. Napoleoni, how could the PXL products be formulated so quickly and so close as they are to IPAC products as to be opined by Dr. Wooton to be knock-offs, Black Gold's CEO Mr. Napoleoni admitted that "I had it available";

- all thereby giving rise to a conclusion from the totality of the evidence that Black Gold through its CEO Mr. Napoleoni, whether alone or in concert with others, caused IPAC Confidential Information to be misappropriated and misused to formulate and make and market and sell PXL products; and

- Black Gold failed to "cooperate with IPAC, to surrender all records to IPAC, and to do whatever is reasonably required by IPAC in order to continue a viable business with IPAC the customers served by the distributor."  Exclusive Distributor Agreement at Section XV.C.

Black Gold's breach of the Sales Representative Agreement and the Exclusive Distributor Agreement has been proven by the totality of the evidence, including but not limited to the foregoing.

### Causation

California law provides that the measure of damages "is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." Civil Code § 3300; *see Brandon & Tibbs v. George Kevorkian Accountancy Corp.*, 226 Cal. App. 3d 442, 455 (1990) ("The basic object of damages is compensation and in the law of contracts the theory is that the party injured by a breach should receive as nearly as possible the equivalents of the benefits of performance."). When lost profits damages are damages that "flow directly and necessarily from a breach of contract", lost profits damages are a part of recoverable general damages. *Mission Beverage Co. v. Pabst Brewing Co.*, 15 Cal. App. 5th 686, 710 (2017) (quoting *Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified School Dist.*, 34 Cal. 4th 960, 968 (2004)). The parties' agreements do not specify whether lost profits damages are or are not within the categories of damages subject to a damages limitation term in each agreement. "The California Supreme Court has explained that ***lost profits from collateral agreements often constitute direct damages in cases involving*** crops, goods intended for resale, or ***an agreement creating an exclusive sales relationship***. *Id.* at 971–72." Wendi J. Berkowitz, *Lost Profits: Direct or Consequential Damages?* https://www.americanbar.org/groups/litigation/committees/business-torts-unfair-competition/articles/2016/spring2016-lost-profits-direct-or-consequential-damages/ (last accessed April 15, 2019)(emphasis added), *citing Lewis Jorge*, 34 Cal. 4th at 971–72. "In those cases, the 'likelihood of lost profits from related or derivative transactions is so obvious . . . that the breaching party must be deemed to have contemplated them at the inception of the contract.'" *Id., quoting Lewis Jorge*, 34 Cal. 4th at 971–72. Lost profit damages can fall within recoverable general damages, and they do so under the facts of this case.

Patricia GELVARINI-PALMERO
Hulssler

Tel. 9777 48 48
20 Rd de 5

Accordingly, the damages limitation in Exclusive Distributor Agreement Section XVI.E.
-- which does not specify a limitation on "lost profits" -- does not apply in this case.  Lost profit
damages, on the facts of this case, are within recoverable direct damages.  The damages
limitation in the Sales Representative Agreement does not apply, for the same reason.  It also
independently does not apply because Black Gold "commit[ed] unauthorized acts beyond the
scope of this Sales Representative Agreement...".  Sales Representative Agreement Section 13.
Thus, even if lost profits damages in the context of this case were to be considered indirect /
consequential damages, lost profits damages are not excluded under the Sales Representative
Agreement.  An appropriate amount of lost profits damages is recoverable by IPAC in this
arbitration.

### Damages to IPAC Proximately Caused by Black Gold's Breaches of Duties

IPAC seeks lost profits damages, calculated based on historical data from IPAC's sales.
California law recognizes that as an acceptable basis for ascertaining lost future profits.  *Sargon
Enters., Inc. v. University of Southern Cal.*, 55 Cal. 4th 747, 774 (2012) ("Historical data, such as
past business volume, supply an acceptable basis for ascertaining lost future profits.") (quoting
*Berge v. International Harvester Co.*, 142 Cal. App. 3d 152, 161-62 (1983)).  IPAC's lost profits
damages are ascertainable with reasonable certainty, and may be properly awarded here.  *See
Sargon Enters.*, 55 Cal. 4th at 774-75 ("Where the *fact* of damages is certain, the amount of
damages need not be calculated with absolute certainty. . . . The law requires only that some
reasonable basis of computation of damages be used, and the damages may be computed even if
the result reached is an approximation.") (quoting *GHK Assocs. V. Mayer Group, Inc.*, 224 Cal.
App. 3d 856, 873-74 (1990)) (emphasis in original).

Part of the lost profits damages IPAC seeks, however, is not sufficiently supported by the
evidence.  IPAC's claims under each of the two agreements are addressed in turn.

