# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **INTERNATIONAL PETROLEUM PRODUCTS AND ADDITIVES COMPANY, INC.,** <br><br> Petitioner, <br><br> vs. <br><br> **BLACK GOLD, S.A.R.L.,** <br><br> Respondent. | CASE NO. 19-cv-03004-YGR <br><br> **ORDER GRANTING MOTION TO CONFIRM ARBITRAL AWARD AND DENYING COUNTER-MOTION TO VACATE, MODIFY, OR CORRECT ARBITRATION AWARD** <br><br> Re: Dkt. Nos. 2, 27 |

Petitioner International Petroleum Products and Additives Company, Inc. ("IPAC") filed this motion to confirm the arbitral award against respondent Black Gold, S.A.R.L. ("Black Gold") issued by Mark C. Dosker of the American Arbitration Association ("AAA"). Thereafter, Black Gold filed an opposition and counter-motion requesting that the Court vacate, or in the alternative, modify and/or correct the arbitration award.[1]

Having carefully considered the papers submitted, and for the reasons set forth more fully below, the Court **GRANTS** IPAC's motion and **DENIES** Black Gold's counter-motion.[2]

---

[1] See Dkt. No. 2 ("Motion"); Dkt. No. 20 ("Opp."). IPAC submitted a reply in support of its motion (Dkt. No. 31 ("IPAC Reply")), after which Black Gold submitted a reply in support of its opposition and counter-motion (Dkt. No. 32 ("Black Gold Reply").) On October 3, 2019, IPAC filed an administration motion to file a sur-reply, which the Court hereby **GRANTS**. (Dkt. No. 36.)

[2] IPAC's objection to evidence submitted by Black Gold in its reply is **OVERRULED**. (Dkt. No. 35.) The relevant evidence, a redacted version of a reply brief submitted by Black Gold

## I. BACKGROUND

The following background is taken from the Petition and the Final Award of the Arbitrator unless otherwise noted.[3]

IPAC is a petroleum additives developer and manufacturer based in Dublin, California. Black Gold is a Monegasque company that sells and distributes petroleum products and additives. Its sole employees and shareholders are husband and wife, Lorenzo and Sophia Napoleoni.

### A. The Contracts

The current dispute arises out of three contracts which were intended to govern Black Gold's role as sales representative and distributor for IPAC. The first contract, the "Sales Representative Agreement," became effective on January 1, 2016. Pursuant to Section 1 of this agreement, Black Gold became the sales representative for a number of IPAC's existing and prospective customers. Section 5(a) provided a term of three years and an automatic renewal for an additional three years, unless properly terminated earlier. The second contract, the "Exclusive Distributor Agreement," also became effective January 1, 2016, and Section XV provided for a one-year term (expiring January 1, 2017) unless properly terminated earlier. Thereunder, Black Gold was designated the exclusive distributor of certain IPAC products for several preexisting IPAC customers. Section VII and Schedule B contemplated that Black Gold would develop additional opportunities to sell IPAC products in the petroleum additives resale market. Both agreements required Black Gold to maintain the confidentiality of IPAC's confidential information[4] and contained arbitration agreements. (Sales Representative Agreement, § 19;

---

to the arbitrator, is not attorney work product, nor is Black Gold prohibited from providing the full reply brief even though it references only portions of the brief in this matter. Moreover, IPAC was able to respond through the filing of its sur-reply. The Court notes, however, that this evidence will not be considered as record evidence concerning what occurred at the merits hearing.

[3] Dkt. Nos. 1, 4-3.

[4] Section VIII.B of the Exclusive Distributor Agreement defined "confidential information" as "information disclosed to the Distributor by IPAC or information disclosed to IPAC by Distributor, or known by the Distributor and IPAC as a consequence of, or through, the affiliation with each other, not generally known in the industry in which IPAC and Distributor are active or may become engaged." Section 12 of the Sales Representative Agreement defined

Exclusive Distributor Agreement, § XVI(E).)

On March 1, 2018, the parties terminated the Sales Representative Agreement with a Termination Agreement and Mutual Release. (Dkt. No. 16, Ex. A ("Termination Agreement").) The Termination Agreement purported to release both parties "from and against any and all actions, claims, suits, payment obligations (except as otherwise expressly set forth in Section 4 []) or other obligations or liabilities of any nature whatsoever, whether known or unknown . . . directly or indirectly arising out of (or in connection with) the [Sales Representative] Agreement[.]" (*Id*. § 3.) Notably, Section 4 of the Termination Agreement, to which the release provision cited, provided that sections 8, 12, and 13 of the Sales Representative Agreement would "continue in accordance with their original terms beyond termination of the Agreement." (*Id*. § 4.)[5] Further, it did not contain a general release under California Civil Code section 1542.