IPAC seeks lost profits damages under the Sales Representative Agreement not only
through its initial term ending December 31, 2018 but also through 2019 – the first year of what

IPAC characterizes as an automatic renewal for additional three-year periods.  But the Sales Representative Agreement allows either party to terminate it without cause on sixty days' notice. Sales Representative Agreement at Section 5(b).  On the one hand, as discussed above, it is clear that, if IPAC had known of Black Gold CEO Lorenzo Napoleoni's activities, it never would have agreed to the terms of the Termination Agreement.  On the other hand, based on the evidence submitted in this Arbitration, the Arbitrator concludes that it is considerably more likely than not that one -- or possibly both -- of the parties would have invoked the termination term in the Sales Representative Agreement at Section 5(b) rather than allow the otherwise allegedly "automatic" renewal to proceed.  Accordingly, taking all the foregoing into consideration, the lost profit damages to which IPAC is entitled under the Sales Representative Agreement are for 2017 (at $196,491.06) and for 2018 (at $405,329.72) but not for 2019.  Krock Written Testimony ¶¶ 33-34.

IPAC also seeks lost profits damages for breach of the Exclusive Distributor Agreement, for 2017 and 2018.  The Exclusive Distributor Agreement did not envision automatic renewal after its initial one-year term.  Rather, the parties would have had to agree on targeted sales volumes or else the Exclusive Distributor Agreement would terminate one year after its effective date.  Exclusive Distributor Agreement at Section XV.A.  Such a further agreement did not happen.  Accordingly, the lost profit damages to which IPAC is entitled under the Exclusive Distributor Agreement are for 2017 (at $85,881.78) but not for 2018.  Krock Written Testimony ¶22.

It cannot be ascertained from the evidence presented in this arbitration how much other damage has been caused to IPAC by Black Gold's breaches, through the acts of its CEO Mr. Napoleoni or otherwise, of the Sales Representative Agreement and the Exclusive Distributor Agreement.

Patricia GRIMALDI-PALMERO
Huissier

Tél. 92 77 4
20 B4 de Suisse
98000

## Injunctive Relief

IPACs argues for injunctive relief barring Black Gold, through December 31, 2020, "from selling any additives that compete with IPAC's additive products that Black Gold sold as a distributor or sales representative of IPAC in 2016-2018." Claimant's Post-Hearing Brief at 41:11-13. Black Gold argues that no injunctive relief is warranted; and that even if it were, the scope of injunctive relief requested by IPAC is excessive.

"The arbitrator may grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties, including, but not limited to, specific performance of a contract." Rules at R-47(a).

In this case, in the two Agreements' respective arbitration terms a broad arbitration clause was used – covering all disputes arising from or relating to the Agreement -- and injunctive relief was not excluded. Such arbitration terms grant the Arbitrator the authority to issue permanent injunctive relief. Rules at R-47(a); *see* Stephen P. Beddell and Louis K. Ebling, *Equitable Relief in Arbitration: A Survey of American Case Law*, 20 Loy. U. Chi. L. J. 39, 43 (1988)("Arbitrators have the power to issue permanent injunctions when their powers are granted by a broad arbitration clause."); *see id.* at n.31 and cases cited therein. The Exclusive Distributor Agreement further specifically provides that the Arbitrator "may grant any legal and/or equitable relief to which a party may be entitled under the law or legal theory under which the party seeks relief...". Exclusive Distributor Agreement at Section XVI.E.

The Arbitrator may issue a permanent injunction. Rules at R-47(a); *Swan Magnetics, Inc. v. Superior Court of Santa Clara County,* 56 Cal. App. 4th 1504, 1507 (1997); *J. Brooks Secs., Inc. v. Vanderbilt Secs., Inc.*, 126 Misc. 2d 875, 484 N.Y.S.2d 472 (N.Y. Sup. Ct. 1985); *see generally* Stephen P. Beddell and Louis K. Ebling, *Equitable Relief in Arbitration: A Survey of American Case Law*, 20 Loy. U. Chi. L. J. 39, 43-45, 71-73 (1988).

The evidence in this arbitration establishes that issuance of an injunction is warranted, but in a different scope than what IPAC has requested. As discussed above, the evidence in this arbitration establishes that what the parties contractually agreed was IPAC Confidential

Information was disclosed by Black Gold by and through its CEO Mr. Napoleoni, in concert with one or more other entities and/or persons, and was misappropriated and misused and apparently still is being misused by them, in unauthorized ways to rapidly develop and to bring to market and to sell competitor products which a qualified and credible expert witness testified are "knock-off products" of IPAC products (Wooton Written Testimony at 3) and which customers in the market have reported being told by PXL that its products are knock-offs of IPAC products. Cereghino Written Testimony at 10:27-11:2. And there may be other ways in which IPAC's Confidential Information is being misused by Black Gold and those non-parties as against whom California law allows an injunction to apply.