### B. The Arbitration Proceedings

On May 7, 2018, approximately two months after the parties terminated their relationship, IPAC filed an arbitration demand before AAA, claiming that Black Gold and the Napoleonis breached the Sales Representative and Exclusive Distributor Agreements, their duty of good faith and fair dealing, and their duty of loyalty. IPAC also pursued claims for tortious interference with contractual relations and misappropriation of trade secrets. Specifically, IPAC alleged that during the term of the agreements, Black Gold's CEO, Mr. Napoleoni, formed a competitor company (PXL) with the help of an ex-IPAC employee, using "sensitive and confidential IPAC information." IPAC alleged that revenues from IPAC customer accounts assigned to Black Gold suffered as a result of Mr. Napoleoni's work for PXL. IPAC further alleged that after termination, Black Gold retained IPAC confidential information and failed to make any effort to transfer to

---

"confidential information" as "including but not limited to, sales information, identity of customers and prospective customers, quantity and kind of Products shipped or sold, prices and methods of pricing, Product returns, unannounced products, confidential product and process information, and other such information which, if disclosed to others, would be detrimental to the best interests of IPAC."

[5] Sections 8, 12, and 13 of the Sales Representative Agreement addressed the return of any IPAC property held by Black Gold, non-disclosure of IPAC's confidential information, and the limitation of liability and indemnification of Black Gold, respectively.

3

IPAC viable business with respect to Black Gold's distribution customers, all in violation of their agreements. IPAC sought damages, attorneys' fees and costs, and injunctive relief.

On September 17, 2018, Arbitrator Dosker issued Preliminary Order No. 3, wherein he determined that he had arbitral jurisdiction over IPAC's claims brought under the Sales Representative and Exclusive Distributor Agreements. (Dkt. No. 16, Ex. B ("Prelim. Order"), at 3-6.) Specifically, Arbitrator Dosker determined that "[t]he Termination Agreement did not end the continuing obligations of the Sales Representative Agreement associated with its Sections 8, 12, and 13," and thus, he had arbitral jurisdiction over claims arising out of the Sales Representative Agreement. (*Id*. at 3, 8.) Likewise, Arbitrator Dosker found that certain "pertinent obligations under the Exclusive Distributor Agreement continue[d] after the duration of that agreement." (*Id*. at 6.) Arbitrator Dosker found, however, that he lacked arbitral jurisdiction over the claims brought against the Napoleonis and the claim arising under the Termination Agreement. (*Id*. at 6-7.)

Thereafter, IPAC and Black Gold participated in a three-day arbitration hearing. On May 29, 2019, following the hearing and briefing by the parties, Arbitrator Dosker issued an arbitration award in favor of IPAC. In his order, Arbitrator Dosker found that Black Gold, through Mr. Napoleoni, breached sections 8 and 12 of the Sales Representative Agreement and sections VIII.B. and XV.C. of the Exclusive Distributor Agreement. Specifically, Arbitrator Dosker made the following factual findings:

During the term of the parties' agreements, Mr. Napoleoni discussed with then-IPAC employees Steven Plitt and Dr. Jeffrey Crow the formation of a new business to compete with IPAC. Despite Dr. Crow raising concerns that it would be difficult to form such a business without misusing IPAC's confidential information, Messrs. Napoleoni and Plitt proceeded to form PXL, a company that formulated, made, marketed, and sold products that directly competed with IPAC's products. Further, IPAC's expert, whom the arbitrator found to be experienced, independent, and accurate, testified that PXL's products were "so strikingly similar to IPAC's products that they [could] be called knock-off products." (Final Award at 21.) Messrs. Napoleoni and Plitt formed PXL while in possession of hundreds of documents containing IPAC's

4

confidential information. For example, during the relevant period, Mr. Plitt e-mailed himself a confidential, password-protected Microsoft Excel file detailing the identity, vendor, price, and relative composition for each component in each of IPAC's products.

In light of the evidence, the arbitrator concluded that Black Gold, through Mr. Napoleoni, caused IPAC's confidential information to be misappropriated and misused to formulate, make, market, and sell PXL products, which in turn, caused a decline in IPAC's sales. (*Id.*) Black Gold failed to "cooperate with IPAC, to surrender all records to IPAC, and to do whatever [was] reasonably required by IPAC in order to continue a viable business with IPAC customers served by the distributor." (*Id.* at 20-21.)

Accordingly, Arbitrator Dosker ordered Black Gold to pay IPAC $1,094,193.58, comprised of $687,702.56 in damages, $305,138.65 in fees and costs, and $101,352.37 in AAA fees and costs. In addition, he enjoined Black Gold from, among other things, using or disclosing IPAC's confidential information.