California law authorizes issuance of a final injunction to prevent the breach of an obligation existing in favor of the applicant, in any one or more of four situations. Cal. Civ. Code Section 3422. Three of those four situations are present here. First, this is a case in which pecuniary compensation would not afford adequate relief. Cal. Civ. Code Section 3422.1. It affords some relief, but not entirely adequate relief – especially as to any ongoing unauthorized use of what the parties agreed under the Sales Representative Agreement and the Exclusive Distributor Agreement is IPAC's Confidential Information. Second, this is a case in which it would be extremely difficult to ascertain the amount of compensation which would afford adequate relief – again, especially as to any ongoing unauthorized use of what the parties agreed under the Sales Representative Agreement and the Exclusive Distributor Agreement is IPAC's Confidential Information. Cal. Civ. Code Section 3422.2. Third, the restraint by injunction is necessary to prevent a multiplicity of proceedings. Cal. Civ. Code Section 3422.3. Absent an injunction in this Final Award, with the expedited enforcement proceedings for arbitral awards that are available under applicable United States law and likewise in most other nations under the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (New York, 10 June 1958), there well could be a multiplicity of proceedings to decide anew various of the matters decided in this Final Award.

Patricia GRIMAUD-PALMERO
Huissier
Tél. 97 77 48 48
20 Bd de Suisse
98000 MONACO

An injunction focused on preventing misuse of what the parties agreed in their Sales Representative Agreement and their Exclusive Distributor Agreement is IPAC's Confidential Information is the appropriate scope of injunctive relief. An injunction focused on preventing competition regardless whether or not IPAC's Confidential Information is being misused is not the appropriate scope of injunctive relief.

Regarding the topic of to whom may an injunction apply, "while the law generally forbids courts [or arbitrators] from naming nonparties [in an injunction], the law does in certain circumstances permit a court to *enforce* an injunction against a nonparty." *Hassel v. Bird*, 5 Cal. 5th 522, 550 (2018)(Kruger, J. concurring)(original italics). "Without such a rule, enjoined parties could "play jurisdictional 'shell games'"; that is, they could "nullify an injunctive decree by carrying out prohibited acts with or through nonparties to the original proceeding." *Id., quoting People v. Conrad*, 55 Cal.App.4th 896, 902 (1997). "For that reason, as [the California Supreme Court] observed more than a century ago, even though injunctions '[o]rdinarily' run only to the named parties in an action, it is 'common practice to make the injunction run also to classes of persons through whom the enjoined party may act, such as agents, servants, employees, aiders, abetters, etc., though not parties to the action.'" *Id., quoting Berger v. Superior Court* 175 Cal. 719, 721 (1917) ("*Berger*"). As explained in *Berger*, non-parties may be bound by an injunction where they have knowledge of the injunction, are servants or agents of the enjoined party, or act "'in combination or collusion with them or assertion of their rights or claims.'" *Id.* at 722, quoting *Rigas v. Livingson* (1904) 178 N.Y. 20, 24). Such non-parties who violate the terms of the injunction "with notice thereof are held guilty of contempt for disobedience of the judgment." *Berger*, 721 Cal. at 721; accord, *e.g., Regal Knitwear Co. v. Board*, 324 U.S. 9, 14 (1945)("*Regal Knitwear*").

California law is clear and well-settled that injunctions may be enforced against a non-party who has notice of the injunction and who aided, abetted, or otherwise acted in concert with or support of the enjoined party to violate the injunction. Again, the California Supreme Court has explained for over a century that "[i]n matters of injunction, however, it has

been a common practice to make the injunction run also to classes of persons through whom the enjoined party may act, such as agents, servants, employees, aiders, abettors, etc., though not parties to the action, and this practice has always been upheld by the courts, and any of such parties violating its terms with notice thereof are held guilty of contempt for disobedience of the judgment". *Berger,* 175 Cal. at 721. The purpose "is simply to make the injunction effectual against all through whom the enjoined party may act," thereby preventing the acts prohibited in the injunction from being carried out by other persons acting in concert with or in support of the enjoined party. *Id.* (italics omitted).

The California Supreme Court has continued to reaffirm in modern times this long-standing principle of California law. *Ross v. Superior Court* 19 Cal.3d 899, 908–909 (1977) (*"Ross"*)(concluding that nonparties were subject to an injunction as agents of the named defendants); *In re Berry* 68 Cal.2d 137, 155–156 (1968) (*"Berry"*) (recognizing that "injunctive orders to persons 'in active concert or participation with' specifically named parties defendant is approved by long-standing custom and practice").