## II. LEGAL STANDARD

Section 9 of the Federal Arbitration Act ("FAA") provides that when presented with an application to confirm an arbitration award, the district court "must grant an order unless the award is vacated, modified, or corrected." 9 U.S.C. § 9. "'Neither erroneous legal conclusions nor unsubstantiated factual findings justify a federal court review of an arbitral award[.]'" *Bosack v. Soward*, 586 F.3d 1096, 1102 (9th Cir. 2009) (quoting *Kyocera v. Prudential-Bache T Servs.*, 341 F.3d 987, 994 (9th Cir. 2003) (en banc)). Rather, grounds for vacating an award are limited to those specified by statute. *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 584 (2008) (holding Section 10 provides the FAA's exclusive grounds for vacatur of an arbitration award). Thus, the role of the courts in reviewing arbitration awards is extremely circumscribed. *Southern California Gas Co. v. Utl. Workers Union of Am., Local 132, AFL-CIO*, 265 F.3d 787, 792 (9th Cir. 2001) (citing *Stead Motors v. Auto. Machinists Lodge*, 886 F.2d 1200, 1208 n.8 (9th Cir. 1989) (en banc)). The confirmation of an arbitration award is meant to be a summary proceeding. *G.C. & K.B. Invs., Inc. v. Wilson*, 326 F.3d 1096, 1105 (9th Cir. 2003).

The FAA authorizes courts to vacate an award when (1) the award was procured by

5

corruption, fraud, or undue means; (2) there was evident partiality or corruption in the arbitrators, or either of them; (3) the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or any other misbehavior by which the rights of any party have been prejudiced; or (4) the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter was not made. 9 U.S.C. § 10(a).

**III. ANALYSIS**

IPAC requests that the Court confirm the arbitration award on the grounds that its motion to confirm was timely filed and none of the exceptions to confirmation are applicable. In addition, IPAC contends that it is entitled to attorneys' fees and costs post-dating the arbitral award. Black Gold counters that the Court should vacate, modify, or amend the arbitration award on the grounds that (a) the award was procured by corruption, fraud, or undue influence, and (b) the arbitrator exceeded his powers.[6] The Court considers each in turn.[7]

**A. Corruption, Fraud, Or Undue Means**

Black Gold argues for vacatur on the grounds the award was procured by corruption, fraud, or undue means.[8] For a claim of fraud, the objecting party must show by clear and convincing evidence that the fraud was not discoverable by due diligence before or during the proceeding, and

---

[6] Black Gold purports to bring its motion on grounds that "Arbitrator Dosker acted in manifest disregard for the law and completely irrationally; acted in manifest disregard of the agreements between the parties; did not adhere to legal principles specified by the parties' agreements; . . . exceeded his powers under the parties' agreements; and[] violated fundamental and accepted legal norms." Throughout the cross-motion, Black Gold conflates these grounds for seeking vacatur. Here, the Court considers Black Gold's cross-motion within the FAA's framework based on the Court's understanding of Black Gold's argument.

[7] As a general matter, the Court notes that Black Gold submitted only a short declaration, a copy of the termination agreement, and a copy of Preliminary Order No. 3 in support of its opposition and counter motion, stating that it did not attach any of the relevant portions of the record "[b]ecause of the [] Stipulated Protective Order, and out of an abundance of caution." (Opp. at 3, n.2.) Further, as IPAC emphasizes, Black Gold makes numerous contentions about the arbitral proceedings that are unsupported by any evidence. The Court can, and will, only analyze the pending motions based on the evidentiary record before it.

[8] Case law often merges these concepts.

6

materially related to the submitted issue. *A.G. Edwards & Sons, Inc. v. McCollough,* 967 F.2d 1401, 1404 (9th Cir. 1992), *cert. denied,* 506 U.S. 1050 (1993) (citing *Lafarge Conseils Et Etudes, S.A. v. Kaiser Cement & Gypsum Corp.,* 791 F.2d 1334, 1339 (9th Cir. 1986)).  An appearance of impropriety is not sufficient to establish fraud or bias under the FAA. *Arizona Elec. Power Co-op. v. Berkeley,* 59 F.3d 988, 993 (9th Cir. 1995).  Further, to vacate an award on the grounds of "undue means," the proponent must show that the ground of "undue means" was not discoverable before the award was made and that it caused the award to be given. *Id.* at 1404.  Courts will vacate an award only where the objecting party has demonstrated that the misconduct actually prejudiced the party's rights. *Weiner v. Original Talk Radio Network Inc.*, No. 10-CV-05785 YGR, 2013 WL 1856568, at *7 (N.D. Cal. May 2, 2013), *aff'd*, 620 F. App'x 568 (9th Cir. 2015).

Black Gold asserts three specific objections.  While ostensibly proffered under the corruption, fraud, and undue means exception, each is more aptly described as disagreements with evidentiary rulings not sufficient to support vacatur.  Thus:

### 1. *Plitt Email and Attachment*

First, Black Gold contends that the arbitrator improperly admitted and considered as evidence an email and attachment that Mr. Plitt sent to himself, which purportedly was never authenticated or subject to cross-examination by a knowledgeable witness.