United States federal law similarly provides that non-parties may be enjoined. The United States Supreme Court explained over one hundred twenty (120) years ago that it is immaterial whether a non-party had notice of the application for injunction or was actually served with a copy of the injunction so long as he had actual notice of the issuing of an injunction by the court. *In re Lennon* 166 U.S. 548, 554 (1897)(*"Lennon"*). This rule was affirmed by the United States Supreme Court in *Regal Knitwear.* Non-parties "who receive actual notice" of the injunction and are "in active concert or participation" with the enjoined party may be bound by its terms. *See Regal Knitwear,* 324 U.S. at 15 (whether an injunction may be enforced against a non-party "depends on an appraisal of his relations and behavior and not upon mere construction of terms of the order"). Likewise, as established by the Federal Rules of Civil Procedure issued under federal statute, non-parties may be bound by an injunction. Fed. R. Civ. P. 65(d)(2)(issued pursuant to 28 U.S.C. 2072); *Blockowicz v. Williams,* 630 F.3d 563, 567 (7th Cir. 2010) (*"Blockowicz"*).

Patricia EMILIAUD-PALMERO
Huissier
Tél. 57 77 49 48

*Berger, Ross,* and *Berry* among other authorities, clearly establish that under California law courts may enforce an injunction against a non-party. *Regal Knitwear, Lennon, Blockowicz* and Fed. R. Civ. P. 65(d)(2)(issued pursuant to 28 U.S.C. 2072) clearly establish the same principle under United States federal law.  A non-party subject to enforcement of such an injunction must have notice of it, and must have aided, abetted, or acted in concert with the enjoined party or in participation with it or in support of it or in combination with it or in collusion with it or in conspiracy with it, whether as aiders, abettors, co-conspirators, agents, servants, employees or otherwise, in violating the injunction.  Evidentiary findings assessing a non-party's notice and acts in concert or participation with an enjoined party may occur at a contempt hearing before an appropriate Court having jurisdiction, when the Plaintiff or Claimant seeks to enforce the injunction against a non-party. *See Ross,* 19 Cal.3d at 903–904; *Regal Knitwear,* 324 U.S. at 16.

If any non-party to this arbitration later contends that the injunction issued in this Final Award, after confirmation by Court(s) having jurisdiction, may not be enforced against such non-party to this arbitration solely because it or he or she was not within the arbitral jurisdiction of the Arbitrator in ruling on IPAC's claims in this arbitration or was not named as a Respondent in this arbitration, that contention would be unsupported by either California law or United States federal law.  *See, e.g., Berger, Ross, Berry, Regal Knitwear, Lennon, Blockowicz* and Fed. R. Civ. P. 65(d)(2)(issued pursuant to 28 U.S.C. 2072); *see also Hassel,* 5 Cal. 5th at 586 (Cuéllar, J. and Stewart J. dissenting)("Yelp's contention that it may not be enjoined because it was not named as a defendant in Hassell's underlying claim is unsupported by California or federal law")(In *Hassel,* a plurality opinion of the California Supreme Court based its reversal of the lower court's decision enforcing an injunction as against non-party Yelp on application of the Communications Decency Act, 47 U.S.C.§ 230, a statute which is irrelevant to this arbitration).

There may be various persons and/or entities who are non-parties to this arbitration but who, depending upon whatever facts may be shown in post-award enforcement proceedings in

Court(s) having jurisdiction, may be in violation of the injunction issued herein after notice of it is given to such persons and/or entities and after this Final Award is confirmed by such Court(s) as a Judgment of such Court(s) if such persons and/or entities do not timely come into compliance with the injunction. Enforcement of the injunction as to any such persons and/or entities is necessarily the province of such Court(s). In that regard, the Arbitrator notes that all of the potential such persons and/or entities who were identified in the evidence in this arbitration are located in either the United States or in other nations which are likewise Contracting States in the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (New York, 10 June 1958) and the Courts of which are subject thereto and subject to carrying out the expedited enforcement mechanisms established thereby.

### Exemplary Damages

IPAC seeks an award of exemplary damages. In doing so, IPAC primarily relies on California Civil Code Section 3294. That statutory section, however, applies to "an action for the breach of an obligation not arising from contract,...". Cal. Civ. Code Section 3294. The obligations at issue in this arbitration partly arise from contract. To that extent, exemplary damages are not available here under Section 3294. IPAC also relies on California Civil Code Section 3426.3(c). That statutory section says that a court [or an arbitrator] "may award" exemplary damages for misappropriation of trade secrets if willful and malicious misappropriation exists. The Arbitrator therefore has discretion to award exemplary damages under California Civil Code Section 3426.3(c) if its requirements are met. Black Gold has engaged in "misappropriation" within the meaning of California Civil Code Section 3426.1(b). Black Gold has engaged in "willful" misappropriation within the meaning of California Civil Code Section 3426.3(c). Whether Black Gold has engaged in "malicious" misappropriation within the meaning of California Civil Code Section 3426.3(c) is a closer call. But whether Black Gold's conduct was "malicious" or not need not be decided, as the Arbitrator hereby

exercises his discretion to not award exemplary damages under California Civil Code Section 3426.3(c).