As to authentication, Preliminary Order No. 4, issued by Arbitrator Dosker prior to the merits hearing, provided that "[f]ormal rules of evidence shall not apply in the merits hearing of this arbitration" and "[t]he authenticity of documents shall be presumed unless a specific objection is raised." (Dkt. No. 31-7, ¶ 20.)  When the referenced email was introduced during the hearing, Black Gold's counsel objected, then agreed with the arbitrator that it would address the objection in post-hearing briefing.  (Dkt. No. 31-3 at 9.)[9]  It is not clear whether Black Gold raised this objection during post-briefing but, in either event, such an evidentiary objection does not support a finding of fraud or undue means.

---

[9] Conformity to the legal rules of evidence is not necessary under the AAA rules.  *See* AAA Commercial Rule R-34(a).

With respect to cross-examination, IPAC presents evidence demonstrating that the referenced email and its attachment were introduced during the direct examination of Dr. Crow, one of IPAC's witnesses, who Black Gold's counsel cross-examined. Black Gold's counsel also cross-examined IPAC's CEO, Brian Cereghino, about the document's attachment.[10] Thus, Black Gold had the opportunity to cross-examine multiple witnesses regarding the substance of the email at issue.

Because the arbitrator was entitled to admit and consider the email at issue, this is not a basis for vacatur of the arbitration award.

*2. Attorneys' Fee Determination*

Second, Black Gold argues that IPAC presented insufficient evidence to support the attorneys' fees award, and Black Gold was not given an opportunity to cross-examine or rebut any of the evidence submitted.

Pursuant to Preliminary Order Nos. 13 and 14, IPAC submitted a costs application requesting attorneys' fees in connection with the arbitration. (Dkt. No. 31-16.) In addition, it submitted both declarations regarding counsel's professional backgrounds including billing rates and heavily redacted billing statements. (*Id*.) Upon review of IPAC's application, Arbitrator Dosker asked for clarification because, while the time entries for February 2019 corresponded to the timing of the merits hearing, the subject line on the invoices referred to "Steven Plitt" with no reference to Black Gold. (Dkt. No. 31-17.) IPAC's counsel then explained in a sworn declaration that the reference to Mr. Plitt was due to a glitch in the firm's accounting software and that the attorneys' fee calculation only included fees related to the arbitration against Black Gold. (Dkt. No. 31-19.) Notwithstanding evidentiary objections raised by Black Gold, which the arbitrator considered and overruled (Final Award at 32), the arbitrator found the fees appropriate.

---

[10] The arbitrator also found that Mr. Napoleoni appeared to concede that he used the attachment to formulate PXL products, thereby damaging his credibility and the persuasiveness of Black Gold's arguments. (Final Award at 18.) Such arbitral assessments regarding witness credibility are not matters for judicial review. *See Pac. Vegetable Oil Corp. v. C.S.T., Ltd.*, 29 Cal. 2d 228, 238 (1946) ("The form and sufficiency of the evidence, and the credibility and good faith of the parties, in the absence of corruption, fraud or undue means in obtaining an award, are not matters for judicial review.").

Black Gold fails to carry its burden of showing that Arbitrator Dosker acted inappropriately in granting IPAC's fees request. IPAC provided multiple sworn declarations and invoices in support of its request, which under Black Gold's own cases, suffice to support a fees award. *See Concepcion v. Amscan Holdings, Inc.*, 223 Cal.App.4th 1309, 1325 (2014) (noting that movant may support a fees motion with "declarations or redacted or unredacted timesheets or billing records"). Further, Arbitrator Dosker appears to have reviewed the materials submitted, as evidenced by his asking IPAC for additional information and declining to award $2,000 in costs. Moreover, even assuming California law applied, as Black Gold contends, Arbitrator Dosker was not required to hold a hearing on the fees motion. *See Schlessinger v. Rosenfeld, Meyer & Susman*, 40 Cal.App.4th 1096, 1105 (1995).[11] Even if he was so required, Black Gold provided no evidence that it was prejudiced by Arbitrator Dosker not doing so. The Court discerns no basis for a finding of fraud or undue means upon which to vacate this portion of the Final Award.

Accordingly, the arbitration award is not subject to vacatur, modification, or correction based on Arbitrator Dosker's attorneys' fees determination.

*3. Citation to Materials Outside of the Hearing*

Black Gold further avers that the arbitration award improperly included two records procured by the arbitrator outside of and after the merits hearing, namely: (i) PXL Chemicals LLC's articles of incorporation, filed with the Ohio Secretary of State's office, which was cited by the arbitrator for the proposition that PXL was formed in Ohio on January 10, 2017; and (ii) a website, which was cited for the proposition that PXL held itself out to the market and the general public on the internet at www.pxlchemicals.com and has offices in Ohio and the Netherlands. (*See* Final Award at 14.)

---

[11] General choice-of-law provisions like those in the Sales Representative and Exclusive Distributor Agreements do not require the use of state procedural or evidentiary rules where the agreements also refer to specific arbitration rules. *See Diamond Foods, Inc. v. Hottrix, LLC*, No. 14-CV-03162-BLF, 2018 WL 3008562, at *7 (N.D. Cal. June 15, 2018) (express incorporation of California substantive law and AAA rules "does not show that the parties intended to incorporate state procedural rules on arbitration") (citing *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52 (1995)). Here, the agreements refer to the AAA rules, and thus, the arbitrator appropriately applied those rules when considering attorneys' fees and costs.