### Attorneys' Fees, Arbitration Costs and Expenses, and Arbitrator Compensation

The arbitration rules agreed to by the parties include provisions addressing the topics of attorneys' fees, arbitration costs and expenses, and arbitrator compensation. Rules at R-47(c), R-47(d), R-53, R-54, and R-55.  Preliminary Order No. 13 called those rules to the parties' attention.

"In the final award, the arbitrator shall assess the fees, expenses, and compensation provided in Sections R-53, R-54, and R-55. The arbitrator may apportion such fees, expenses, and compensation among the parties in such amounts as the arbitrator determines is appropriate." Rule R-47(c).  In turn, Rule R-53 further addresses administrative fees, Rule R-54 further addresses expenses and Rule R-55 further addresses arbitrator compensation.  Regarding attorneys' fees, Rule R-47(d)ii provides as follows:

"(d) The award of the arbitrator(s) may include:...
      ii.    an award of attorneys' fees if all parties have requested such an award or it is authorized by law or their arbitration agreement."

In this arbitration, all parties have repeatedly and consistently requested an award of attorneys' fees – in the Claimant's Demand for Arbitration, in the Claimant's Amended Detailed Statement of Claims, in the Respondent's Answer to the Amended Detailed Statement of Claims, in each party's pre-hearing brief, in each party's post-hearing brief and in each party's post-hearing reply brief.

The parties' Exclusive Distributor Agreement further provides in Section XVI.E., in pertinent part, that in any arbitration under the arbitration agreement therein:

"The costs of the proceeding, including the fees and costs of attorneys, accountants, and witnesses, and the compensation of the arbitrators, shall be assessed by the arbitrators against the parties according to the arbitrators' determination of fault."

In this arbitration, Respondent Black Gold is the party at fault within the meaning of the above-quoted part of the parties' Exclusive Distributor Agreement. *See* Procedural Order No. 13. The parties' Sales Representative Agreement provides that "[e]ach party shall bear its costs" in any arbitration. Sales Representative Agreement at Section 19. That is irrelevant, however, as the same amount of costs would have been incurred by Claimant arbitrating under the Exclusive Distributor Agreement alone as were incurred by Claimant arbitrating under both it and the Sales Representative Agreement.

Claimant has submitted an application seeking US$307,138.65 in fees and costs of attorneys, accountants, and witnesses. The other item within Exclusive Distributor Agreement Section XVI.E., arbitrator compensation, is readily capable of calculation without application by Claimant, as stated in Procedural Order No. 13, and is also addressed in the Rules at R-47(c) and R-55.

Respondent has submitted its opposition to Claimant's application. Respondent's opposition focuses largely on arguing that Claimant should not receive as much in attorneys' fees as Claimant seeks, considering that only the Exclusive Distributor Agreement has an attorneys' fee term and the Sales Representative Agreement does not. Respondent's opposition, however, entirely ignores Rule R-47(d). Most notably, Respondent's opposition ignores Rule R-47(d)ii. As stated above, that Rule -- to which the parties agreed in their arbitration terms in both the Sales Representative Agreement and the Exclusive Distributor Agreement – provides that an award of attorneys' fees may be made "*if all parties have requested such an award* or it is authorized by law or their arbitration agreement." Rule R-47(d)ii (emphasis added). Meeting that applicable standard, all parties have repeatedly and consistently requested an award of attorneys' fees – in the Claimant's Demand for Arbitration, in the Claimant's Amended Detailed

Page 31 of 38

Patricia ESMALO-PALMERO
Hussier
Tel. 97 27 48 48
SOCLO MONACO

Statement of Claims, in the Respondent's Answer to the Amended Detailed Statement of Claims, in each party's pre-hearing brief, in each party's post-hearing brief and in each party's post-hearing reply brief.

Respondent's opposition to Claimant's cost application, at page 14 lines 23-27, misreads part of Preliminary Order No. 13 and makes incorrect assumptions based on that misreading. The nature and extent of Respondent's misreading and incorrect assumptions are addressed above in the reasoning for this Final Award, and so they need not be separately addressed here.

Respondent submitted various evidentiary objections with its opposition to Claimant's cost application. Those objections are overruled. Rule R-34(b). Moreover, the arbitration rules to which the parties agreed in their two agreements provide that "[c]onformity to legal rules of evidence shall not be necessary." Rule R-34(a).