9

In general, "[i]f a neutral arbitrator intends to base an award upon information not obtained at the hearing, he [must] disclose the information to all parties to the arbitration." *Shaffer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 779 F. Supp. 2d 1085, 1089-90 (N.D. Cal. 2011). However, a party seeking to vacate an arbitration award based on corruption, fraud, or undue means must show "substantial prejudice." *Canadian Indem. Co. v. Ohm,* 271 Cal.App.2d 703, 708 (Cal.Ct.App. 1969). In *Ohm,* for example, an arbitrator obtained independent bids from subcontractors to help him ascertain the amount of damages at issue. *Id.* at 706. The court held that the award was not subject to vacatur, however, because even that extent of independent investigation did not substantially prejudice the parties. *Id.* at 708; *see also Shaffer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 779 F. Supp. 2d 1085, 1089-90 (N.D. Cal. 2011) (hiring of two attorneys by arbitrator to do legal research was not prejudicial).

Here, Black Gold has not demonstrated that it was substantially prejudiced by the arbitrator's citation to two outside sources. There was ample evidence introduced during the hearing establishing that Mr. Plitt formed PXL while the Sales Representative Agreement was in effect. (Dkt. No. 31-3, 2019:23-211:19; Dkt. No. 31-20.) Black Gold does not establish that the specific date and location of the company's formation was material to the arbitrator's decision, such that Black Gold was prejudiced by reference to the articles of incorporation. Similarly, even if the webpage cited by the arbitrator was not admitted into evidence, numerous pages from PXL's website, which contained overlapping information, were properly admitted into evidence. (Dkt. No. 31-22.) In any event, the proposition for which the webpage was cited does not appear to have caused the arbitrator to render a decision in IPAC's favor, and thus, Black Gold has not shown that it was prejudiced.

Accordingly, Black Gold has not established that the arbitrator's reference to materials outside of the hearing warrants vacatur of the arbitration award.

### B. Exceeding Scope of Arbitrator's Powers

Black Gold next argues that the arbitration award must be overturned because Arbitrator Dosker exceeded his powers. Arbitrators exceed their powers only if an arbitration award constitutes a "manifest disregard for the law" or is "completely irrational." *Comedy Club, Inc. v.*

10

*Improv W. Associates*, 553 F.3d 1277, 1288 (9th Cir. 2009). "'Manifest disregard of the law' means something more than just an error in the law or a failure on the part of the [arbitrator] to understand or apply the law. It must be clear from the record that the [arbitrator] (1) recognized the applicable law and then (2) ignored it." *Michigan Mut. Ins. Co. v. Unigard Sec. Ins. Co.*, 44 F.3d 826, 832 (9th Cir. 1995) (internal quotations omitted). That is, the moving party must demonstrate that the arbitrator "'underst[oo]d and correctly state[d] the law, but proceed[ed] to disregard the same.'" *Bosack*, 586 F.3d at 1102 (quoting *Collins v. D.R. Horton, Inc.*, 505 F.3d 874, 879 (9th Cir. 2007) (alterations in original). An award is completely irrational if it fails to "draw its essence from the agreement." *Comedy Club*, 553 F.3d at 1288. This standard is satisfied if the arbitrator is arguably interpreting the contract and that interpretation is "plausible." *Lagstein v. Certain Underwriters at Lloyd's,* London, 607 F.3d 634, 643 (9th Cir. 2010).

The Court addresses each of Black Gold's three arguments that Arbitrator Dosker exceeded his powers namely by issuing an injunction that violates California public policy as codified in Business and Professions Code section 16600; issuing a decision based on claims that were released by the Termination Agreement, and de-designating portions of Mr. Napoleoni's trial testimony.

*1. Violation of Section 16600*

Black Gold contends that the arbitration award should be vacated because the injunction violates California public policy as codified in Business and Professions Code section 16600. Section 16660 provides, in relevant part, that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." California courts, however, have repeatedly recognized an "exception" to the rule where trade secret information may be used to redirect business away from one business to another. *See Wanke, Indus., Commercial, Residential, Inc. v. Keck*, 209 Cal. App. 4th 1151, 1174 (2012) ("[C]ourts have repeatedly held a former employee may be barred from soliciting existing customers to redirect their business away from the former employer and to the employee's new business *if the employee is utilizing trade secret information to solicit those customers.*") (emphasis in original) (quoting *The Ret. Grp. v. Galante*, 176 Cal. App. 4th 1226, 1237 (2009)).