The Arbitrator has considered Claimant's application and Respondent's opposition to it. The amount of US$305,138.65 for the costs of the proceeding, consisting of the fees and costs of attorneys, accountants, and witnesses and the amount of the compensation of the arbitrator, as addressed below, are hereby determined appropriate to award pursuant both to the applicable Rules R-47(c), R-47(d)ii and R-54 and Exclusive Distributor Agreement Section XVI.E. But Claimant's requested amount of US$2,000 for travel and meal expenses of two of Claimants' witnesses is not sufficiently proven, for two reasons, and therefore will not be awarded. First, those witnesses live and work in the same metropolitan area where the arbitration hearing was conducted. No explanation was provided for why US$2,000 for local travel and meal expenses was incurred or why those would be appropriate expenses. Second, contrary to the requirement of Preliminary Order No. 13 at 3:4-10, Claimant did not submit any invoice copies supporting its request for that US$2,000 amount. Respondent also opposes reimbursement for $1,505.89 for travel, hotel, food and reprographic costs in connection with the parties' agreed-upon deposition of Black Gold in New York. Respondent questions whether the charge might have been for IPAC's Alan Krock to attend the deposition. But the invoice from Claimant's law firm, together

with the declaration of Claimant's counsel, adequately establishes that amount for Claimant's counsel to travel from San Francisco to New York and related expenses for that deposition.

The award of attorneys' fees herein, calculated without specific allocation as to which of the two agreements specific portions of attorneys' fees were incurred under, is hereby determined pursuant to Rule R-47(d)ii to be independently appropriate, notwithstanding that the Sales Representative Agreement has no attorney fee term. All parties have repeatedly requested such an attorneys' fees award throughout this arbitration. Rule R-47(d)ii.

## CONFIDENTIALITY DESIGNATION ISSUE

Respondent's counsel designated a portion of the merits hearing testimony as "Highly Confidential – Attorneys' Eyes Only" under the Stipulated Protective Order in effect in this arbitration. That portion of testimony was by Black Gold's CEO Mr. Napoleoni and it related to the topics of PXL lab facilities, certain of PXL's revenue, certain of PXL's customers, and certain of PXL's product formulation activities. Tr. 537:10-538:3 and 560:9-570:6 (hereinafter "the designated testimony").

Claimant IPAC requests that the designated testimony be "down-designated" to non-confidential, or at least to "Confidential", rather than remaining designated as "Highly Confidential – Attorneys' Eyes Only". Claimant argues, *inter alia*, that "[o]therwise, IPAC will be left in the incongruous position of having proved that its confidential information has been used, but no way of pursuing relief against other parties, in particular PXL's outsourced blending unit." Claimant's Post-Hearing Brief at 45:14-16. Claimant IPAC has further challenged the designation of the designated testimony, using the procedure for doing so which the parties stipulated to and the Arbitrator approved in Preliminary Order No. 6 – Stipulated Protective Order (November 5, 2018). Respondent Black Gold was given an opportunity to further respond to Claimant IPAC's challenge of the designation of the designated testimony.

Panda's EPIS AUO-PALMERO

Respondent Black Gold asserts that the designated testimony was properly designated under the Stipulated Protective Order and that it should remain designated "Highly Confidential – Attorneys' Eyes Only". In its main post-hearing briefing, Respondent Black Gold did not state any substantive grounds for those assertions. Respondent's Reply Closing Arbitration Brief at 36:2-10. It its response to Claimant IPAC's challenge to Black Gold's designation, however, Respondent Black Gold cites various California precedent in support of its designation and argues that the situation here is analogous to that precedent.

When Respondent's two counsel at the hearing of this arbitration designated the designated testimony under the Stipulated Protective Order, they made no statement about on whose behalf they were designating it. Black Gold's briefing likewise does not clearly so state. The information contained in the designated testimony appears not to belong to Black Gold, but rather to one or both of the Non-Party PXL companies. No argument on behalf of either or both of the Non-Party PXL companies has been submitted identified as such in this arbitration. That said, however, the witness who gave the designated testimony was Mr. Napoleoni who is both the CEO of Respondent Black Gold and the Managing Director of non-party PXL Chemicals BV. Respondent Black Gold's counsel have reconfirmed, in response to Claimant IPAC's challenge, that Mr. Napoleoni wishes for the challenged designation to be maintained.