11

Under such circumstances, although a court may not, under section 16600, enjoin the act of engaging in a competing business, *the misuse of trade secrets* may be enjoined. *See Galante*, 176 Cal. App. 4th at 1238 ("[S]ection 16600 bars a court from specifically enforcing (by way of injunctive relief) a *contractual* clause purporting to ban a former employee from soliciting former customers . . . , but a court may enjoin *tortious* conduct . . . by banning the former employee from using trade secret information to identify existing customers, to facilitate the solicitation of such customers, or to otherwise unfairly compete with the former employer.") (emphasis in original); *Hollingsworth Solderless Terminal Co. v. Turley* 622 F.2d 1324, 1338 (9th Cir. 1980) ("We think the applicable California law is that the employer will be able to restrain by contract only that conduct of the former employee that would have been subject to judicial restraint under the law of unfair competition, absent the contract.") (internal quotation marks omitted).

Here, in discussing injunctive relief, Arbitrator Dosker noted that "[a]n injunction focused on preventing misuse of what the parties agreed in their Sales Representative Agreement and their Exclusive Distributor Agreement is IPAC's Confidential Information is the appropriate scope of injunctive relief. An injunction focused on preventing competition regardless [of] whether or not IPAC's Confidential Information is being misused is not the appropriate scope of injunctive relief." (Final Award at 26.) Consistent with this approach, Arbitrator Dosker enjoined Black Gold from:

> (a) making, marketing or selling any product formulated or otherwise made using IPAC Confidential Information;
> (b) otherwise using any IPAC Confidential Information;
> (c) disclosing to any other persons or entities any IPAC Confidential Information;
> (d) possessing any IPAC Confidential Information, other than Black Gold's counsel possessing a copy of materials produced in this arbitration;
> (e) to the extent, if any, not already enjoined in paragraphs l(a)- l(d) above, taking any other action prior to January 1, 2024 that would violate Section 12 of the Sales Representative Agreement (which Section survives pursuant to Paragraph 4 of the Termination Agreement); and
> (f) to the extent, if any, not already enjoined in paragraphs l(a) – l(d) above, taking any action at any time that would violate Section VIII.B. of the Exclusive Distributor Agreement (which provides, *inter alia,* that "[t]he parties shall not, at any time either during the term of this Agreement or thereafter, divulge to any person, firm, or corporation any of the [IPAC] Confidential Information received by it during the term of this Agreement).

(Final Award at 36.)[12] Importantly, the injunction does not prohibit Black Gold from engaging in competitive business activities generally. Rather, it is appropriately limited in scope to prevent future breaches of the parties' agreements or Black Gold's improper use of materials gained from its past breaches.[13] Accordingly, the injunction does not violate the public policy objectives of section 16600, and the arbitration award may not be vacated on this basis.[14]

---

[12] The injunction is also limited to a set of persons and entities who might act on behalf of Black Gold, namely, "any and all persons acting in concert with [Black Gold] or in participation with it or in support of it or in combination with it or in collusion with it or in conspiracy with it, whether as aiders, abettors, co-conspirators, agents, servants, employees or otherwise . . . ." (Final Award at 36; *see also* Fed. R. Civ. P. 65(d)(2) (persons bound by an injunction may include "the parties' officers, agents, servants, employees, and attorneys," as well as "other persons who are in active concert or participation with [the parties]").)

[13] The cases on which Black Gold relies fail to persuade. For example, in *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 946 n.4 (2008), the court explicitly found that it was not required to "address the applicability of the so-called trade secret exception to section 16600." Additionally, *The Ret. Grp. v. Galante*, 176 Cal. App. 4th 1226 (2009), as previously cited, actually supports *IPAC's* argument that an arbitrator may enjoin tortious conduct without violating section 16600. Finally, in *Robinson v. Jardine Ins. Brokers Int'l Ltd.*, 856 F. Supp. 554 (N.D. Cal. 1994), the court did not analyze the potential trade secret exception because defendant had not even attempted to identify a trade secret.

Black Gold's reliance on the "inevitable disclosure" doctrine likewise is unavailing. The arbitrator's award was not based on the mere possession or inevitable disclosure of IPAC's confidential information, but rather, that the confidential information *actually* was "misappropriated and misused to formulate and make and market and sell PXL products." (Final Award at 20.) The arbitrator's order set forth in detail his weighing of the evidence and testimony presented, which led to this conclusion. To the extent Black Gold asserts that IPAC acted in "bad faith" by bringing this action only to prevent competition in violation of section 16600, such argument is not appropriately before this Court as it does not sit as a fact finder.