Parts of the designation as to the designated testimony which Respondent's counsel have made under the Stipulated Protective Order appear appropriate as to the Non-Party PXL companies. The Stipulated Protective Order provides that information designated as "CONFIDENTIAL" means that information which qualifies for protection under the California Code of Civil Procedure. Preliminary Order No. 6 at para. 2.2. The Stipulated Protective Order provides that information designated as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" means extremely sensitive information that could be otherwise designated as "CONFIDENTIAL", disclosure of which to another Party or Non-Party would create a substantial risk of serious harm that could not be avoided by less restrictive means. Preliminary

Order No. 6 at para. 2.7.   The designated testimony -- except two points of information -- appears to be information which qualifies for protection for the Non-Party PXL companies under the California Code of Civil Procedure as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" under the Stipulated Protective Order.  The identity and location of the company which was the "blending unit" named in the designated testimony, regarding PXL products which Dr. Wooton has persuasively testified were knock-offs of IPAC products, however, are not information that would be protected under the California Code of Civil Procedure – which is the standard the parties selected and adopted in the Stipulated Protective Order.  Preliminary Order No. 6 at para. 2.2. The parties agreed in the Stipulated Protective Order that the designating party must bear the burden of persuasion on any challenge to the designation.  Preliminary Order No. 6 at 8:24-25.  Respondent has not carried that burden of persuasion as to the identity and location of that "blending unit" company, which have not been shown to have any legitimate need, or lawful authority, for confidentiality under Preliminary Order No. 6 – Stipulated Protective Order (November 5, 2018).

The Stipulated Protective Order provides that the Arbitrator may direct a change in the treatment of information designated under it.  Preliminary Order No. 6 – Stipulated Protective Order (November 5, 2018) at page 4 line 14; page 9 lines 3 and 14; page 10 line 12; page 15 lines 26-27.  The testimony in the hearing transcript at page 566 lines 22-24 and at page 567 line 14 through page 568 line 2 is hereby de-designated and is no longer subject to any protection under Preliminary Order No. 6 – Stipulated Protective Order (November 5, 2018).   The remainder of the challenged designated testimony in the transcript of the February 6, 2019 hearing is hereby maintained in its initial designation as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" under Preliminary Order No. 6 – Stipulated Protective Order (November 5, 2018).

Patricia GRIMAUD PALMERO
Huissier

Tel. 377 7 93 48
20 Bd de S.... ...
98000 MONACO

* * * * * * *

## AWARD

For the reasons stated above, I award as follows:

1.     "IPAC Confidential Information" as used herein is defined on page 11 of this Final Award.  Respondent Black Gold S.a.r.l. , herein referred to as "Black Gold",  and any and all persons or entities acting in concert with it or in participation with it or in support of it or in combination with it or in collusion with it or in conspiracy with it, whether as aiders, abettors, co-conspirators, agents, servants, employees or otherwise, are permanently enjoined from:

(a) making, marketing or selling any product formulated or otherwise made using IPAC Confidential Information;

(b) otherwise using any IPAC Confidential Information;

(c) disclosing to any other persons or entities any IPAC Confidential Information;

(d) possessing any IPAC Confidential Information, other than Black Gold's counsel possessing a copy of materials produced in this arbitration;

(e) to the extent, if any, not already enjoined in paragraphs 1(a) – 1(d) above, taking any other action prior to January 1, 2024 that would violate Section 12 of the Sales Representative Agreement (which Section survives pursuant to Paragraph 4 of the Termination Agreement); and

(f) to the extent, if any, not already enjoined in paragraphs 1(a) – 1(d) above, taking any action at any time that would violate Section VIII.B. of the Exclusive Distributor Agreement (which provides, *inter alia*, that "[t]he parties shall not, at any time either during the term of this Agreement or thereafter, divulge to any person, firm, or corporation any of the [IPAC] Confidential Information received by it during the term of this Agreement).

2.     Respondent Black Gold shall pay to Claimant International Petroleum Products and Additives Company, Inc., herein referred to as "IPAC", damages in the sum of

US$687,702.56, and this amount is therefore included in the Final Total Amount stated in paragraph 5 below.

3.     Respondent Black Gold shall pay to Claimant IPAC the sum of **US$305,138.65** in recovery of the costs of the proceeding, including the fees and costs of attorneys, accountants, and witnesses, and this amount is therefore included in the Final Total Amount stated in paragraph 5 below.

4.     The administrative fees and expenses of the American Arbitration Association's International Centre for Dispute Resolution ("ICDR") totaling **US$18,975.00** and the compensation and expenses of the Arbitrator totaling **US$100,038.01** shall be borne by Respondent Black Gold. Therefore, Respondent shall reimburse Claimant the sum of **US$101,352.37** representing that portion of said fees and expenses in excess of the apportioned costs previously advanced by Respondent. This amount is therefore included in the Final Total Amount stated in paragraph 5 below.