[14] In its reply brief, Black Gold argues that Arbitrator Dosker failed to make a predicate determination that the information misappropriated by Black Gold constituted "trade secrets." Black Gold does not persuade. Although the arbitrator used the term "trade secret" infrequently in his final decision, he discussed at length his finding that Black Gold had misappropriated IPAC's "Confidential Information," defined in part as information "not generally known in the industry." (Final Award at 11.) He noted that certain misappropriated materials were accessed through IPAC's "restricted network" that was intended only for legitimate business purposes. (Final Award at 4.) He further cited evidence that IPAC's sales suffered "a steep and otherwise unexplained drop-off" due to Black Gold's action, demonstrating the economic value of the misappropriated information. These findings are sufficient to show that the arbitrator's finding was not a "manifest disregard of the law" regarding the law on trade secret misappropriation. Further, as noted in the Final Award, Black Gold misconstrued the applicability of California

*2. Mutual Release of Claims*

Black Gold argues that petitioner's claims for breach of the duty of loyalty, breach of the duty of good faith and fair dealing, tortious interference with contractual relations, and trade secret misappropriation could not be arbitrated as they were released by the March 2018 Termination Agreement's mutual release clause in Section 3. That clause stated, in relevant part, that Black Gold and IPAC released one another "from and against any and all actions, claims, suits, payment obligations . . . or other obligations or liabilities of any nature whatsoever, whether known or unknown . . . directly or indirectly arising out of (or in connection with) the [Sales Representative] Agreement[.]" (Termination Agreement, § 3.) *Expressly excluded* from the mutual release were obligations associated with sections 8, 12, and 13 of the Sales Representative Agreement, which the Termination Agreement provided would "continue in accordance with their original terms beyond termination of the Agreement." (*Id*. § 4.) Although the Exclusive Distributor Agreement terminated on January 1, 2017, the Termination Agreement did not reference it.

Arbitrator Dosker found that each of IPAC's claims, except for a single claim arising under the Termination Agreement, arose out of or related to the surviving obligations of either the Sales Representative Agreement or the Exclusive Distributor Agreement and were not released. (Final Award at 2-3, 11.) Black Gold challenges that finding. Arbitrator Dosker explained:

> [T]he Termination Agreement makes no reference to the Exclusive Distributor Agreement . . . [its] integration term is limited to superseding and governing over all prior proposals, agreements, or other communications between the parties, oral or written, regarding 'the subject matter contained herein' . . . 'the subject matter contained herein' within the meaning of [the] Termination Agreement Section is not the Exclusive Distributor Agreement.

(Prelim. Order, at 5-6.) To avoid review, an arbitrator's interpretation need only be "plausible." *Lagstein*, 607 F.3d at 643. Arbitrator Dosker's interpretation suffices: any claims arising under obligations of the Exclusive Distributor Agreement which survived termination of that agreement were unaffected by the subsequent Termination Agreement and thus, within his authority to

---

discovery rules related to the identification of trade secrets prior to trial. This evidentiary rule allows parties to crystalize claims but it need not be followed in arbitrations where the rules provide otherwise.

14

decide.[15]

As it pertains to the Sales Representative Agreement, Black Gold argues that IPAC's breach of duty and tort claims do not arise out of or relate to the agreement's surviving sections. It further argues that its claims were released by the Termination Agreement because IPAC did not establish that it became aware of the facts giving rise to its claims *after* termination.

Arbitrator Dosker held that the Termination Agreement did not preclude him from deciding IPAC's claims arising under sections 8, 12 and 13 of the Sales Representative Agreement, as those sections were expressly carved out of the mutual release. (Prelim. Order at 4.) Further, he noted that the language of the arbitration clause in section 19 of the Sales Representation Agreement was broader than that of the Termination Agreement section 6.b. and encompassed the claims at issue. (*Id*. at 4, n.1.)[16] Finally, Arbitrator Dosker held that IPAC's claims were not precluded by termination because California Civil Code section 1542, which precludes a party from releasing unknown claims, applied. (Final Award at 10.)[17]

---

[15] This included obligations arising under sections VIII.B. and XV.C. of the Exclusive Distributor Agreement. Section XV.C. provides, in relevant part: "[Black Gold] agrees to co-operate with IPAC, to surrender all records to IPAC, and to do whatever is reasonably required by IPAC in order to continue a viable business with IPAC the customers served by [Black Gold][.]"

Black Gold misconstrues Arbitrator Dosker's holding in Preliminary Order No. 3 by arguing that there, the arbitrator found that the scope of the arbitration proceeding only involved claims arising out of sections 8, 12, and 13 of the Sales Representative Agreement and section VIII.B. of the Exclusive Distributor Agreement. Rather, the arbitrator cited to Section VIII.B. for the proposition that "[p]ertinent obligations" from the Exclusive Distributor Agreement would continue after termination (Prelim. Order, at 6), but did not foreclose the possibility that other obligations would also continue.

[16] Section 6.b. of the Termination Agreement provided: "This Termination Agreement shall be interpreted, construed and enforced in all respects in accordance with the laws of the State of California, without regards to its conflicts of laws principal. Each party irrevocably consents to the exclusive jurisdiction of the courts of California *in connection with any action to enforce the provisions of this Termination Agreement or arising under or by reason of this Termination Agreement*. (Emphasis supplied.) Section 19 of the Sales Representative Agreement provided, in pertinent part, that "[a]ny dispute or controversy between the parties *arising out of or relating to this Agreement* . . . shall be submitted to arbitration[.]"