5.     Within thirty (30) days from the date of transmittal of this Final Award to the Parties, Respondent Black Gold shall pay to Claimant IPAC the Final Total Amount of **US$1,094,193.58.**

6.     This Final Award is in full settlement of all claims submitted in this Arbitration. Any claims not expressly granted herein are denied.

I hereby certify that, for the purposes of Article 1 of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in San Francisco, California, United States of America.

Dated: May __, 2019

_____
Arbitrator Mark C. Dosker

Patricia GRIMAUD-PALMERO
Huissier
Tel. 97 77 48 49
93000 MONACO

Commonwealth of Massachusetts

County of Dukes County

}

SS:

I, Mark C. Dosker, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Final Award.

Dated: May ___, 2019

_____
Arbitrator Mark C. Dosker

Commonwealth of Massachusetts

County of Dukes County

}

SS:

On this 26 day of May 2019, before me personally came and appeared Mark C. Dosker, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public

BRYANN DARCY
NOTARY PUBLIC
COMMONWEALTH OF MASSACHUSETTS
MY COMMISSION EXPIRES ON
MARCH 16, 2023

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of California

| | |
|---|---|
| International Petroleum Products and Additives Company, Inc. <br><br> _____ <br> *Plaintiff(s)* <br> v. <br> Black Gold S.A.R.L. <br><br> _____ <br> *Defendant(s)* | ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action No.  3:19-cv-03004  JCS |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Black Gold S.A.R.L.
6, Lacets Saint-Leon
98000
Monaco

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:    Vinay V. Joshi
Amin Turocy & Watson LLP
160 West Santa Clara Street
Suite 975
San Jose, CA 95113

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*
Susan Y. Soong



Date:  June 4, 2019                                                                        Signature of Clerk or Deputy Clerk

Patricia GRIMAUD-PALMERO
Huissier
Tél. 97 77 48 48
70 Bd de Suisse
98000 MONACO

# T R A D U C T I O N

Affaire 3:19-cv-03004-JCS   Document 13   Déposé le 04/06/19   Page 1 de 1

AO 440 (Rév. 06/12) Citation à comparaître dans une action civile

## TRIBUNAL DE DISTRICT DES ÉTATS-UNIS

pour le

District du nord de la Californie

| | |
|---|---|
| International Petroleum Products and Additives Company, Inc. | ) ) ) ) |
| *Demandeur(s)* | ) |
| c. | ) Action civile n° 3:19-cv-03004 JCS |
| Black Gold S.A.R.L. | ) ) ) |
| *Défendeur(s)* | ) ) |

### CITATION À COMPARAÎTRE DANS UNE ACTION CIVILE

À : *(Nom et adresse du Défendeur)*   Black Gold
S.A.R.L. 6, Lacets
Saint-Léon
98000.
Monaco

Une action en justice a été intentée contre vous.

Dans les 21 jours suivant la signification de cette convocation (sans compter le jour où vous l'avez reçue), ou 60 jours si vous êtes un représentant des États-Unis ou d'une agence américaine, ou un dirigeant ou employé des États-Unis tel que décrit dans les Règles de procédure civile fédérales P. 12 (a)(2) ou (3), vous devez signifier au Demandeur une réponse à la plainte ci-jointe ou une requête en vertu de la règle 12 des Règles de procédure civile fédérales. La réponse ou la requête doit être signifiée au Demandeur ou à son avocat, dont le nom et l'adresse sont :   Vinay V. Joshi
Amin Turocy & Watson LLP
160 West Santa Clara Street
Suite 975
San Jose, CA 95113

Si vous ne répondez pas, un jugement par défaut sera prononcé contre vous pour la réparation demandée dans la plainte.   Vous devez également déposer votre réponse ou votre requête auprès du tribunal.

*GREFFIER DU TRIBUNAL, Susan Y. Soong*

Date : <u>4 juin 2019</u>

*Signature du Greffier ou Greffier-Adjoint*

## *ATTESTATION DE TRADUCTION EXACTE*

Je soussignée, Catherine Lewi, certifie en toute bonne foi que la traduction ci-dessus en langue française a été faite par moi-même en ma qualité de Traductrice professionnelle certifiée d'anglais en français par l'ATA (American Translators Association) et représente la version complète et conforme du document original en langue anglaise.

*Catherine Lewi – New York, NY 10028 – USA*
*Tél. : +1-858-401-0127 - e-mail : catherine.lewi@yahoo.com*

Verify at www.atanet.org/verify

_____

**Signature**

28 JUILLET 2019
_____

**Date**

STATE OF NEW YORK, COUNTY OF NEW YORK

This foregoing instrument was acknowledged before me
this ___ day of _____, 201_ by CATHERINE LEWI

Charmaine Raphael, Notary Public 01RA6217552
COMMISSION EXPIRES FEBRUARY 16, 2022