[17] California Civil Code Section 1542 provides: "A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected

15

Again, the Court finds Arbitrator Dosker's interpretation of the agreements plausible. Although the Arbitrator's Final Award does not state which specific claims arose under Sales Representative Agreement sections 8, 12, and 13 and Exclusive Distributor Agreement sections VIII.B. and XV.C., his analysis of the scope of his arbitral jurisdiction "draws its essence" from the express language of the three agreements. *Comedy Club*, 553 F.3d at 1288. Further, the claims at issue in the arbitration all plausibly arise out of unreleased claims, namely, Black Gold's obligations to return IPAC's property, retain the confidentiality of IPAC's information, and help IPAC continue viable business with customers Black Gold serviced. (*See* Sales Representative Agreement §§ 8, 12; Exclusive Distributor Agreement §§ VIII.B., XV.C.) Moreover, the absence of a section 1542 waiver in the Termination Agreement and the presence of such waivers in other IPAC agreements establish that IPAC did not intend to waive any claims of which it was unaware. (Final Award at 10.) Black Gold does not persuade that Arbitrator Dosker exceeded his authority in reaching this conclusion.

Reduced to its essence, Black Gold disagrees with Arbitrator Dosker's evidentiary findings and his application of relevant law. Nothing suggests that the arbitrator understood the law and disregarded it. *Michigan Mut. Ins. Co.*, 44 F.3d at 832. Respondent's challenges are inadequate to justify vacatur by this Court. *See Bosack v. Soward*, 586 F.3d 1096, 1102 (9th Cir. 2009) ("Neither erroneous legal conclusions nor unsubstantiated factual findings justify federal court review of an arbitral award") (quoting *Kyocera*, 341 F.3d at 994).

    *3.    De-Designation of Trial Testimony*

Finally, Black Gold contends that the arbitration award must be vacated, modified, or corrected because Arbitrator Dosker exceeded his powers by de-designating portions of Mr. Napoleoni's trial testimony from "Highly Confidential—Attorneys' Eyes Only" to "Confidential."[18]

Here, Arbitrator Dosker de-designated portions of the testimony regarding the identity and

---

his or her settlement with the debtor or released party."

[18] Black Gold's position in this regard is elusive, but the Court, as discussed herein, finds no error or basis to vacate, modify, or correct the award.

location of PXL's "blending unit," finding that Black Gold had not carried its burden of showing that this particular testimony was protected under the California Code of Civil Procedure, which governed privilege designations. (Final Award at 33-35.)[19] In support of its argument that de-designation was improper, Black Gold cites to cases establishing that sensitive trade secret information may be designated "attorneys' eyes only." Black Gold fails, however, to provide any evidence that the particular testimony at issue, consisting of less than two pages of the trial transcript, was so sensitive that disclosure would create a risk of serious harm that could not be avoided by less restrictive means. In other words, Black Gold falls far short of satisfying its burden of demonstrating that the arbitrator manifestly disregarded the law or acted completely irrationally. Accordingly, it is not entitled to vacatur, modification, or correction of the arbitration award on this ground.

## IV. CONCLUSION

The FAA requires that the Court grant an application to confirm and arbitration award "unless the award is vacated, modified, or corrected." 9 U.S.C. § 9. For the foregoing reasons, the Court **ORDERS** as follows:

(1) IPAC's motion is **GRANTED** and Black Gold's counter-motion is **DENIED**; and

(2) the final arbitration award in *International Petroleum Products and Additives Company, Inc v. Black Gold S.A.R.L.*, AAA Case No. 01-18-0001-9728, dated May 30, 2019, is **CONFIRMED**.

The Court will issue a judgment by separate order. IPAC shall file a proposed form of judgment, approved as to form, by no later than five (5) business days after the date of this order. Any request for attorneys' fees and costs shall comply with the process outlined in Local Rule 54.[20]

---

[19] In its briefing before the arbitrator, IPAC requested that approximately 11 pages of testimony regarding PXL's lab facilities, revenue, customers, revenue, or product formulation activities be de-designated. The arbitrator de-designated approximately two pages of the testimony at issue here and maintained the "Attorneys' Eyes Only" designation as to the other testimony. (Final Award at 33-35.)

[20] IPAC is entitled to its attorneys' fees and costs for activities post-dating the arbitration

17

This Order terminates Docket Numbers 2 and 27.

**IT IS SO ORDERED.**

Dated: November 8, 2019

_____
**YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT COURT JUDGE**

---

award, including those related to the instant petition and motion. *See Ajida Techs., Inc. v. Roos Instruments, Inc.*, 87 Cal.App.4th 534, 552 (2001) ("[A] contract provision that permits the recovery of fees in arbitration is broad enough to include fees in related judicial proceedings, including an appeal from the judgment confirming the award."); *Stermer v. Modiano Constr. Co.*, 44 Cal.App.3d 264, 272-273 (1975) ("This dispute was to enforce the terms of the contract; the arbitration award was to enforce the terms of the contract; and this action to confirm the award is also to enforce the terms of the contract. [The prevailing party] is entitled to a reasonable amount for its attorney's fees in this action . . . and this appeal.").